# Whether the Second Amendment Secures an Individual Right

The Second Amendment secures a right of individuals generally, not a right of states or a right restricted to persons serving in militias.

August 24, 2004

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

I. The Unsettled Legal Landscape ........................................................................ 128

II. Textual and Structural Analysis ..................................................................... 136
    A. "The Right of the People" ......................................................................... 136
    B. "To Keep and Bear Arms" ........................................................................ 139
        1. "To Keep . . . Arms" ........................................................................ 140
        2. "To . . . Bear Arms" ......................................................................... 142
    C. "A Well Regulated Militia, Being Necessary to the Security of a Free
    State" ........................................................................................................... 144
        1. The Limits of Prefatory Language ................................................... 145
        2. The "Militia" ................................................................................... 149
        3. The "Well Regulated" Militia ......................................................... 154
        4. The "Security of a Free State" ......................................................... 157
    D. Structural Considerations ......................................................................... 161
        1. The Bill of Rights ............................................................................ 161
        2. The Militia Powers .......................................................................... 163

III. The Original Understanding of the Right to Keep and Bear Arms ............... 165
    A. The Right Inherited From England ........................................................... 166
    B. The Right in America Before the Framing ............................................... 174
        1. The Experience of the Revolution ................................................... 174
        2. Early Constitutional Recognition of the Right ................................ 179
    C. The Development of the Second Amendment ........................................... 185
        1. Recommendations From the Ratification of the Original
           Constitution ..................................................................................... 186
        2. The Drafting and Ratification of the Second Amendment ............... 193

IV. The Early Interpretations ............................................................................. 203
    A. The First Commentators ........................................................................... 204
    B. The First Cases ......................................................................................... 210
        1. Cases Before 1840 ........................................................................... 210
        2. Cases From 1840 to the Civil War .................................................. 213
    C. Reconstruction .......................................................................................... 223
    D. Beyond Reconstruction ............................................................................ 226

V. Conclusion ..................................................................................................... 230

The Second Amendment of the Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." You have asked for the opinion of this Office on one aspect of the right secured by this Amendment. Specifically, you have asked us to address the question whether the right secured by the Second Amendment belongs only to the states, only to persons serving in state-organized militia units like the National Guard, or to individuals generally. This memorandum memorializes and expands upon advice that this Office provided to you on this question in 2001.

As relevant to the question addressed herein, courts and commentators have relied on three different interpretations of the Second Amendment. Under the "individual right" view, the Second Amendment secures to individuals a personal right to keep and to bear arms, whether or not they are members of any militia or engaged in military service or training. According to this view, individuals may bring claims or raise challenges based on a violation of their rights under the Second Amendment just as they do to vindicate individual rights secured by other provisions of the Bill of Rights.[1] Under the "collective right" view, the Second Amendment is a federalism provision that provides to states a prerogative to establish and maintain armed and organized militia units akin to the National Guard, and only states may assert this prerogative.[2] Finally, there is a range of intermediate views according to which the Amendment secures a right only to select persons to keep and bear arms in connection with their service in an organized state militia such as the National Guard. Under one typical formulation, individuals may keep arms only if they are "members of a functioning, organized state militia" and the state has not provided the necessary arms, and they may bear arms only "while and as a part of actively participating in" that militia's activities.[3] In essence, such a view would allow a private cause of action (or defense) to some persons to vindicate a state's power to establish and maintain an armed and organized militia such as the National Guard.[4] We therefore label this group of intermediate positions the "quasi-collective right" view.

The Supreme Court has not decided among these three potential interpretations, and the federal circuits are split. The Executive Branch has taken different views over the years. Most recently, in a 2001 memorandum to U.S. Attorneys, you endorsed the view that the Second Amendment protects a "'right of individuals, including those not then actually a member of any militia or engaged in active military service or training, to privately possess and bear their own firearms'" but allows for "reasonable restrictions" designed "to prevent unfit persons from

---

[1] *See, e.g.*, *United States v. Emerson*, 270 F.3d 203, 220, 260 (5th Cir. 2001).

[2] *See, e.g.*, *Silveira v. Lockyer*, 312 F.3d 1052, 1060–61, 1086–87 (9th Cir. 2002).

[3] *Emerson*, 270 F.3d at 219 (describing intermediate view); *see also, e.g.*, *Cases v. United States*, 131 F.2d 916, 923 (1st Cir. 1942).

[4] *See, e.g.*, *United States v. Parker*, 362 F.3d 1279, 1283 (10th Cir. 2004).

possessing firearms or to restrict possession of firearms particularly suited to criminal misuse."[5]

As developed in the analysis below, we conclude that the Second Amendment secures a personal right of individuals, not a collective right that may only be invoked by a state or a quasi-collective right restricted to those persons who serve in organized militia units. Our conclusion is based on the Amendment's text, as commonly understood at the time of its adoption and interpreted in light of other provisions of the Constitution and the Amendment's historical antecedents. Our analysis is limited to determining whether the Amendment secures an individual, collective, or quasi-collective right. We do not consider the substance of that right, including its contours or the nature or type of governmental interests that would justify restrictions on its exercise, and nothing in this memorandum is intended to address or call into question the constitutionality, under the Second Amendment, of any particular limitations on owning, carrying, or using firearms.

This memorandum proceeds in four parts. Part I addresses the current unsettled state of the law in this area. Part II demonstrates that the text and structure of the Constitution support the individual right view of the Second Amendment. Part III shows why this view finds further support in the history that informed the understanding of the Second Amendment as it was written and ratified. Finally, Part IV examines the views of commentators and courts closest to the Second Amendment's adoption, which reflect an individual right view, and then concludes by describing how the modern alternative views of the Second Amendment took hold in the early twentieth century.

## I. The Unsettled Legal Landscape

Recent interpretations of the Second Amendment have been characterized by disagreement and uncertainty. The Supreme Court has not decided the question that we address here, and at least three views prevail in the federal courts of appeals. The Executive Branch has taken varying positions, and the Amendment has been the subject of extensive academic debate for the past two decades.

The Supreme Court's most important decision on the meaning of the Second Amendment, *United States v. Miller*,[6] grew out of the enactment of the National Firearms Act of 1934.[7] That Act was the first federal regulation of private

---

[5] Memorandum for United States Attorneys from the Attorney General, *Re: United States v. Emerson* (Nov. 9, 2001) (quoting *Emerson*, 270 F.3d at 260), *reprinted in* Brief for the United States in Opposition, App., *Emerson v. United States*, 536 U.S. 907 (2002) (No. 01-8780) (denying certiorari). You added that the Department of Justice "can and will continue to defend vigorously the constitutionality, under the Second Amendment, of all existing federal firearms laws."

[6] 307 U.S. 174 (1939).

[7] Ch. 757, 48 Stat. 1236.

firearms.[8] It taxed (and thereby registered) transfers of sawed-off shotguns or rifles capable of being concealed, machine guns, and silencers. It also taxed dealers in such weapons and required anyone who possessed such a weapon acquired before 1934 to register it with federal tax authorities.

A Second Amendment challenge to this Act produced *Miller* in 1939, the closest that the Supreme Court has come to interpreting the substance of the Amendment. Miller and a co-defendant were indicted for transporting an unregistered sawed-off shotgun in interstate commerce from Oklahoma to Arkansas, and the district court sustained their Second Amendment challenge to the indictment. On appeal by the government, neither defendant appeared or filed a brief.[9] The Court, in reversing and remanding, held that the sawed-off shotgun was not among the "Arms" protected by the Second Amendment absent "evidence tending to show that" its use or possession "at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia." Citing an 1840 decision of the Tennessee Supreme Court, *Aymette v. State*, the Court concluded that it was not "within judicial notice" that a sawed-off shotgun was a weapon that was "any part of the ordinary military equipment" or whose use "could contribute to the common defence." Absent evidence, therefore, the Court could not "say that the Second Amendment guarantees the right to keep and bear such an instrument."[10]

After this one-paragraph discussion, the Court quoted the powers that Article I, Section 8, Clauses 15 and 16 of the Constitution grant to Congress to provide for calling forth, organizing, arming, and disciplining "the Militia," and stated that the Second Amendment's "declaration and guarantee" were made "[w]ith obvious purpose to assure the continuation and render possible the effectiveness of" the militia, and that the Amendment "must be interpreted and applied with that end in view."[11] The Court then added a historical discussion demonstrating that "the term Militia" as used in various provisions of the Constitution, including the Second Amendment, referred to a body that "comprised all males physically capable of acting in concert for the common defense," who "were expected to appear" for occasional training "bearing arms supplied by themselves and of the kind in common use at the time," which in the 1700s usually meant a "good" musket of proper length.[12]

*Miller* did not resolve the question addressed in this memorandum. Although the meaning of the decision is much debated, three points appear evident. First, the

---

[8] *See National Firearms Act: Hearings on H.R. 9066 Before the House Comm. on Ways and Means*, 73d Cong. 90 (1934) (statement of Ass't Att'y Gen. Keenan); *United States v. Lopez*, 2 F.3d 1342, 1348 (5th Cir. 1993), *aff'd*, 514 U.S. 549 (1995).

[9] 307 U.S. at 175–77.

[10] *Id*. at 178 (citing *Aymette v. State*, 21 Tenn. (2 Hum.) 154, 158 (1840)). We discuss *Aymette* below in Part IV.B.2.

[11] *Id*.

[12] *Id.* at 179; *see id*. at 179–82 (describing militia regulations, including arms requirements).

holding was limited to the meaning of "Arms" in the Second Amendment and whether a sawed-off shotgun is among the arms protected. In determining that meaning, the Court also interpreted the term "Militia" as used in the Constitution. Second, the Court did not categorically reject Miller's Second Amendment challenge. The Court's decision to address the substance of this challenge to his indictment, as opposed to concluding that only states could bring such a challenge, appears to be inconsistent with a collective right view.

Finally, the Court did not clearly decide between the individual right and quasi-collective right views. Its holding regarding the meaning of "Arms" is consistent with either view: The Court's limitation of "Arms" to those weapons reasonably related to the preservation or efficiency of a well-regulated militia (such as those that are "part of the ordinary military equipment" or that "could contribute to the common defense") could be consistent with a right to "keep and bear" such arms that is restricted to service in an organized military unit such as the National Guard; but that holding is also consistent with an individual right to keep and bear whatever "Arms" the Amendment protects. Similarly, the Court's reference to the need to interpret the Second Amendment's "declaration and guarantee" with the "end in view" of furthering "the continuation and render[ing] possible the effectiveness of" the militia could be consistent with a quasi-collective right view; but it is also consistent with the understanding of the relationship between an individual right to keep and bear arms and the "Militia" that prevailed at the time of the Founding, an understanding confirmed by early authorities' discussions of the Second Amendment's preface.[13]

Even so, absent from the Court's opinion in *Miller* was any discussion of whether the defendants were members of the National Guard or any other organized military force, whether they were transporting the shotgun in the service of such a force, or whether they were "physically capable of" bearing arms in one and thus even eligible for service. The nature of the weapon at issue, not of the defendants or their activities, appeared to be the key fact, and this aspect of the opinion tends to point toward the individual right view rather than the quasi-collective right view. In addition, *Miller*'s broad reading of "Militia" is most consistent with the individual right view, as we explain below in Part II.C.2, and is in tension with the quasi-collective right view, under which the militia is understood to refer to select military units, akin to the modern National Guard, organized and armed by the states.[14]

---

[13] See below Parts II.C (discussing Second Amendment's preface), III.B–C (discussing Founders' recognition that the individual right to arms furthered the citizen militia), IV.A (discussing early commentators), IV.B.2 (discussing early cases), IV.D (discussing views of Thomas Cooley soon after Civil War).

[14] Later opinions of the Supreme Court appear to accept the individual right view, at least in dicta, although none is dispositive. In *Johnson v. Eisentrager*, 339 U.S. 763 (1950), the Court rejected a claim that the Fifth Amendment's criminal procedure protections applied to nonresident enemy aliens by pointing out, among other things, that a contrary view would require also applying the "companion

Three years after *Miller*, in *Cases v. United States*, the First Circuit read *Miller* to turn solely on the type of weapon at issue and to suggest an individual right view of the Second Amendment: "Apparently, then, under the Second Amendment [as interpreted in *Miller*], the federal government . . . cannot prohibit the possession or use of any weapon which has any reasonable relationship to the preservation or efficiency of a well regulated militia." But the court doubted that *Miller* "was attempting to formulate a general rule applicable to all cases," warned of the consequences of such a view, and asserted that it was "unlikely that the framers of the Amendment intended any such result."[15] The court, instead, adopted what amounted to a quasi-collective right view: A person has no right under the Second Amendment unless he is "a member of a[] military organization" or uses his weapon "in preparation for a military career," thus "contributing to the efficiency of the well regulated militia."[16] Neither in support of its assertion about the Framers' intent nor in its paragraph fashioning this rule did the court cite any text or other authority.

Also in 1942, the Third Circuit in *United States v. Tot* applied *Miller*'s definition of "Arms" to affirm the conviction of a defendant who received a pistol in interstate commerce after having been convicted of a felony involving violence.[17] Alternatively, the court rested its affirmance on the ground that the government may prohibit such a convict from possessing a firearm.[18] Although either of these

---

civil-rights Amendments" in the Bill of Rights, including the Second Amendment. *Id*. at 784 ("during military occupation irreconcilable enemy elements, guerrilla fighters, and 'werewolves' could require the American Judiciary to assure them freedoms of speech, press, and assembly as in the First Amendment, right to bear arms as in the Second, security against 'unreasonable' searches and seizures as in the Fourth, as well as rights to jury trial as in the Fifth and Sixth Amendments"). In *Konigsberg v. State Bar of Cal.*, 366 U.S. 36 (1961), the Court, citing *Miller*, again equated the Second Amendment right with the rights secured by the First Amendment. *Id*. at 49 n.10. More recent cases have assumed an individual right in dicta by listing the Second Amendment right among the personal rights composing the "liberty" that the Constitution's due process provisions protect. *See Planned Parenthood v. Casey*, 505 U.S. 833, 847 (1992); *Moore v. City of East Cleveland*, 431 U.S. 494, 502 (1977) (plurality opinion) (quoting *Poe v. Ullman*, 367 U.S. 497, 542–43 (1961) (Harlan, J., dissenting)); *id*. at 542 (White, J., dissenting) (same as plurality). *But see Adams v. Williams*, 407 U.S. 143, 150 (1972) (Douglas, J., dissenting) ("A powerful lobby dins into the ears of our citizenry that these gun purchases are constitutional rights protected by the Second Amendment," but "[t]here is no reason why all pistols should not be barred to everyone except the police."). The Court in *Lewis* v. *United States*, 445 U.S. 65 (1980), rejected an equal protection challenge to a prohibition against felons possessing firearms. In a one-sentence footnote explaining why it was applying rational basis review, the Court stated that such a prohibition is not "based upon constitutionally suspect criteria" and does not "trench upon any constitutionally protected liberties." *Id*. at 65 n.8. Although this language is consistent with the view that the Second Amendment does not secure a right of individuals, it is also consistent with the traditional understanding of the individual right view that the liberty protected by the Second Amendment does not extend to convicted felons. See notes 19 & 29 below, and the discussions referenced therein.

[15] 131 F.2d 916, 922 (1st Cir. 1942).

[16] *Id*. at 923.

[17] 131 F.2d 261, 266 (3d Cir. 1942), *rev'd on other grounds*, 319 U.S. 463 (1943).

[18] *Id*. The same ground appears to have been available in *Cases*. *See id.*, 131 F.2d at 919 n.1.

views is consistent with an individual right,[19] *Tot* added, in apparent dicta, a one-paragraph historical discussion in support of the view that the Amendment "was not adopted with individual rights in mind, but as a protection for the states in the maintenance of their militia organizations against possible encroachments by the federal power."[20] The court did not address the Amendment's text but instead chiefly relied on the *Aymette* case's account of the right that emerged from the English Revolution of 1688–1689.

Over the past few decades, the Executive Branch has taken differing views of the right secured by the Second Amendment.[21] In 1941, President Roosevelt signed legislation authorizing requisitions of private property for war use that prohibited requisitioning or new registration "of any firearms possessed by any individual for his personal protection or sport" and, moreover, any impairing or infringing of "the right of any individual to keep and bear arms."[22] In 1959, this Office reviewed a bill that would have secured the custody and disposition of missiles, rockets, and earth satellites. We questioned its definition of "missile," which included "projectile" and "seems to include conventional ammunition," and we commented that if the bill purported "to prohibit *private individuals* from acquiring, possessing, or receiving any standard ammunition for firearms . . . . serious constitutional problems would arise under the Second Amendment."[23] In commenting on similar bills in 1961 and 1962, this Office cited and reaffirmed its 1959 memorandum.[24] In

---

[19] Regarding violent felons, although the case involved possession, the court relied on authority for regulating the *bearing* of arms (banning carrying weapons concealed or to the terror of the people). For more on-point authority, see proposals made during the ratifying conventions, discussed below in Part III.C.1, and *Emerson*, 270 F.3d at 226 n.21; *cf. Lewis*, 445 U.S. at 65 n.8 (rejecting equal protection challenge to prohibition of felon possessing a firearm); *Richardson v. Ramirez*, 418 U.S. 24, 53–55 (1974) (holding constitutional the disenfranchisement of convicted felons who had completed their sentences and paroles).

[20] 131 F.2d at 266. The court cited some history from the Founding Era, which we address in Part III.C.1.

[21] We have not conducted a review of the government's litigating positions in the numerous firearms cases since *Miller*. In its brief in *Miller*, the government made two alternative arguments. The first was consistent with a quasi-collective right view. *See* Brief for United States at 9–18, *United States v. Miller*, 307 U.S. 174 (1939) (No. 696). The second (which the Court adopted) was consistent with either a quasi-collective or individual right view. *See id.* at 18–20. Its present litigating position appears to be consistent with your 2001 memorandum to U.S. Attorneys endorsing the individual right view. *See, e.g.*, *United States v. Lippman*, 369 F.3d 1039, 1045 (8th Cir. 2004) (Colloton, J., concurring in part and concurring in the judgment).

[22] Property Requisition Act, ch. 445, § 1, 55 Stat. 742, 742.

[23] Memorandum for Lawrence E. Walsh, Deputy Attorney General, from Paul A. Sweeney, Acting Assistant Attorney General, Office of Legal Counsel, *Re*: *H.R. 232, 86th Cong., 1st Sess., a bill "To provide for the securing of custody and disposition by the United States of missiles, rockets, earth satellites, and similar devices adaptable to military uses, and for other purposes"* at 1–2 (Apr. 9, 1959) (emphasis added).

[24] *See* Memorandum for Byron R. White, Deputy Attorney General, from Nicholas deB. Katzenbach, Assistant Attorney General, Office of Legal Counsel, *Re*: *H.R. 2057, a bill to provide for the securing of custody and disposition by the United States of missiles, rockets, earth satellites, and*

1965, however, the Justice Department expressly adopted the collective right interpretation in congressional testimony by Attorney General Katzenbach.[25]

Soon after, in 1968, Congress passed the first major federal gun regulation since 1938, the Omnibus Crime Control and Safe Streets Act.[26] This statute produced a flurry of decisions in the federal courts of appeals rejecting the individual right view. Following the Third Circuit's dicta in *Tot*, the Fourth, Sixth, Seventh, and Ninth Circuits eventually adopted the collective right view.[27] Following the First Circuit in *Cases*, the Eighth, Tenth, and Eleventh Circuits adopted quasi-collective right views.[28] As in *Tot* and *Cases*, many of these cases, particularly the initial ones, involved constitutional challenges by persons convicted of felonies or violent crimes,[29] and some involved challenges to restrictions

---

*similar devices adaptable to military use* (May 8, 1961); Memorandum for Byron R. White, Deputy Attorney General, from Nicholas deB. Katzenbach, Assistant Attorney General, Office of Legal Counsel, *Re: Proposed report of the Department of Defense on H.R. 2057 "To provide for the securing of custody and disposition by the United States of missiles, rockets, earth satellites and similar devices adaptable to Military uses, and for other purposes"* at 1 (Mar. 22, 1962).

[25] *See Federal Firearms Act: Hearings Before the Subcomm. to Investigative Juvenile Delinquency of the Senate Comm. on the Judiciary*, 89th Cong. 40–41 (1965) (statement of Attorney General Katzenbach). For subsequent treatment of the Second Amendment, *see, e.g.*, Memorandum for Richard G. Kleindienst, Deputy Attorney General, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: Proposed "Federal Gun Registration and Licensing Act of 1969"* (Feb. 19, 1969) (in one-sentence discussion, citing *Miller* and *Tot* to find no "serious legal obstacle" under Amendment to proposal for federal registration of firearms and limited federal licensing); Memorandum for D. Lowell Jensen, Assistant Attorney General, Criminal Division, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Legislation Relating to Firearms and to Mandatory Sentencing*, at 2 (May 27, 1981) (citing *Miller* as basis for "perceiv[ing] no basis for suggesting that the [1968 Gun Control] Act so interferes with the powers of the States to raise militias as to transgress the Second Amendment"); Firearm Owners' Protection Act, Pub. L. No. 99-308, § 1(b)(1)(A), 100 Stat. 449, 449 (1986), *codified at* 18 U.S.C. § 921 note (2000) (law signed by President Reagan that recognized "the right[] of citizens . . . to keep and bear arms under the second amendment").

[26] Pub. L. No. 90-351, 82 Stat. 197.

[27] *See, e.g.*, *Love v. Pepersack*, 47 F.3d 120, 122–24 (4th Cir. 1995); *United States v. Warin*, 530 F.2d 103, 105–07, 108 (6th Cir. 1976) (dismissing "the erroneous supposition that the Second Amendment is concerned with the rights of individuals rather than those of the States" and rejecting claim involving gun admittedly bearing reasonable relationship to preservation or efficiency of the army); *Gillespie v. City of Indianapolis*, 185 F.3d 693, 710–11 (7th Cir. 1999); *Hickman v. Block*, 81 F.3d 98, 99–102 (9th Cir. 1996). The Third Circuit's present position is at least the quasi-collective right view, if not the collective right view. *See United States v. Rybar*, 103 F.3d 273, 286 (3d Cir. 1996).

[28] *See, e.g.*, *United States v. Hale*, 978 F.2d 1016, 1019–20 (8th Cir. 1992); *United States v. Oakes*, 564 F.2d 384, 387 (10th Cir. 1977); *United States v. Wright*, 117 F.3d 1265, 1272–74 (11th Cir. 1997), *vacated in part on other grounds*, 133 F.3d 1412 (1998). These courts make clear that the right under the quasi-collective right view protects only members of organized militia units such as the National Guard, not members of the "militia" defined more broadly. *Oakes*, for example, rejected a claim based on the defendant's membership in the Kansas militia, which consisted of all able-bodied men between twenty-one and forty-five. 564 F.2d at 387; s*ee also Wright*, 117 F.3d at 1271–74 (similar); *Hale*, 978 F.2d at 1020 (similar); *Warin*, 530 F.2d at 105, 106, 108 (similar).

[29] *See, e.g.*, *United States v. Baer*, 235 F.3d 561, 564 (10th Cir. 2000); *Gillespie*, 185 F.3d at 710–11; *Marchese v. California*, 545 F.2d 645, 646 (9th Cir. 1976); *United States v. Johnson*, 497 F.2d 548,

on carrying concealed weapons.[30] These decisions did not analyze, at least not in depth, the Amendment's text or history. Rather, they relied on *Tot* or *Cases* (or their progeny), claimed support from *Miller*, or both. As the Ninth Circuit recently recognized in the course of adhering to its collective right position, these earlier decisions reached their conclusions "with comparatively little analysis," "largely on the basis of the rather cursory discussion in *Miller*, and touched only briefly on the merits of the debate."[31]

In contrast, the burgeoning scholarly literature on the Second Amendment in the past two decades has explored the meaning of the Second Amendment in great detail. The collective right and quasi-collective right positions have many adherents,[32] although the preponderance of modern scholarship appears to support the individual right view.[33]

---

550 (4th Cir. 1974) (per curiam); *Cody v. United States*, 460 F.2d 34, 35–37 (8th Cir. 1972); *Stevens v. United States*, 440 F.2d 144, 149 (6th Cir. 1971); *United States v. Synnes*, 438 F.2d 764, 766 (8th Cir. 1971), *vacated on other grounds*, 404 U.S. 1009 (1972). Courts have recognized that such holdings could be consistent with an individual right view. *See United States v. Price*, 328 F.3d 958, 961 (7th Cir. 2003); *supra* note 19 (discussing *Tot*); *cf. Emerson*, 270 F.3d at 261 (upholding prohibition on possession of firearm by person subject to domestic violence restraining order by concluding that Amendment protected an individual right but finding no violation); *Lippman*, 369 F.3d at 1044–45 (Colloton, J.) (similar).

[30] *See Hickman*, 81 F.3d at 99–103; *Thomas v. Members of City Council of Portland*, 730 F.2d 41, 42 (1st Cir. 1984) (per curiam). Courts have recognized that such holdings also could be consistent with an individual right view. *See Parker*, 362 F.3d at 1285–86 (Kelly, J., concurring) (arguing for upholding conviction on narrower ground that case involved reasonable restriction on concealed weapons, and criticizing circuit courts, in interpreting Second Amendment, for ignoring "the universal admonition to decide constitutional issues narrowly"); Part IV.B.2 (discussing cases recognizing individual right but rejecting right to carry concealed weapons).

[31] *Silveira*, 312 F.3d at 1063–64 & n.11.

[32] For a symposium of articles spanning the views, see *The Second Amendment Today: Historical and Contemporary Perspectives on the Constitutionality of Firearms Regulation*, 29 N. Ky. L. Rev. 643 (2002), and for articles critical of the individual right view, see *Symposium on the Second Amendment: Fresh Looks*, 76 Chi.-Kent L. Rev. 3 (2000). *See also, e.g.*, Garry Wills, *A Necessary Evil: A History of American Distrust of Government* 207–21, 256–60 (1999); Andrew D. Herz, *Gun Crazy: Constitutional False Consciousness and Dereliction of Dialogic Responsibility*, 75 B.U. L. Rev. 57 (1995); Richard M. Aborn, Essay, *The Battle Over the Brady Bill and the Future of Gun Control Advocacy*, 22 Fordham Urb. L.J. 417 (1995); Carl T. Bogus, Essay, *Race, Riots, and Guns*, 66 S. Cal. L. Rev. 1365 (1993); Dennis A. Henigan, *Arms, Anarchy and the Second Amendment*, 26 Val. U. L. Rev. 107 (1991); Wendy Brown, Comment, *Guns, Cowboys, Philadelphia Mayors, and Civic Republicanism: On Sanford Levinson's The Embarrassing Second Amendment*, 99 Yale L.J. 661 (1989); Keith A. Ehrman & Dennis A. Henigan, *The Second Amendment in the Twentieth Century: Have You Seen Your Militia Lately?*, 15 U. Dayton L. Rev. 5 (1989); Samuel Fields, *Guns, Crime and the Negligent Gun Owner*in, 10 N. Ky. L. Rev. 141 (1982); Warren Spannaus, *State Firearms Regulation and the Second Amendment*, 6 Hamline L. Rev. 383 (1983); *cf.* David Yassky, *The Second Amendment: Structure, History, and Constitutional Change*, 99 Mich. L. Rev. 588 (2000); David C. Williams, *Civic Republicanism and the Citizen Militia: The Terrifying Second Amendment*, 101 Yale L.J. 551, 554–55 (1991).

[33] *See, e.g.*, 1 Laurence H. Tribe, *American Constitutional Law* 900 & 902 n.221 (3d ed. 2000); Nelson Lund, *The Ends of Second Amendment Jurisprudence: Firearms Disabilities and Domestic Violence Restraining Orders*, 4 Tex. Rev. L. & Pol. 157 (1999); Leonard W. Levy, *Origins of the Bill*

Recent decisions of the Fifth and Ninth Circuits have begun to remedy the relatively sparse judicial analysis of the meaning of the Second Amendment. In 2001, the Fifth Circuit in *United States v. Emerson* adopted the individual right view, based on an extensive analysis of the Amendment's text and history.[34] The following year, the Ninth Circuit in *Silveira v. Lockyer* rejected *Emerson* with an extended counter-analysis and reaffirmed its adherence to the collective right view.[35] Six members of the Ninth Circuit dissented from denial of rehearing en banc and endorsed an individual right view.[36]

In sum, the question of who possesses the right secured by the Second Amendment remains open and unsettled in the courts and among scholars. Accordingly, we turn to the Amendment's text, as commonly understood at the time of its adoption and interpreted in light of other provisions of the Constitution and the Amendment's historical antecedents, to discern its proper meaning.

---

*of Rights* 134 (1999); Ronald S. Resnick, *Private Arms as the Palladium of Liberty: The Meaning of the Second Amendment*, 77 U. Det. Mercy L. Rev. 1 (1999); Brannon P. Denning, *Gun Shy: The Second Amendment as an "Underenforced Constitutional Norm,"* 21 Harv. J.L. & Pub. Pol'y 719 (1998); L.A. Powe, Jr., *Guns, Words, and Constitutional Interpretation*, 38 Wm. & Mary L. Rev. 1311 (1997); Nelson Lund, *The Past and Future of the Individual's Right to Arms*, 31 Ga. L. Rev. 1 (1996); Randy E. Barnett & Don B. Kates, *Under Fire: The New Consensus on the Second Amendment*, 45 Emory L.J. 1139 (1996); Glenn Harlan Reynolds & Don B. Kates, *The Second Amendment and States' Rights: A Thought Experiment*, 36 Wm. & Mary L. Rev. 1737 (1995); David B. Kopel, *It Isn't About Duck Hunting: The British Origin of the Right to Arms*, 93 Mich. L. Rev. 1333, 1355 (1995); William Van Alstyne, Essay, *The Second Amendment and the Personal Right to Arms*, 43 Duke L.J. 1236; Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (1994); Clayton E. Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* (1994); Akhil Reed Amar, *The Bill of Rights as a Constitution*, 100 Yale L.J. 1131, 1162–68 (1991); Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 Geo. L.J. 309 (1991); Sanford Levinson, Comment, *The Embarrassing Second Amendment*, 99 Yale L.J. 637 (1989); Nelson Lund, *The Second Amendment, Political Liberty, and the Right to Self-Preservation*, 39 Ala. L. Rev. 103 (1987); David T. Hardy, *Armed Citizens, Citizen Armies: Toward a Jurisprudence of the Second Amendment*, 9 Harv. J.L. & Pub. Pol'y 559 (1986); Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143 (Winter 1986); Stephen P. Halbrook, *That Every Man Be Armed: The Evolution of a Constitutional Right* (1984); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204 (1983); *see also Printz v. United States*, 521 U.S. 898, 938 n.2 (1997) (Thomas., J., concurring) (noting "growing body of scholarly commentary indicat[ing] that the [right]" is a personal one); *Emerson*, 270 F.3d at 220 (similar).

[34] 270 F.3d at 227–60.

[35] 312 F.3d at 1060–87.

[36] *Silveira v. Lockyer*, 328 F.3d 567, 570 (9th Cir. 2003) (Kleinfeld, J., joined by Kozinski, O'Scannlain, and T.G. Nelson, JJ., dissenting from denial of rehearing en banc); *see* 328 F.3d at 568 (Pregerson, J., same); *id.* at 568 (Kozinski, J., same); *id.* at 592 (Gould, J., joined by Kozinski, J., same). For other recent opinions of Ninth Circuit judges endorsing the individual right view and criticizing *Silveira*, see *Nordyke*, 319 F.3d at 1195 (Gould, J., concurring); *Nordyke v. King*, 364 F.3d 1025, 1025 (9th Cir. 2004) (Kleinfeld, J., dissenting from denial of rehearing en banc); *id.* at 1026 (Gould, J., joined by O'Scannlain, Kleinfeld, Tallman, and Bea, JJ., same).

## II. Textual and Structural Analysis

The Second Amendment of the United States Constitution, part of the Bill of Rights, reads in full as follows:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

The Amendment expressly protects a "right of the people," which is "to keep and bear Arms" and which has some relation to the prefatory declaration that a "well regulated Militia" is necessary for the ultimate end of "the security of a free State." We address each of these phrases in turn and then consider how the structure of the Constitution illuminates the Amendment's meaning.

As explained below, the text of the Second Amendment points to a personal right of individuals: A "right of the people" is ordinarily and most naturally a right of individuals, not of a state and not merely of those serving the state as militiamen. The phrase "keep arms" at the time of the Founding usually indicated the private ownership and retention of arms by individuals as individuals, not the stockpiling of arms by a government or its soldiers, and the phrase certainly had that meaning when used in connection with a "right of the people." While the phrase "bear arms" often referred to carrying of arms in military service, it also sometimes denoted carrying arms for private purposes. The Amendment's prefatory clause, considered under proper rules of interpretation, could not negate the individual right recognized in the clear language of the operative clause. In any event, the prefatory clause—particularly its reference to the "Militia," which was understood at the Founding to encompass all able-bodied male citizens, who were required to be enrolled for service—is fully consistent with an individual right reading of the operative language. Moreover, the Second Amendment appears in the Bill of Rights amid amendments securing numerous individual rights, a placement that makes it likely that the right of the people to keep and bear arms likewise belongs to individuals. Finally, a consideration of the powers that the original Constitution grants or allows over the militia makes it unlikely that the Second Amendment would secure a collective or quasi-collective right.

### A. "The Right of the People"

The Second Amendment's recognition of a "right" that belongs to "the people" indicates a right of individuals. The word "right," standing by itself in the Constitution, is clear. Although in some contexts entities other than individuals are

said to have "rights,"[37] the Constitution itself does not use the word "right" in this manner. Setting aside the Second Amendment, not once does the Constitution confer a "right" on any governmental entity, state or federal. Nor does it confer any "right" restricted to persons in governmental service, such as members of an organized military unit. In addition to its various references to a "right of the people" discussed below, the Constitution in the Sixth Amendment secures "right[s]" to an accused person, and in the Seventh secures a person's "right" to a jury trial in civil cases.[38] By contrast, governments, whether state or federal, have in the Constitution only "powers" or "authority."[39] It would be a marked anomaly if "right" in the Second Amendment departed from such uniform usage throughout the Constitution.

In any event, any possible doubt vanishes when "right" is conjoined with "the people," as it is in the Second Amendment. Such a right belongs to individuals: The "people" are not a "State," nor are they identical with the "Militia." Indeed, the Second Amendment distinctly uses all three of these terms, yet it secures a "right" only to the "people." The phrase "the right of the people" appears two other times in the Bill of Rights, and both times refers to a personal right, which belongs to individuals. The First Amendment secures "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances," and the Fourth safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." In addition, the Ninth Amendment refers to "rights . . . retained by the people." We see no reason to read the phrase in the Second Amendment to mean something other than what it plainly means in these neighboring and contemporaneous amendments.

The Supreme Court, in interpreting the Fourth Amendment, likewise has recognized that the Constitution uses "the people," and especially "the right of the people," to refer to individuals:

> "[T]he people" seems to have been a term of art employed in select parts of the Constitution. The Preamble declares that the Constitution is ordained and established by "the People of the United States." The Second Amendment protects "the right of the people to keep and bear Arms," and the Ninth and Tenth Amendments provide that certain rights and powers are retained by and reserved to "the people." *See also* U.S. Const., Amdt. 1 ("Congress shall make no law . . .

---

[37] For example, Article II of the Articles of Confederation, drafted a decade before the Constitution, reserved to each state "every power, jurisdiction, and right" not expressly delegated to the federal government.

[38] In addition, the Copyright and Patent Clause authorizes Congress to grant an "exclusive Right" to authors and inventors for a limited time. U.S. Const. art. I, § 8, cl. 8.

[39] *See, e.g.*, U.S. Const. art. I, § 1; *id.* art. I, § 8; *id.* art. II, § 1; *id.* art. III, § 1; *id.* amend. X.

abridging . . . *the right of the people* peaceably to assemble") (emphasis added); Art. I, § 2, cl. 1 ("The House of Representatives shall be composed of Members chosen every second Year *by the People of the several States*") (emphasis added). While this textual exegesis is by no means conclusive, it suggests that "the people" protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.[40]

Thomas Cooley, the leading constitutional scholar after the Civil War, took the same view in explaining "the people" in the context of the First Amendment: "When the term 'the people' is made use of in constitutional law or discussions, it is often the case that those only are intended who have a share in the government through being clothed with the elective franchise. . . . But *in all the enumerations and guaranties of rights the whole people are intended*, because the rights of all are equal, and are meant to be equally protected."[41]

The Constitution confirms this meaning of "the people" as individuals by expressly distinguishing the "people" from the "States," using each word to refer to a distinct thing. Indeed, the Second Amendment itself refers separately to "the people" and the "State." And the difference is firmly established by the Tenth Amendment, which distinguishes between the powers reserved "to the States" and those reserved "to the people." The "people" are the individuals who compose the states, distinct from—and bearing their federal "rights" apart from—those entities.[42]

Similarly, the Constitution gives distinct meanings to "the people" and the "Militia." Again, the Second Amendment itself is a notable example, referring to

---

[40] *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *see also id*. at 279 (Stevens, J., concurring in judgment) ("aliens who are lawfully present in the United States are among those 'people' who are entitled to the protection of the Bill of Rights, including the Fourth Amendment"); *id*. at 287–88 (Brennan, J., dissenting) (similar; contending that "'the people'" is broader than "'citizens,' 'freemen,' 'residents,' or 'the American people'"). The Ninth Circuit in *Silveira* did not discuss the "right of the people" in the Second Amendment, and it disregarded *Verdugo-Urquidez* except to cite its analysis of "the people" as an analogy in support of its own reading of "Militia." *See* 312 F.3d at 1069–70 & n.25, 1071 & n.27. While recognizing that "[t]he question . . . is not whether arms may be kept, but by whom and for what purpose," *id*. at 1074, the court in *Silveira* did not consider that the "who[]" might be "the people" to whom the Second Amendment's text—like that of the First, Fourth, and Ninth—expressly gives the right.

[41] Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 267–68 (1880; reprint 2000) (emphasis added).

[42] Of course the "people" might choose to exercise those individual rights in groups rather than alone, as in the First Amendment right to assemble and petition, but that does not make their rights "collective" or quasi-collective in the sense of depending on the will or actions of a state or on one's service to it.

the "well regulated Militia" but granting the "right" to "the people." The Constitution's other references to "rights" of "the people," noted above, cannot plausibly be construed as referring to the "Militia." In addition, when granting governmental power over the militia, the Constitution speaks of the militia expressly, without any reference to or suggestion of the broader "people."[43] And the Fifth Amendment's Grand Jury Clause, which distinguishes between all "person[s]" and those serving in the army, navy, or "the Militia, when in actual service," indicates that where the Constitution addresses rights that turn on service in the militia it does so expressly.

The only truly "collective" use of the "the people" at the time of the Founding was to refer to the people as they existed *apart from* government or any service to it. The Declaration of Independence refers to "one People" dissolving their political bonds with another and forming their own nation, and "We the people" created the Constitution in ratifying conventions chosen "by the People" of each state.[44] Thus, even in this context, the "people" are distinguished from "the government" or "the State"; nor can the term plausibly be limited to the "Militia." And when "the people" appears in the phrase "the *right* of the people" in the Constitution, we conclude that it indicates a personal right of individuals, whether that be a right to assemble and petition, to be secure in one's person and property, or to keep and bear arms.

### B. "To Keep and Bear Arms"

The "right of the people" that the Second Amendment secures is a right "to keep and bear Arms." As the previous subpart showed, those who hold the right are, according to the text, "the people"—individuals—not the government or even the militia. The phrase "to keep and bear Arms" is consistent with this conclusion: The phrase "keep . . . Arms" reinforces it,[45] and the phrase "bear Arms" is not inconsistent with it.

---

[43] U.S. Const. art. I, § 8, cls. 15–16; *id.* art. II, § 2, cl. 1.

[44] The last quotation is from the Constitutional Convention's resolution transmitting the proposed Constitution to the Congress. 2 *The Records of the Federal Convention of 1787*, at 665 (Max Farrand ed., rev. ed. 1966). This distinction between the "people" and the government is why the Founders insisted that the Constitution be ratified by popularly elected special conventions rather than by the state governments, to ensure its supremacy over those governments. *See The Federalist No. 39*, at 253–54 (James Madison) (Jacob E. Cooke ed., 1961); James Madison, *Notes of Debates in the Federal Convention of 1787*, at 70 (1987) (remarks of Madison, June 5, 1787); *id.* at 348–49 (remarks of George Mason and Edmund Randolph, July 23, 1787); *id.* at 352–53 (remarks of Madison).

[45] Those who reject the individual right view tend to neglect "keep" or to treat it as redundant with "bear." In *Silveira*, the court found it "not clear" why the word "was included in the amendment" and concluded by summarizing the Amendment as merely protecting a right to "'bear arms'" in conjunction with militia service. 312 F.3d at 1074, 1086. *See also* Michael C. Dorf, *What Does the Second Amendment Mean Today?*, 76 Chi.-Kent L. Rev. 291, 317 (2000) (contending without citation that "keep and bear" is "a unitary phrase," with "keep" adding nothing to "bear," but admitting possibility that "the plain meaning of 'keep' would have been sufficient to connote an individual right"); H. Richard Uviller & William G.

## 1. "To Keep . . . Arms"

In eighteenth-century English, an individual could "keep arms," and keep them for private purposes, unrelated to militia duty, just as he could keep any other private property, and the phrase was commonly used in this sense. For example, in *Rex v. Gardner* (K.B. 1738), a defendant charged with "keeping a gun" in violation of a 1706 English statute (which prohibited commoners from keeping specified objects or "other engines" for the destruction of game) argued that "though there are many things for the bare keeping of which a man may be convicted; yet they are only such as can only be used for destruction of the game, whereas a gun is necessary for defence of a house, or for a farmer to shoot crows." The court agreed, reasoning that "a gun differs from nets and dogs, which can only be kept for an ill purpose."[46] The Court of Common Pleas six years later treated *Gardner* as having "settled and determined" that "a man may keep a gun for the defence of his house and family,"[47] and in 1752 the King's Bench reiterated that "a gun may be kept for the defence of a man's house, and for divers other lawful purposes."[48] The same usage appeared in an earlier prosecution of a man for "keeping of a gun" contrary to a statute that barred all but the wealthy from privately owning small handguns.[49]

William Blackstone, whose *Commentaries on the Laws of England*, first published in the decade before the American Revolution, was the leading legal authority in America at the Founding, wrote, without any reference to the militia, of "person[s]" who are "qualified to keep a gun" and are "shooting at a mark," apparently on their own property.[50] He also noted that certain persons could not

---

Merkel, *The Second Amendment in Context: The Case of the Vanishing Predicate*, 76 Chi.-Kent L. Rev. 403, 424–25, 508, 549–50, 593 (2000) (similar).

[46] 2 Strange Rep. 1098, 1098 (applying 5 Ann., c. 14 (1706)); *see Rex v. Gardner*, 87 Eng. Rep. 1240, 7 Mod. Rep. 279 (K.B. 1739) (apparently later case, but similar); *id*. at 1241 (defendant, arguing that "to charge only that he kept a gun is improper, for it includes every man that keeps a gun," and that guns are kept "for the defence of a man's house"); *id*. (Lee, C.J.) (words of statute "do not extend to prohibit a man from keeping a gun for his necessary defence"); *id*. (Probyn, J.) ("farmers are generally obliged to keep a gun, and are no more within the Act for doing so than they are for keeping a cabbage-net").

[47] *Mallock v. Eastly*, 87 Eng. Rep. 1370, 1374, 7 Mod. Rep. 482 (C.P. 1744).

[48] *Wingfield v. Stratford*, 96 Eng. Rep. 787, 787, Sayer Rep. 15 (K.B. 1752).

[49] *King v. Silcot*, 87 Eng. Rep. 186, 186, 3 Mod. Rep. 280 (K.B. 1690) (italics omitted) (interpreting 33 Hen. VIII, c. 6 (1541), and quashing indictment because it did not specifically allege that defendant's income was insufficient when he kept the gun).

[50] 4 William Blackstone, *Commentaries* *182. The qualification to which Blackstone refers is a wealth requirement tied to the game laws, *see id*. at *174–75, which we discuss in Part III.A and elsewhere. Regarding Blackstone's influence and authority, see, e.g., Madison, *Notes of Debates*, *supra* note 44, at 547 (remarks of Dickenson, Aug. 29, 1787); *The Federalist No. 69*, at 465 n.* (Alexander Hamilton); *The Federalist No. 84*, at 577 (Alexander Hamilton); Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 130; *Schick v. United States*, 195 U.S. 65, 69 (1904). Edmund Burke informed Parliament that "they have sold nearly as many of Blackstone's Commentaries in America as in

"keep arms in their houses," pursuant to a statute that used "keep" to signify private ownership and control over arms, wherever located.[51] Colonial and early state statutes similarly used "keep" to "describe arms possession by individuals in all contexts," including requiring those exempt from militia service (such as the over-aged) to "keep" arms in their homes for both law enforcement and "the defense of their homes from criminals or foreign enemies."[52] At the Massachusetts Ratifying Convention in 1788, Samuel Adams proposed an amendment prohibiting Congress from "prevent[ing] the people of the United States, who are peaceable citizens, from keeping their own arms," indicating ownership by individuals of private arms.[53] And that state's Supreme Court, in a libel case soon after the Founding, likened the "right to keep fire arms" to the freedom of the press, both being individual but not unlimited rights—the former not protecting "him who uses them for annoyance or destruction."[54] The basic dictionary definition of "keep"—"[t]o retain" and "[t]o have in custody"—was consistent with this specific meaning.[55]

In short, the phrase "keep arms" was commonly understood to denote ownership of arms by private citizens for private purposes. When that phrase is read together with its subject—"the right of the people"—the evidence points strongly toward an individual right. Had the Constitution meant not to protect the right of the whole "people" to "keep" arms but instead to establish a "right" of the states or of only the members of their militias to store them, presumably it would have used different language.[56]

---

England." Speech Concerning Resolutions for Conciliation With the Colonies (Mar. 22, 1775), *in* Edmund Burke, *Pre-Revolutionary Writings* 206, 225 (Ian Harris ed., 1993).

[51] 4 William Blackstone, *Commentaries* *56; *see id.* (person barred from "keeping arms in his house"). *See also* 1 W. & M., 1st Sess., c. 15, § 3 (1688) ("no papist . . . shall or may have or keep in his house, or elsewhere, or in the possession of any other person to his use, or at his disposition, any arms, weapons, gunpowder, or ammunition").

[52] Kates, *supra* note 33, 82 Mich. L. Rev. at 215, 219.

[53] We discuss this proposal below in Part III.C.1.

[54] *Commonwealth v. Blanding*, 20 Mass. (3 Pick.) 304, 338 (1825).

[55] Samuel Johnson, *A Dictionary of the English Language* (1755) (unpaginated). *See* Noah Webster, *An American Dictionary of the English Language* (1828) (unpaginated) (defining "Keep" first as "To hold; to retain in one's power or possession").

[56] *See* Stephen P. Halbrook, *A Right to Bear Arms: State and Federal Bills of Rights and Constitutional Guarantees* 94 (1989) (contending that "common linguistic usage of the day . . . referr[ed] to the *depositing* of public arms in an arsenal, in contrast with the *keeping* of private arms by the people," and providing an example of the former usage in a 1789 state statute); *cf.* U.S. Const. art. I, § 10, cl. 3 ("No *State* shall . . . keep Troops" without Congress's consent) (emphasis added). When members of a militia, as opposed to the people in general, retained their own arms for militia service, common usage seems to have been to speak of them "providing" themselves with weapons, *see* Militia Act, ch. 33, § 1, 1 Stat. 271 (1792); Thomas Jefferson, *Notes on the State of Virginia* 88 (William Peden ed., 1955); 1 *The Papers of George Mason, 1725–1792*, at 212 (Robert A. Rutland ed., 1970), although we do not mean to claim that one could not speak of militiamen "keeping" arms for militia use.

## 2. "To . . . Bear Arms"

To "bear" was, at the Founding as now, a word with numerous definitions—used with great "latitude" and "in very different senses," as Samuel Johnson noted in his dictionary.[57] Its basic meaning was simply to "carry" or "wear" something, particularly carrying or wearing in a way that would be known to others, such as in bearing a message, bearing another person, or bearing something as a mark of authority or distinction.[58] As a result, "bear," when taking "arms" as its object, could refer to multiple contexts in which one might carry or wear arms in this way.[59] It is true that "bear arms" often did refer to carrying arms in military service.[60] But the phrase was not a term of art limited to this sense. Arms also could be "borne" for private, non-military purposes, principally tied to self-defense. For example, an early colonial statute in Massachusetts required every "freeman or other inhabitant" to provide arms for himself and anyone else in his household able to "beare armes," and one in Virginia required "all men that are fitting to beare armes" to "bring their pieces" to church.[61]

There are also several examples closer to the Founding. In 1779, a committee of eminent Virginians including Thomas Jefferson and George Mason, charged with revising the new state's laws, authored a bill penalizing any person who, within a year of having violated a restriction on hunting deer, "shall bear a gun out of his inclosed ground, unless whilst performing military duty." This bill demonstrates that to "bear a gun" was not limited to "performing military duty." James Madison submitted this bill to the Virginia legislature in 1785.[62] Many early state

---

[57] Johnson, *Dictionary*, *supra* note 55 (unpaginated).

[58] *See id.* (defining "bear" as to "carry as a burden," "convey or carry," "carry as a mark of authority" (such as a sword), "carry as a mark of distinction" (such as to "*bear* arms in a coat"), and "carry as in show"); Webster, *American Dictionary*, *supra* note 55 (unpaginated) (defining "bear" as to "support," "sustain," "carry," "convey," "support and remove from place to place," "wear," and "bear as a mark of authority or distinction; as, to *bear* a sword, a badge, a name; to *bear* arms in a coat").

[59] In *Muscarello v. United States*, 524 U.S. 125 (1998), which involved a statute, the Court was unanimous in understanding "bear arms" to refer generally to a person carrying arms upon his person for the purpose of being armed and ready for offensive or defensive action, the dissent citing the Second Amendment in support of this view. The majority gave "carries a firearm" a broader meaning. *Id.* at 130; *id.* at 139–40, 143 (Ginsburg, J., dissenting).

[60] *See, e.g.*, Kates, *supra* note 33, 82 Mich. L. Rev. at 219 (explaining that, in early colonial statutes, "'bear' did generally refer to the carrying of arms by militiamen"); St. George Tucker, 2 *Blackstone's Commentaries* *408–09 n.1 (1803; reprint 1996) ("Tucker's Blackstone") (discussing Virginia law exempting from militia duty those "religiously scrupulous of bearing arms"); The Declaration of Independence para. 28 (1776) ("He has constrained our fellow Citizens taken Captive on the high Seas to bear Arms against their country."). Militia service was not, however, limited to "military" action. The Constitution speaks of using the militia "to execute the Laws of the Union," which is distinct from both "repel[ling] Invasions" and "suppress[ing] Insurrections." U.S. Const. art. I, § 8, cl. 15.

[61] *Quoted in* Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 139.

[62] 2 *The Papers of Thomas Jefferson* 443–44 (Julian P. Boyd ed., 1950). Concerning the Committee of Revisors, see *id.* at 305; 1 Tucker's Blackstone, *supra* note 60, Note F, at 444–45.

constitutions, including some written before the Founding (Pennsylvania's and Vermont's) and one written a month after Secretary of State Jefferson declared the Bill of Rights ratified (Kentucky's), protected an individual's right to "bear arms" in "defense of himself and the State" or in "defense of themselves and the State," indicating that a person might be said to "bear arms" in self-defense.[63] A 1780 opinion of London's Recorder (the city's legal adviser and the primary judge in its criminal court) on the legality of a *private* self-defense association acknowledged "the rights of the people of this realm to bear arms, and to instruct themselves in the use of them, collectively," albeit within limits.[64] In a newspaper commentary published in major cities after Madison introduced the Bill of Rights in Congress, a friend of his wrote that the proposed Second Amendment would "confirm[]" the people's "right to keep and bear their private arms."[65] Supreme Court Justice Joseph Story, in his 1833 *Commentaries on the Constitution of the United States*, paraphrased as a "right to bear arms" the right of English "subjects . . . [to] have arms for their defence," an individual right not tied to service in the militia.[66] Finally, other examples of contemporaneous uses of "bear arms" to denote actions of individuals appear in cases from the early 1800s up to the Civil War, discussed below in Part IV.B.

The Minority Report issued by twenty-one delegates of the Pennsylvania Convention that ratified the Federal Constitution in late 1787 illustrates the various uses of the phrase at the time, including both the *right* of private "bearing" and the *duty* of "bearing" for the government in the militia. The Report recommended amending the Constitution to recognize "[t]hat the people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game" and also urged exemption from militia service for those "conscientiously scrupulous of bearing arms." Although the Minority Report was a product of Anti-Federalists, who had lost at that convention and who lost the

---

[63] These are collected, through the Michigan Constitution of 1835, in *Emerson*, 270 F.3d at 230 n.29. We discuss the Pennsylvania and Vermont constitutions below in Part III.B.2. For an 1822 judicial interpretation confirming the plain meaning of the Kentucky provision as granting an individual right, see Part IV.B.1 below. Regarding ratification of the Bill of Rights, see Part III.C.2 below.

[64] Legality of the London Military Foot-Association (July 24, 1780), *reprinted in* William Blizard, *Desultory Reflections on Police: With an Essay on the Means of Preventing Crimes and Amending Criminals* 59, 59 (London 1785) (emphasis omitted). Regarding this opinion, which was "of wide interest," Leon Radzinowicz, 4 *A History of English Criminal Law* 107 (1968), *see id*. at 107–10; Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 133–34; and our further discussion below in Part III.A. Regarding the Recorder, *see* 1 William Blackstone, *Commentaries* *76; 3 *id*. at *80–81 n.i; *id*. at *334; John H. Langbein, *Shaping the Eighteenth-Century Criminal Trial: A View From the Ryder Sources*, 50 U. Chi. L. Rev. 1, 8, 17–19, 34–36 (1983).

[65] This essay by Tench Coxe is discussed below in Part III.C.2.

[66] Joseph Story, *Commentaries on the Constitution of the United States* § 980, at 695 (Ronald D. Rotunda & John E. Nowak eds., 1833, reprint 1987) ("*Abridgment*"). The English right is discussed below in Part III.A.

battle over ratifying the Constitution, we are unaware of any contemporaneous criticisms that this widely circulated document misused language in giving such senses to the phrase "bear arms."[67]

In sum, although "bear arms" often referred to carrying or wearing arms in connection with military duty, it was not limited to such a meaning. When, as in the Second Amendment, those words are used in conjunction with "keep arms," which commonly did refer to private action, and the whole phrase "to keep and bear Arms" is used in the context of a "right of the people,"[68] we conclude that the core, operative text of the Amendment secures a personal right, which belongs to individuals. We next consider whether the Amendment's prefatory language requires a different conclusion.

## C. "A Well Regulated Militia, Being Necessary to the Security of a Free State*"*

A feature of the Second Amendment that distinguishes it from the other rights that the Bill of Rights secures is its prefatory subordinate clause, declaring: "A well regulated Militia, being necessary to the security of a free State, . . . ." Advocates of the collective right and quasi-collective right interpretations rely on this declaration, particularly its reference to a well-regulated militia. On their interpretation, the "people" to which the Second Amendment refers is only the

---

[67] *See* 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665, 672 (1971). We discuss the Pennsylvania Convention, including the Minority Report and its critics, in Part III.C.1 below. Regarding the Report's wide circulation, see *id*. at 628; 2 *The Documentary History of the Ratification of the Constitution* 617 (Merrill Jensen ed., 1976) (note); 15 *id.* at 7–10 (John P. Kaminski & Gaspare J. Saladino eds., 1984) (note).

[68] In addition, the Second Amendment's reference to "Arms" in the context of "keep" and "bear" reinforces our view that it protects an individual right. The mere word "Arms" could denote any weapon, including artillery. *See* Webster, *American Dictionary*, *supra* note 55 (unpaginated) (defining "arms" as "Weapons of offense, or armor for defense and protection of the body" and including explanation of "*Fire arms*" as "such as may be charged with powder, as cannon, muskets, mortars &c."; also defining the verb "arm" as including "[t]o furnish with means of defense; to prepare for resistance; to fortify"); Johnson, *Dictionary*, *supra* note 55 (unpaginated) (defining "arms" as "Weapons of offence, or armour of defence"). Certainly Congress's power in Article I, Section 8, Clause 16 to provide for "arming" the militia includes such weapons, particularly given that the Constitution contemplates that the states will use militias to defend themselves against surprise invasions. *See* U.S. Const. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress, . . . keep Troops, . . . or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."); Militia Act § 4, 1 Stat. 271, 272 (1792) (requiring each division of state's militia to have a company of artillery and troop of horse). If the Second Amendment protected a state prerogative to have organized and effective militias, one would expect it to protect all of the arms essential for that purpose, including artillery. Yet its text suggests that the "Arms" that it protects do not include those that "the people" could not both "keep" and "bear"—those that an individual could not store and carry. This use of "Arms" points toward an individual right view rather than a right of states to have select "militias," and it also seems more consistent with an individual right than a quasi-collective right view, as the latter requires that the "militia" of which the claimant is a member be fully organized and equipped. *See, e.g.*, *United States v. Parker*, 362 F.3d 1279, 1283 (10th Cir. 2004).

"people" in a collective, organized capacity as the state governments, or a small subset of the "people" actively organized by those governments into military bodies. "People" becomes interchangeable with the "State" or its "organized militia."

This argument misunderstands the proper role of such prefatory declarations in interpreting the operative language of a provision. A preface can illuminate operative language but is ultimately subordinate to it and cannot restrict it.

Wholly apart from this interpretive principle, this argument also rests on an incomplete understanding of the preface's language. Although the Amendment's prefatory clause, standing alone, might suggest a collective or possibly quasi-collective right to a modern reader, when its words are read as they were understood at the Founding, the preface is fully consistent with the individual right that the Amendment's operative language sets out. The "Militia" as understood at the Founding was not a select group such as the National Guard of today. It consisted of all able-bodied male citizens. The Second Amendment's preface identifies as a justification for the individual right that a necessary condition for an effective citizen militia, and for the "free State" that it helps to secure, is a citizenry that is privately armed and able to use its private arms.

## 1. The Limits of Prefatory Language

In the eighteenth century, the proper approach to interpreting a substantive or "operative" legal provision to which a lawmaker had joined a declaration (whether a "Whereas" clause or analogous language) was (1) to seek to interpret the operative provision on its own, and (2) then to look to the declaration only to clarify any ambiguity remaining in the operative provision.[69] It was desirable, if consistent with the operative text, to interpret the operative provision so that it generally fulfilled the justification that the preface declared, but a narrow declaration provided no warrant for restricting the operative text, and the preface could not itself create an ambiguity. This rule applied equally to declarations located in any part of a law, not simply at the beginning of it, and to both statutes and constitutions. We therefore consider this rule applicable to the Second Amendment.

---

[69] This rule assumes that the legislature incorporated the declaration during the ordinary legislative process, not adopting it separately (with little consideration) or leaving it to others to insert. 2A Norman J. Singer, *Sutherland on Statutory Construction* § 47.04, at 220 & 223 (6th ed. 2000); *see* 1 James Kent, *Commentaries on American Law* 516 (9th ed. 1858) (noting that titles and preambles "generally . . . are loosely and carelessly inserted, and are not safe expositors of the law"); *see also King v. Williams*, 96 Eng. Rep. 51, 52, 1 Blackst. Rep. 93 (K.B. 1758) ("The conciseness of the title shall not control the body of the Act. The title is no part of the law; it does not pass with the same solemnity as the law itself. One reading is often sufficient for it."); Thomas Jefferson, *A Manual of Parliamentary Practice for the Use of the Senate of the United States* 41 (1801; reprint 1993) (noting desirability that preamble "be consistent with" a bill but possibility that it may not be, because of legislative procedures).

English Parliaments of the 1700s and late 1600s regularly included prefaces throughout statutes—not only at the beginning (constituting the first section) but also in particular sections.[70] The same rule of interpretation applied to both uses of prefaces. As an example of the latter, a section of a bankruptcy statute recited the problem of persons who "convey *their* goods to other men upon good consideration" before becoming bankrupt, yet continue to act as owners of the goods; the immediately following clause of the statute provided that if a bankrupt debtor possessed "*any* goods or chattels" with "the consent and permission of the true owner," was their reputed owner, and disposed of them as an owner, such property should repay the debtor's debts rather than return to the true owner. The difficulty arose when the bankrupt debtor possessed property that never had been his, such as property in trust. A leading case in 1716 read the enacting language to apply even in such cases and rejected the argument "that the preamble shall restrain the operation of the enacting clause; and that, because the preamble is too narrow or defective, therefore the enacting clause, which has general words, shall be restrained from its full latitude, and from doing that good which the words would otherwise, and of themselves, import."[71] The King's Bench reiterated the rule in 1723, rejecting in a criminal case an argument based on declaratory language introducing part of a statute: "Now those general words in the enacting part, shall never be restrained by any words introducing that part; for it is no rule in the exposition of statutes to confine the general words of the enacting part to any particular words either introducing it, or to any such words even in the preamble itself." The court acknowledged that "a construction which agrees with the preamble" was desirable, "but not such as may confine the enacting part to it."[72]

---

[70] Examples of both include the statutes discussed or cited below in Part III.A. *See, e.g.*, the Militia Act of 1662, 13 & 14 Car. II, c. 3, §§ 1, 3, 14, 20; the Game Act of 1671, 32 & 33 Car. II, c. 25, §§ 1, 2, 4, 5, 6, 7; the Act to Disarm Papists, 1 W. & M., 1st Sess., c. 15, §§ 1, 3 (1688); the Bill of Rights, 1 W. & M., 2d Sess., c. 2, §§ 1, 9 (1689); the Game Act of 1692, 4 & 5 W. & M., c. 23, §§ 1, 3, 4, 5, 7, 10; the act repealing the ban on hail-shot, 6 & 7 Will. III, c. 13, §§ 1, 3 (1695); and the Game Act of 1706, 5 Ann., c. 14, §§ 1, 3, 5.

[71] *Copeman v. Gallant*, 24 Eng. Rep. 404, 407, 1 P. Wms. Rep. 314 (Ch. 1716); *id*. at 405 (quoting statute) (emphases added); *see* 2A *Sutherland*, *supra* note 69, § 47.04, at 220 ("Copeman . . . established the rule that the preamble could not be used to restrict the effect of the words used in the purview."). In *Ryall v. Rolle*, 26 Eng. Rep. 107, 1 Atkyns Rep. 165 (Ch. 1749), although the question was not at issue, *see id*. at 116 (Lee, C.J.); *id*. at 118 (Hardwicke, Ch.), some judges voiced disagreement with *Copeman*'s interpretation of that statute because of the great "inconvenience" it would cause to commercial arrangements such as trusts, agency, and bailment, but they still recognized the general rule, *see id*. at 113 (Parker, C.B.) (recognizing another case holding "[t]hat the preamble shall not restrain the enacting clause" and recognizing that *Copeman* "exploded the notion of the preamble's governing the enacting clause," but adding that "if the not restraining the generality of the enacting clause will be attended with an inconvenience, the preamble shall restrain it"); *id*. at 118 (Hardwicke, Ch.) (agreeing with Parker).

[72] *King v. Athos*, 8 Mod. Rep. 136, 144 (K.B. 1723). *See id.* (Fortescue, J.) ("[I]t must be admitted, that a preamble may be a good expositor of a statute; but what was offered on the other side is not properly a preamble, but only introductive to an enacting part of a statute: besides . . . preambles are no more than recitals of inconveniences, which do not exclude any other to which a remedy is given by the

Blackstone summed up this understanding in explaining that, although the words of an enacting clause were "generally to be understood in their usual and most known signification," yet if its words, *after* due analysis, were "still dubious" or "ambiguous, equivocal, or intricate," one might look to the context, which included "the proeme, or preamble, [which] is often called in to help the construction of an act of parliament."[73] Chancellor Kent, a leading early American commentator, likewise reasoned that a preamble, although not technically part of the law, "may, at times, aid in the construction of" a statute or "be resorted to in order to ascertain the inducements to the making" of it, "but when the words of the enacting clause are clear and positive, recourse must not be had to the preamble."[74]

Prefatory language also was common in constitutions, and this rule of construction applied in the same way. Speaking of the preamble of the whole federal Constitution, Joseph Story in his *Commentaries* reiterated that statutory preambles are "properly resorted to, where doubts or ambiguities arise upon the words of the enacting part; for if they are clear and unambiguous, there seems little room for interpretation," and he could not see "any reason why, in a fundamental law or constitution of government," the same rule should not apply.[75] Similarly, the Supreme Court has held that the Constitution's preamble lacks any operative legal effect and that, even though it states the Constitution's "general purposes," it cannot be used to conjure a "spirit" of the document to confound clear operative language;[76] the Court has, however, also sought some guidance from the preamble when the operative text did not resolve a question.[77]

The same reasoning applied to declaratory phrases in the language of individual constitutional provisions, the closest analogies to the Second Amendment. The 1784 New Hampshire Constitution provided: "In criminal prosecutions, the trial of

---

enacting part."); *Kinaston v. Clark*, 26 Eng. Rep. 526, 527, 2 Atkyns Rep. 204 (Ch. 1741) ("There are many cases where the enacting part in a statute extends further than the preamble even in criminal matters . . . .").

[73] 1 William Blackstone, *Commentaries* *59–60. *See Crespigny v. Wittenoom*, 100 Eng. Rep. 1304, 1305, 4 Term Rep. 791 (K.B. 1792) (Buller, J.) ("I agree that the preamble cannot controul the enacting part of a statute, which is expressed in clear and unambiguous terms. But if any doubt arise on the words of the enacting part, the preamble may be resorted to, to explain it."); *id*. at 1306 (Grose, J.) ("Though the preamble cannot controul the enacting clause, we may compare it with the rest of the Act, in order to collect the intention of the Legislature.").

[74] 1 Kent, *Commentaries*, *supra* note 69, at 516. *See Mills v. Wilkins*, 87 Eng. Rep. 822, 822–23, 6 Mod. Rep. 62 (Q.B. 1703) ("[T]he title is not the law, but the name or description given to it by the makers: just as the preamble of a statute is no part thereof, but contains generally the motives or inducements thereof."); *see also* 2A Sutherland, *supra* note 69, § 47.04, at 221–22; *id*. at 224–25 ("The preamble can neither limit nor extend the meaning of a statute which is clear. Similarly, it cannot be used to create doubt or uncertainty.").

[75] 1 Joseph Story, *Commentaries on the Constitution of the United States* §§ 459–460, at 443–44 (1833; reprint 1991).

[76] *Jacobson v. Massachusetts*, 197 U.S. 11, 22 (1905).

[77] *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 821 n.31, 838 (1995); *id*. at 846 & n.1 (Thomas, J., dissenting); *see also Stenberg v. Carhart*, 530 U.S. 914, 953 (2000) (Scalia, J., dissenting).

facts in the vicinity where they happen, is so essential to the security of the life, liberty and estate of the citizen, that no crime or offence ought to be tried in any other county than that in which it is committed."[78] Even though in some cases a trial outside of the county where a crime was committed might bring it closer to the crime scene, or a judge might think a trial in the county where the crime occurred not "essential to" (or even in conflict with) "the security of the life, liberty and estate of the citizen," neither fact would justify disregarding the clear operative language of this constitutional provision.[79] Likewise, the pre-1787 constitutions of Massachusetts, New Hampshire, and Vermont declared that freedom of speech in the legislature was "so essential to the rights of the people" that words spoken there could not the basis of "any" suit.[80] One could not use this declaration to avoid the clear immunity conferred by the operative language, even where particular statements made in the legislature—such as an egregious slander unrelated to a pending bill—were not thought "essential to" the people's rights.[81] In addition, Madison's draft of what became the First Amendment's Free Press Clause read: "the freedom of the press, *as one of the great bulwarks of liberty*, shall be inviolable."[82] The emphasized declaratory language presumably could not have qualified or limited the freedom clearly conferred, such as by exempting from protection, as hostile to "liberty," publications advocating absolute monarchy.

A discussion at the Constitutional Convention demonstrates the same understanding, including that prefaces in a particular constitutional provision might merely state policy. What would become Article I, Section 8, Clause 16 of the Constitution, empowering Congress to "provide for organizing, arming, and disciplining the Militia," had reached its final form. But George Mason proposed "to preface" it with the phrase, "And that the liberties of the people may be better secured against the danger of standing armies in time of peace." He wished "to insert something pointing out and guarding against the danger of" standing armies. Madison spoke in favor, because the preface would "discountenance" a peacetime

---

[78] N.H. Const. art. I, § 17 (1784), *reprinted in* 4 *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws* 2455 (Francis Newton Thorpe ed., 1909; reprint 1993).

[79] *See* Eugene Volokh, *The Commonplace Second Amendment*, 73 N.Y.U. L. Rev. 793, 798, 804–05, 808–09 (1998); *Emerson*, 270 F.3d at 234 n.32.

[80] Mass. Const. pt. I, art. 21 (1780), *reprinted in* 3 *Federal and State Constitutions*, *supra* note 78, at 1892; N.H. Const. art. I, § 30 (1784), *reprinted in* 4 *id.* at 2457; Vt. Const. ch. I, § 16 (1786), *reprinted in* 6 *id.* at 3753.

[81] *See* Volokh, *supra* note 79, 73 N.Y.U. L. Rev. at 794–95, 799–800. As with statutes, constitutional prefaces and operative language often do not match exactly, the latter sometimes being overinclusive compared to the declaration and sometimes underinclusive. *See id*. at 801–07 (providing examples).

[82] *Creating the Bill of Rights: The Documentary Record from the First Federal Congress* 12 (Helen E. Veit et. al. eds., 1991) (emphasis added).

standing army while "not restrain[ing] Congress from establishing" one.[83] No doubt an organized, armed, and disciplined militia *would* generally "better secure" liberties against peace-time standing armies (by reducing the need for such armies and the threat from any that were created), and thus the operative grant of power "agree[d] with" the declaratory preface;[84] but the preface did not restrain or confine the power.

We see no reason to except the Second Amendment from this broadly applicable interpretive rule.[85] Thus, the Amendment's declaratory preface could not overcome the unambiguously individual "right of the people to keep and bear Arms" conferred by the operative text—even if the collective right and quasi-collective right schools' understanding of the preface's meaning were correct, and even though the preface might help resolve any ambiguities concerning the scope of that individual right remaining after one has analyzed the operative text. At the same time, any interpretation of the right ought, if possible consistent with its text, to further the declared justification in general, as the Court in *Miller* recognized when it stated that interpretation of the Amendment should keep the "end in view" of assuring the continuation and rendering possible the effectiveness of the militia.[86] As we explain in the remainder of this subpart—considering in turn the meaning of "Militia," what a "well regulated Militia" was, and the ultimate end of "the security of a free State"—the individual right view does further the ends set forth in the prefatory language, and therefore the preface, properly understood, is fully consistent with the individual right interpretation of the operative text.

### 2. The "Militia"

A key claim of the collective right and quasi-collective right schools with regard to the Second Amendment's preface is that a "well regulated Militia" is a standing military organization or body of troops, of limited size, organized and governed by state governments, albeit concurrently with the federal government (akin to voluntary select forces such as the National Guard that were established over a hundred years after the Amendment was adopted). As a result, the argument goes, the Amendment merely protects the states against federal efforts to undermine such forces, either by protecting the states directly or by protecting only persons serving in those forces.[87]

---

[83] Madison, *Notes of Debates*, *supra* note 44, at 639 (Sept. 14, 1787). Mason's proposal was defeated, apparently on the ground that it improperly impugned soldiers. *Id*. at 639–40.

[84] *Athos*, 8 Mod. Rep. at 144.

[85] The Ninth Circuit in *Silveira* provided only one paragraph on the proper relationship between a preface and operative language, concluding that the latter must be read "to implement the policy" of the former. *See* 312 F.3d at 1075.

[86] *United States* v. *Miller*, 307 U.S. 174, 178 (1939).

[87] *See, e.g.*, *Silveira*, 312 F.3d at 1069–72.

This argument disregards the understanding of the "Militia" at the time of the Founding. As used in the Second Amendment, and elsewhere in the Constitution, "Militia" referred to a body consisting of all adult male citizens up to a certain age (anywhere from forty-five to sixty), the goal being to include all who were physically capable of service. It was not limited to a select force of persons in active military duty. This entire population of able-bodied male citizens was involuntarily "enrolled" by local militia officials, somewhat as men now register for the selective service (except that enrollment required no action by the citizen), and all enrolled citizens were required by law to join occasional "exercise"—to which they were expected to bring their own, private arms—but they otherwise remained in civilian life. The militia "rest[ed] upon the shoulders of the people,"[88] because, as then understood, it consisted of a large number of the "people" at any one time and of all of the able-bodied white men for a substantial portion of their lives. It was the people embodied as an armed force. Thus, a key aspect of the term "Militia" was the composition of the force to which it referred. As a result, the reference to the "Militia" in the Second Amendment's preface "agrees with" the individual right that the Amendment's operative text sets out,[89] because securing to "the people" a right to keep and to bear their own arms made such a broad-based, privately armed force more likely to exist and to be effective.[90]

The term "Militia" was used in contrast both to a regular, standing army and, more importantly, to a "select militia" or "corps."[91] The latter distinction is evident throughout contemporaneous usage, "select militia" denoting a significantly smaller body, consisting either of better trained military professionals who could remain active for extended periods, or of those chosen selectively, perhaps because of political or other discrimination.[92] For example, at the Constitutional Convention, George Mason mentioned the need for federal regulation of the

---

[88] *Nordyke v. King*, 364 F.3d 1025, 1031 (9th Cir. 2004) (Gould, J., joined by O'Scannlain, Kleinfeld, Tallman, and Bea, J.J., dissenting from denial of rehearing en banc).

[89] *Athos*, 8 Mod. Rep. at 144.

[90] *See* Kopel, *supra* note 33, 93 Mich. L. Rev. at 1355 ("[O]ne of the reasons Congress guaranteed the right of the people to keep and bear arms was so that a popular militia could be drawn from the body of the people.") (footnote omitted). Thus, the *Silveira* court's description of the militia as "the state-created and -organized military force," 312 F.3d at 1069, is technically true but critically incomplete, because it ignores the composition of the militia.

[91] On the former distinction, see U.S. Const. art. I, § 8, cls. 12–16; art. I, § 10, cl. 3; art. II, § 2, cl. 1; amend. V; Articles of Confed. art. VI (contrasting a "body of forces" with "a well regulated and disciplined militia, sufficiently armed and accoutered."); *Authority of President to Send Militia Into a Foreign Country*, 29 Op. Att'y Gen. 322, 322 (1912) (Wickersham, A.G.) ("[T]he militia has always been considered and treated as a military body quite distinct and different from the Regular or standing army.").

[92] *See* Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 125 (discussing concerns of English Whigs after the English Revolution of 1688–1689 to maintain a citizens' militia as opposed to a select one); *id*. at 95–97, 103, 105 (discussing purges and selective disarmament of militia by Charles II and James II); *id.* at 63 (discussing Charles II's select militia).

militia to ensure that it was adequately trained. He suspected that the states would not relinquish "the power over the whole" but would "over a part as a select militia." He added that "a select militia" would be "as much as the Gen[eral] Gov[ernment] could advantageously be charged with," and thus suggested that it receive power only over "one tenth part" of the militia per year. Oliver Ellsworth, later to be a Senator and Chief Justice, objected because a "select militia" either would be impractical or would cause "a ruinous declension of the great body of the Militia."[93] Edmund Randolph, leader of the Virginia delegation, similarly equated the militia with "the whole mass" of the people.[94]

In the debate over ratification, both sides shared this broad understanding of "Militia." Among the Federalists, Madison in *The Federalist* predicted that a federal army bent on oppression would be opposed by "a militia amounting to near half a million of citizens with arms in their hands"—a group that he likened to the citizen bands that had fought in the Revolution and linked to "the advantage of being armed, which the Americans possess over the people of almost every other nation."[95] Alexander Hamilton described the militia as "the great body of the yeomanry and of the other classes of the citizens," "the great body of the people," and "the whole nation," which he contrasted with a "select corps."[96] A Connecticut Federalist writing as "The Republican" praised as "a capital circumstance in favour of our liberty" that "the people of this country have arms in their hands; they are not destitute of military knowledge; every citizen is required by Law to be a soldier; we are all martialed into companies, regiments, and brigades, for the defence of our country."[97] In a speech, later published, in response to South Carolina's vote to ratify, David Ramsay, a state legislator and delegate to the ratifying convention, praised the Constitution's militia powers and asked, "What European power will dare to attack us, when it is known that the yeomanry of the country uniformly armed and disciplined, may on any emergency be called out to our defence . . . ?"[98] Maryland's "Aristides," in a fairly widely circulated pamphlet, wrote simply that "the militia . . . is ourselves."[99]

Among the Anti-Federalists, Mason, in the Virginia Ratifying Convention, asked: "Who are the Militia? They consist now of the whole people," while

---

[93] Madison, *Notes of Debates*, *supra* note 44, at 478, 483–84 (Aug. 18, 1787).

[94] *Id*. at 515 (Aug. 23). John Adams also praised a militia of the whole people, as opposed to a select band, in works that he published in 1776 and 1787. See Part III.B.1 below.

[95] *The Federalist No. 46*, at 321 (James Madison). The population of all white males aged 16 and over in the 1790 census was 813,298, making Madison's number a fair approximation of the citizen militia. *See* U.S. Dept. of Commerce, Bureau of the Census, 1 *Historical Statistics of the United States* 16 (1975).

[96] *The Federalist No. 29*, at 183–85 (Alexander Hamilton).

[97] 1 *The Debate on the Constitution* 712 (Bernard Bailyn ed., 1993).

[98] 2 *id*. at 507. For Ramsey's biography, *see id*. at 1009.

[99] Aristides, *Remarks on the Proposed Plan of a Federal Government* (1788), *reprinted in* 15 *Ratification*, *supra* note 67, at 522, 533; *see id*. at 518–20 (note regarding circulation and responses).

warning that the new Congress might exempt the rich from service.[100] The Federal Farmer, a leading Anti-Federalist essayist, explained that the "militia, when properly formed, are in fact the people themselves," and counseled "that regular troops, and select corps, ought not to be kept up without evident necessity." If the federal government properly organized, armed, and disciplined the militia—including in it, "according to the past and general usage of the states, all men capable of bearing arms"—the country would have a "genuine" rather than "select militia." Under such wise regulation, "the militia are the people."[101]

This common sense of "Militia" also appeared in the House of Representatives' debates on the Second Amendment, discussed below in Part III.C.2, and the Second Congress applied it in the first Militia Act, enacted in 1792, two months after the Second Amendment was officially ratified. The Act required "each and every able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years," to be "enrolled in the militia" by the local commanding officer. Each enrolled citizen was required to provide his own arms—"a good musket or firelock" or "a good rifle"—plus ammunition and accouterments. These private arms were exempted from "all suits, distresses, executions or sales, for debt or for the payment of taxes." The enrollees were required to appear, armed, "when called out to exercise, or into service," although Congress left the details of exercise to each state.[102] (Since 1792, Congress has only expanded this definition, such as by eliminating the racial restriction and including some women.[103]) Finally, Noah Webster in his 1828 American dictionary defined "militia" in accord with this Act and the above understanding: "The militia of a country are *the able bodied men* organized into companies, regiments and brigades, with officers of all grades, and required by law to attend military exercises on certain days only, but at other times left to pursue their usual occupations." They were "enrolled for discipline, but not engaged in actual service except in emergencies."[104]

The analogy of the "Militia" to a select (and voluntary) corps such as the National Guard is further strained by the common law prohibition against the King's

---

[100] 10 *Ratification*, *supra* note 67, at 1312 (John P. Kaminski & Gaspare J. Saladino eds., 1993) (June 16, 1788).

[101] *Federal Farmer No. 18* (1788), *reprinted in* 2 *The Complete Anti-Federalist* 341–42 (Herbert J. Storing ed., 1981); *see also Federal Farmer No. 3* (1787), *reprinted in id.* at 242. Publius (Hamilton) recognized the *Federal Farmer* letters as among the best of the Anti-Federalists'. *See The Federalist No. 68*, at 457–58.

[102] Act of May 8, 1792, ch. 33, §§ 1–2, 1 Stat. at 271–72; *see* 2 Tucker's Blackstone, *supra* note 60, at *409 n.1.

[103] 10 U.S.C. § 311(a) (2000) (including in the militia "all able-bodied males at least 17 years of age and . . . under 45 years of age," both citizens and those "who have made a declaration of intention to become" citizens, certain men between 45 and 64, and "female citizens of the United States who are members of the National Guard").

[104] Webster, *American Dictionary*, *supra* note 55 (unpaginated) (emphasis added).

deploying the militia outside the country—a rule that Blackstone celebrated as part of the individual's "absolute right" of "personal liberty."[105] The Constitution appears to incorporate this rule, by specifying domestic reasons for the federal government to call out the militia: "to execute the Laws of the Union, suppress Insurrections and repel Invasions."[106] Implicit in the common law rule is that the militia was so composed that its members ought to be treated as ordinary citizens doing their duty, rather than as soldiers. President Taft's Attorney General reaffirmed this ancient rule in 1912 as Congress was developing the modern National Guard, which, partly to avoid this rule, was made a component of the regular military forces.[107]

The Supreme Court in *Miller*, relying on a brief historical survey, summarized as follows the definition of "Militia" that we have set out and explained above:

> The signification attributed to the term Militia appears from the debates in the Convention, the history and legislation of Colonies and States, and the writings of approved commentators. These show plainly enough that the Militia comprised *all males physically capable of acting in concert for the common defense*. "A body of citizens enrolled for military discipline." And further, that ordinarily when called for service these men were expected to *appear bearing arms supplied by themselves* and of the kind in common use at the time.[108]

If, as the Court recognized and historical usage confirms, the "Militia" was composed of the general population of able-bodied men, an individual right of the whole people to keep and bear arms would make eminent sense. A large portion of the "people" would be required to appear occasionally for service or simply training, and they were expected to bring their private arms. If the people could be disarmed, it would then, among other things, be impossible for militiamen to make the required provision of their privately provided arms when called up, and the citizen militia would be undermined.

---

[105] 1 William Blackstone, *Commentaries* *134, *138, *413.

[106] U.S. Const. art. I, § 8, cl. 15.

[107] *Authority of President to Send Militia Into a Foreign Country*, 29 Op. Att'y Gen. 322, 322 (1912) (Wickersham, A.G.); *see Perpich v. Dep't of Defense*, 496 U.S. 334, 341–44 (1990).

[108] 307 U.S. at 179 (emphases added); *see id.* at 179–82 (collecting historical support); *Presser v. Illinois*, 116 U.S. 252, 265 (1886) ("It is undoubtedly true that all citizens capable of bearing arms constitute the reserved military force or reserve militia of the United States as well as of the States."); *Maryland v. United States*, 381 U.S. 41, 46 (1965) (describing pre-World War I militia as "a citizen army").

### 3. The "Well Regulated" Militia

Advocates of the collective right and quasi-collective right views argue that the Amendment's reference in its preface to a "well regulated" militia indicates that the preface refers to a select, organized body akin to today's National Guard. They claim additional support for this argument from usage of the term "Militia" elsewhere in the Constitution, in the context of governmental power over the Militia.[109] No doubt the "Militia" was, through enrollment, exercise, and command when activated by a governor or president, a creature of the government. But it does not follow that the meaning of "Militia" as used in the Second Amendment depended on congressional (or state) legislation organizing or regulating the Militia. The word's use elsewhere in the Constitution and the Amendment's prefatory reference to a "well regulated Militia," properly understood, in fact suggest the opposite.

The Constitution distinguishes not only between the "Militia" and the regular armed forces but also between different parts and conditions of the militia. The latter distinctions appear in (1) Article I, Section 8, Clause 15, authorizing Congress to "provide for *calling forth* the Militia"; (2) the immediately following clause authorizing Congress to "provide for *organizing*, arming, and disciplining the Militia, and for governing *such Part of them* as may be employed in the Service of the United States"; (3) Article II, Section 2, Clause 1, making the President Commander in Chief of "the Militia of the several States" when "called into the *actual Service* of the United States"; and (4) the Fifth Amendment, which withholds the protection of the Grand Jury Clause from persons whose cases arise in the militia, but only when "in *actual service* in time of War or public danger" (cases in the army and navy, by contrast, are always exempted).

These provisions indicate that the militia is of a size that will make complete mobilization usually unnecessary, that members of the militia will often not be in service (or that not all parts of the militia will always be in service), and that when any members are not employed in "actual service," they ought to be treated as ordinary citizens. The "Militia" is both large and largely latent. In addition, the reference to "organizing . . . the Militia" suggests an entity that in some sense exists and is definable apart from congressional regulation, in contrast to "Armies," which Congress must "raise," pursuant to another power in Article I, Section 8. Congress might not "organiz[e]" *all* of the "Militia"; it might organize some parts differently from others; and it would be expected to give necessary precision to the definition of the body's membership by laying down a specific age range for service (as Congress did in the first Militia Act). But the background meaning of the word would remain. As an Anti-Federalist writer recognized: "[T]he militia is divided into two classes, viz. active and inactive," the former, he

---

[109] *See, e.g., Silveira*, 312 F.3d at 1069–72.

expected, likely to "consist of young men chiefly."[110] Thus, the use of "Militia" throughout the Constitution is consistent with the common understanding of the word at the Founding.

Nor does the preface's phrase "well regulated" alter this sense of "Militia"; rather, it presupposes it. Having an armed citizenry, which the operative text protects by establishing a right of individuals, becomes a necessary (albeit not sufficient) condition for a well-regulated militia once one properly defines "Militia." As one academic commentator has put it: "The Second Amendment simply forbids one form of inappropriate regulation," which would ensure a militia that was *not* well regulated, namely "disarming the people from whom the militia must necessarily be drawn. . . . [T]he one thing the government is forbidden to do is infringe the right of the people, who are the source of the militia's members, to keep and bear arms."[111] A militia composed of the whole body of able-bodied male citizens and only infrequently meeting for state-sponsored exercise is more likely to be "well regulated" in the bearing of arms, and can more readily be trained and disciplined, if its members possess their private arms and are accustomed to them from usage for private purposes between exercises.[112] And an individual right of the people to have arms has the indirect effect of securing the ability of states at least to have their militias armed.[113] As the Court stated in *Miller*, the Second Amendment seeks "to assure the continuation and *render possible* the effectiveness of" the militia of "all males physically capable of acting in concert for the common defense."[114] It protects the minimum for a well-regulated citizen militia.

In addition, the standard for a "well regulated *Militia*," as opposed to a well-regulated *select* militia, or well-regulated army, presupposes the background meaning of "Militia" by taking into account the body's large size and varied source. As the Militia Act of 1792 contemplated, it might be enough to have a county officer enroll persons and ensure that they possessed arms and knew how to use them through basic training once or twice a year. Similarly, the Virginia Declaration of Rights of 1776 defined "a well-regulated militia" as simply being "composed of the body of the people, trained to arms."[115] And the first New York Constitution declared that "the militia" should always "be armed and disciplined,

---

[110] Aristocrotis, *The Government of Nature Delineated, or An Exact Picture of the New Federal Constitution* (1788), *reprinted in* 3 *Complete Anti-Federalist*, *supra* note 101, at 202.

[111] Lund, *supra* note 33, 31 Ga. L. Rev. at 25, 26.

[112] *See Silveira*, 328 F.3d at 579 (Kleinfeld, J., joined by Kozinski, O'Scannlain, and T.G. Nelson, JJ., dissenting from denial of rehearing en banc) ("The panel seems to imagine that a well regulated militia is a people disarmed until the government puts guns in their hands after summoning them to service.").

[113] See Part IV.A below for St. George Tucker's discussion of a similar point.

[114] 307 U.S. at 178–79 (emphasis added).

[115] Va. Decl. of Rights § 13 (1776), *reprinted in* 7 *Federal and State Constitutions*, *supra* note 78, at 3814.

and in readiness for service" *because* "it is the duty of every man who enjoys the protection of society to be prepared and willing to defend it."[116]

Even those Founders skeptical of the benefits of the citizen militia, and who advocated a more highly regulated select corps, still recognized the distinction between the proper regulation of the two. Alexander Hamilton in *The Federalist* argued that it would be both "futile" and "injurious" for Congress to attempt to "disciplin[e] *all the militia* of the United States." Most enrolled citizens would need extensive "time and practice . . . under arms for the purpose of going through military exercises and evolutions as often as might be necessary to acquire the degree of perfection which would intitle them to the character of a well-regulated militia." But such a burden on so many citizens "would be a real grievance to the people and a serious public inconvenience and loss." Thus, as to "*the people at large,*" he expected that "[l]ittle more can reasonably be aimed at . . . than to have them properly armed and equipped" and, for this purpose, "assemble them once or twice" a year. He therefore recommended that Congress use its constitutional power to provide for organizing the militia also to form a select militia—"*a select corps* of moderate size."[117] Hamilton was reiterating George Washington's well-known recommendations to Congress for a two-tiered militia, consisting of (1) "the Citizens of America . . . from 18 to 50 years of age," who would be put "on *the Militia Rolls*" and given minimal training, and (2) "a *Corps* in every State" consisting of those aged 18–25.[118] From the opposite political pole, the Federal Farmer likewise recognized that Congress might make just such distinctions in "modelling the militia" and warned that creation of a "*select corps* of militia" would lead to "inattention to *the general militia.*"[119]

This understanding of the "well regulated Militia," and of the possibilities for congressional organization of it (or not), leads to a view of the preface that not only fits the meaning of "Militia" in common contemporaneous usage, including throughout the Constitution, but also most agrees with the meaning of the Second Amendment's operative text setting out a "right of the people." The "well regulated Militia" and the "people" were not identical, but because of their close relationship, a right of the latter—of individuals—to keep and bear arms would facilitate the former. By contrast, a view rejecting the individual right on the basis of the preface's reference to the "well regulated Militia" struggles to harmonize the operative language establishing a seemingly general and individual right with that prefatory language. As Justice Scalia has written, a narrow definition of "Militia" "produces a guarantee that goes far beyond its stated purpose—rather

---

[116] N.Y. Const. § 40 (1777), *reprinted in* 5 *id.* at 2637.

[117] *The Federalist No. 29*, at 183–84 (Alexander Hamilton) (emphases added).

[118] *Sentiments on a Peace Establishment* (1783), *reprinted in* 3 *The Founders' Constitution* 129 (Phillip B. Kurland and Ralph Lerner eds., 1987) (emphases added).

[119] *Federal Farmer No. 3*, *reprinted in* 2 *Complete Anti-Federalist*, *supra* note 101, at 242; *Federal Farmer No. 18*, *reprinted in id.* at 342 (emphases added).

like saying 'police officers being necessary to law and order, the right of the people to carry handguns shall not be infringed.'"[120] The "Militia" on this erroneous view consists only of those few citizens whom a state chooses to specially organize, arm, and train into professional units, which requires one to reject the normal, unambiguous meaning of the operative text as overbroad, rewriting "the people" to mean either "the select militia" or "the State." If that were the true meaning, the Amendment's authors chose singularly inartful language.

### 4. The "Security of a Free State"

The preface's express linking of the "well regulated Militia" to the ultimate necessity of "the security of a free State" is also fully consistent with the conclusion that the "right of the people to keep and bear Arms" is a personal one. The security of a free state at the Founding no doubt was understood to include those things necessary to the security of any state, such as "to execute the Laws . . . , suppress Insurrections and repel Invasions."[121] But the security of a *free* state was not just these things. It also was understood to include the security of freedom in a state. Thus, while Blackstone recognized the individual liberty of the press as "essential to the nature of a free state," pre-1787 state constitutions described the same right as "essential to the security of freedom in a state."[122] The Preamble of the Constitution states the goal of making "secure the Blessings of Liberty," and the Fourth Amendment highlights the importance of the individual "right of the people to be secure in their persons, houses, papers, and effects." A secure *free* state was one in which liberties and rights were secure.

This clause of the Second Amendment's preface reinforces the individual right to keep and bear arms in two related ways—by supporting the broad meaning of "Militia" set out above, and by identifying a benefit for individuals of the right that the operative text secures. First, to say at the time of the Founding that the militia was necessary to the security of a "free State" was to refer to the citizen militia, composed of the people, who retained the right to keep and use their private weapons. A select militia, particularly if it existed to the exclusion of the citizen militia, might undermine the free state, if citizens excluded from it were left defenseless, or if it disarmed the citizens and infringed their other rights (or both). As we show in Part III.A, that is what had happened in England during the

---

[120] Antonin Scalia, Response, *in A Matter of Interpretation: Federal Courts and the Law* 137 n.13 (1997).

[121] U.S. Const. art. I, § 8, cl. 15; *see id*. amend V (discussing militia service in "War or public danger").

[122] 4 William Blackstone, *Commentaries* *151; *e.g.*, Mass. Const. pt. I, art. 16 (1780), *reprinted in* 3 *Federal and State Constitutions*, *supra* note 78, at 1892. Similarly, the English Declaration of Rights, well known to the Founding Generation, see Part III.A below, charged King James II with having sought to "subvert and extirpate" the "liberties of this kingdom" by taking several actions "utterly and directly contrary to" the "freedom of this realm." 1 W. & M., 2d Sess., c. 2, § 1 (1689).

strife that produced in 1689 the express right of individual subjects to have and use arms for their defense, the ancestor of the right in the Second Amendment.[123] Thus the Virginia Declaration of Rights, the only state bill of rights before the adoption of the Second Amendment that expressly tied the militia to the security "of a free State," also emphasized that the "militia" was "composed of the body of the people."[124]

Contemporaneous writers across the political spectrum acknowledged the link between the citizen militia and securing the freedom of a state. "The Republican" praised "a militia of freemen" as among the "principal circumstances which render liberty secure," and singled out as "a capital circumstance in favour of our liberty" that "the people themselves are the military power of our country," having "arms in their hands" and "military knowledge."[125] The Federal Farmer listed among the "military forces of a free country" the "militia," by which he meant "the people themselves . . . when properly formed." A citizen militia was critical to "the duration of a free and mild government." Absent it, and in the face of an "anti-republican" select militia, "the substantial men, having families and property, will generally be without arms, without knowing the use of them, and defenceless; whereas, to preserve liberty, it is essential that the whole body of the people always possess arms, and be taught alike, especially when young, how to use them."[126] James Burgh, a Scotsman whose 1774 *Political Disquisitions* were well-known in America, including being cited in *The Federalist*, wrote that a "good militia" formed "the chief part of the constitution of every free government" and would "preserve the public liberty." He added that "[t]he possession of arms is the distinction between a freeman and a slave. . . . [H]e who thinks he is his own master, and has anything he may call his own, ought to have arms to defend himself and what he possesses, or else he lives precariously and at discretion."[127]

---

[123] *See also* Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 50–53, 115–16, 123 (militia officers' use of discretionary power to disarm); *id*. at 45–46 (disarmament by Charles II prior to 1662); *id*. at 85 (disarmament by militia in 1678); *id*. at 103 (use of militia by James II to disarm suspicious persons); *id*. at 105 (attempted use of militia in 1686 to disarm by enforcing game act); *id*. at 31 (in Civil War); *see also id*. at 92–93, 95 (in response to 1683 Rye House plot; confiscated arms given to militia); *id*. at 100 (disarmament by Charles II in western England early in reign, and in response to Rye House plot later). Efforts to disarm and undermine the militia also included requiring its members to "store" their arms in government magazines. *See id*. at 38, 78–79, 96–97; *see also id*. at 3, 5, 10–11 (discussing private ownership and storage prior to English Civil War, and failed plans to require public storage). The actions of white militias toward freed blacks in the South after the American Civil War were similar. See Part IV.C below.

[124] Va. Decl. of Rights § 13 (1776), *reprinted in* 7 *Federal and State Constitutions*, *supra* note 78, at 3814; *see also* Md. Const., Decl. of Rights § 25 (1776), *reprinted in* 3 *id*. at 1688 ("That a well-regulated militia is the proper and natural defence of a free government.").

[125] 1 *Debate on the Constitution*, *supra* note 97, at 711–12.

[126] *Federal Farmer No. 18*, *reprinted in* 2 *Complete Anti-Federalist*, *supra* note 101, at 341–42.

[127] James Burgh, *Political Disquisitions*, *reprinted in part in* 3 *Founders' Constitution*, note 118, at 126, 125; *see The Federalist No. 56*, at 382 n.* (James Madison); *see also* 2 Tucker's Blackstone, *supra* note 60, at *245 n.7 (quoting Burgh's *Disquisitions*). In both passages, Burgh was loosely

Thus, "every male" should be trained in the use of arms, or at least "all men of property."[128]

Second, and related, the freedom of a state was understood at the time of the Founding to include a citizen's individual right of self-defense (that is, defense of his right to life and personal security) when the state cannot assist him. An individual right to arms such as that secured by the Second Amendment's operative text helps to preserve this basic right and thus a free state. As the preface indicates, the existence of a well-regulated citizen militia further secures the link between such an individual right and this aspect of a free state (by increasing the number of persons equipped and trained to exercise the right well), but, as the discussion of the militia in the previous paragraph suggests, this link was not understood to be confined to one's actions while participating in even such a broad-based entity.[129] Blackstone's summary of key English rights explains this point. With no mention of the militia, he described the "right of having and using arms for self-preservation and defence" as the last security of individual English subjects for keeping the state, including themselves, free:

> [T]he rights, or, as they are frequently termed, the liberties of Englishmen . . . consist primarily, in the free enjoyment of personal security, of personal liberty, and of private property. So long as these remain inviolate, the subject is perfectly free; for every species of compulsive tyranny and oppression must act in opposition to one or other of these rights, having no other object upon which it can possibly be employed. To preserve these from violation, it is necessary, that the constitution of parliament be supported in its full vigour; and limits, certainly known, be set to the royal prerogative. And lastly, to vindicate these rights, when actually violated or attacked, the subjects of England are entitled, in the first place, to the regular admin-

---

quoting Andrew Fletcher, a prominent member of the Scottish Parliament prior to union with England in 1707. *See A Discourse of Government With Relation to Militias* (1698), *reprinted in* Andrew Fletcher, *Political Works* 21–22 (John Robertson ed., 1997); *Speeches by a Member of the Parliament, No. 7* (1703), *reprinted in id*. at 149–50. Regarding Fletcher and Burgh, see David Thomas Konig, *The Second Amendment: A Missing Transatlantic Context for the Historical Meaning of "the Right of the People to Keep and Bear Arms,"* 22 L. & Hist. Rev. 119, 125–26, 136–39 (2004).

[128] Burgh, *Political Disquisitions*, *reprinted in* 3 *Founders' Constitution*, note 118, at 124, 126. As Fletcher put it: "I cannot see, why arms should be denied to any man who is not a slave, since they are the only true badges of liberty . . . neither can I understand why any man that has arms, should not be taught the use of them." *A Discourse of Government*, *reprinted in* Fletcher, *Political Works*, *supra* note 127, at 23.

[129] The duty to serve in the militia and the right to possess or carry weapons for self-defense were related but distinct in colonial America. One might have the latter without the former. *See* Cottrol & Diamond, *supra* note 33, 80 Geo. L.J. at 325–37 (surveying colonial laws and explaining the development of "the view that the security of the state was best achieved through the arming of all free citizens," regardless of eligibility for militia service); see also Part II.B.1 above (discussing right to "keep" arms for private purposes).

istration and free course of justice in the courts of law; next, to the right of petitioning the king and parliament for redress of grievances; and, lastly, to the right of having and using arms for self-preservation and defence.

This right to arms, Blackstone added, facilitates self-defense "when the sanctions of society and laws are found insufficient to restrain the violence of oppression."[130] John Locke, although not explicitly discussing arms, similarly explained the individual right of self-defense that a free society allows. Discussing the right of self-defense against a robber, he wrote: "I have no reason to suppose that he who would *take away my liberty*, would not, when he had me in his power, take away everything else." Therefore "the law, which was made for my preservation, where it cannot interpose to secure my life from present force, which if lost, is capable of no reparation, permits me my own defence."[131]

It is therefore reasonable to conclude that the ability of a "right of the people to keep and bear Arms" to further the Second Amendment preface's ultimate end of the "security of a free State" consisted not merely in the existence of a trained band ready to act as soldiers should the state's *government* call upon them, but also in the ability of the citizens (many of them part of the privately armed citizen militia), by individually keeping and bearing arms, to help secure the freedoms of the state and its citizens.[132] Thus, the "people" in the Second Amendment were distinct from the "Militia" and a "State," but a right of the people to keep and bear arms was understood both to facilitate a well-regulated militia and to help maintain a state that was free. By contrast, the collective right and quasi-collective right views would sanction not only the creation of a select militia (to the exclusion of the citizen militia) but also the disarming of the rest of the citizenry, a

---

[130] 1 William Blackstone, *Commentaries* *144. Blackstone also described the fundamental "right of personal security" as including protection against "loss of limb," so as to guard a man's ability "to protect himself from external injuries in a state of nature," and condemned any destruction of limbs as "a manifest breach of civil liberty," *id*. at *129, *130; and he set out the basic common law rule of self-defense, "the primary law of nature," by which it is lawful for a person "forcibly attacked in his person or property . . . to repel force by force" without being liable for breach of the peace or a resulting homicide, 3 *id*. at *3–4. The importance of this right of self-defense was reinforced by the absence of any constitutional duty of government to defend citizens' lives, liberty, or property. *See DeShaney v. Winnebago Cnty. Soc. Servs. Dep't*, 489 U.S. 189, 195–97 (1989).

[131] John Locke, *Second Treatise of Government* §§ 18–19, at 12–13 (Richard H. Cox ed., 1982) (1689); *see also id*. §§ 204–10, at 126–29 (similar). Blackstone and Locke disagreed on the exact scope of the right of self-defense. 4 William Blackstone, *Commentaries* *181–82; *see also* 1 *id*. at *251. Locke was, after Blackstone and Montesquieu, the writer whom American political writers of the Founding cited most. Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 142 & 214 n.44. His thinking is particularly evident in the Declaration of Independence. *See also* 2 Tucker's Blackstone, *supra* note 60, at *161 & n.25.

[132] *See* Van Alstyne, *supra* note 33, 43 Duke L.J. at 1243 (The Second Amendment "looks to an ultimate reliance on the common citizen who has a right to keep and bear arms . . . as an essential source of security [for] a free state."); *see also* Lund, *supra* note 33, 31 Ga. L. Rev. at 24.

result antithetical to the true "Militia" as understood at the Founding and to the "free State" that the Founding Generation understood it to secure.

## D. Structural Considerations

Our conclusion that the text of the Second Amendment protects an individual right is further confirmed by the structure of the Constitution, in particular the Amendment's placement and its inter-relation with the powers that the Constitution grants over the militia.

### 1. The Bill of Rights

The Second Amendment is embedded within the Bill of Rights. Every one of the other rights and freedoms set forth in the first nine amendments of the Bill—whether or not phrased as a "right of the people"—protects individuals, not governments; none of its provisions protects persons only in connection with service to the government.[133] As Thomas Cooley summarized, writing of the Bill's first eight amendments, "[I]t is declared that certain enumerated liberties of the people shall not be taken away or abridged."[134] It is therefore reasonable to interpret the Second Amendment to protect individuals just as the rest of these nine amendments do.

More particularly, the Second Amendment is located within a subset of the Bill of Rights amendments, the First through Fourth, that relates most directly to personal freedoms (as opposed to judicial procedure regulating deprivation by the government of one's life, liberty, or property)—the amendments that, in Story's words in his *Commentaries*, "principally regard subjects properly belonging to a bill of rights."[135] These four amendments concern liberties that are tied to the right of individuals to possess and use certain property (the printing "press" in the First

---

[133] *Cf. Planned Parenthood v. Casey*, 505 U.S. 833, 847 (1992) (rejecting argument that the personal "liberty" that the Fourteenth Amendment protects "encompasses no more than those rights already guaranteed *to the individual* against federal interference by the express provisions *of the first eight Amendments*") (emphasis added) (citation omitted); *Moore v. City of East Cleveland*, 431 U.S. 494, 502 (1977) (plurality opinion) (similar, quoting *Poe v. Ullman*, 367 U.S. 497, 542–43 (1961) (Harlan, J., dissenting)); *Johnson v. Eisentrager*, 339 U.S. 763, 784 (1950) (describing First, Second, Fourth, Fifth, and Sixth Amendments as the "civil-rights Amendments"); *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897) (describing Bill of Rights as embodying "certain guaranties and immunities which we had inherited from our English ancestors"). While some might argue that, as an original matter, the First Amendment's Establishment Clause (which makes no reference to any "right" or "freedom") was an exception to this rule, the Supreme Court has held that it too creates an individual right, applicable even against states. *See Zelman v. Simmons-Harris*, 536 U.S. 639, 678 (2002) (Thomas, J., concurring); *Everson v. Bd. of Educ.*, 330 U.S. 1, 8 (1947); David Currie, *The Constitution in the Supreme Court: The Second Century* 339–40 (1990).

[134] Cooley, *General Principles*, *supra* note 41, at 200.

[135] Story, *Abridgement*, *supra* note 66, § 984, at 698 (commencing discussion of First through Fourth, and Eighth through Tenth Amendments).

Amendment,[136] "house[s]" in the Third's restriction on quartering soldiers, and "houses, papers, and effects" in the Fourth's restriction on searches and seizures), or otherwise to act without undue governmental interference (worship, speech, assembly and petition). Again, it seems reasonable to interpret the Second Amendment, consistently with this context, to set out another personal liberty (keeping and bearing) and privileged form of individual property (arms), useful for protecting not only the citizen's person but also the "houses" that the Third and Fourth Amendments guard.[137]

Finally, the right in the Second Amendment immediately follows the right to assemble and petition, which concludes the First Amendment. The latter right is undeniably personal and individual, not depending on governmental organization, regulation, or service. And the two are aligned, not only in their placement but also in their origin, purpose, and limitations. Antecedents of both appeared in proximity in the English Bill of Rights of 1689.[138] Blackstone, in the passage block-quoted in the previous subpart, discussed in immediate succession their dual utility as guards of the great individual rights of life, liberty, and property,[139] and he did likewise in discussing the criminal law's limitations on abuses of those rights.[140] St. George Tucker, the first leading American commentator on Blackstone and the Constitution (discussed more in Part IV.A below), noted that both rights had been transplanted to the United States from England, both stripped of many English restrictions.[141] It follows that the former right—that secured by the Second Amendment—also would be individual.

---

[136] *See* 4 William Blackstone, *Commentaries* *152 n.a; John O. McGinnis, *The Once and Future Property-Based Vision of the First Amendment*, 63 U. Chi. L. Rev. 49, 92–94 (1996).

[137] *Compare* 1 William Blackstone, *Commentaries* *138 ("The third absolute right, inherent in every Englishman, is that of property: which consists in the free *use, enjoyment, and disposal* of all his acquisitions, without any control or diminution, save only by the laws of the land.") (emphasis added), *with id.* at *144 (recognizing "the right of *having and using* arms") (emphasis added); see Part II.B.1 above (discussing English cases in 1700s approving the "keeping" of arms for defense of one's self and home).

[138] 1 W. & M., 2d Sess., c. 2, § 1, paras. 5 & 7 of the list of rights.

[139] *See also* 1 William Blackstone, *Commentaries* *143–44 (similar); 2 Jean L. De Lolme, *The Rise and Progress of the English Constitution* 886–87 (A.J. Stephens ed., 1838) (1784) (noting that English Bill of Rights "expressly ensured to individuals the right of publicly preferring complaints against the abuses of the government, and, moreover, of being provided with arms for their own defence," and then quoting 1 William Blackstone, *Commentaries* *144 regarding these rights).

[140] *See* 4 *id.* at *145–49 (discussing the following misdemeanor breaches of the peace: affray, riot, rout, unlawful assembly, tumultuous petitioning, forcible entry or detainer, and going armed with dangerous or unusual weapons to the terror of the people). Among felonies against the public peace, Blackstone first listed violation of the Riot Act against "riotous assembling of twelve persons" and then described "unlawful hunting" in certain parks, which involved being disguised and "armed with offensive weapons." *Id.* at *142–44.

[141] 2 Tucker's Blackstone, *supra* note 60, at *143–44 nn. 38–41. *See also United States v. Cruik-shank*, 92 U.S. 542, 551–53 (1876) (analyzing the two rights similarly); *Logan v. United States*, 144 U.S. 263, 286–87 (1892) (same).

## 2. The Militia Powers

Interpreting the Second Amendment in light of the militia powers granted to the federal government and the states in the original Constitution likewise suggests an individual right to keep and bear arms rather than a "right" of states, against the federal government, to maintain select militias or a quasi-collective right to be exercised only by persons who serve in such entities. Clauses 15 and 16 of Article I, Section 8, respectively grant power to Congress:

> To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions; [and]

> To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.

In addition, Article II, Section 2, makes the President "Commander in Chief . . . of the Militia of the several States, when called into the actual Service of the United States."

These clauses, independently of the Second Amendment, presuppose the existence of functioning state militias and leave significant powers over them to the states. The states expressly retain the powers to appoint all officers and to train the militia according to federally specified rules. They implicitly retain the power of "governing" any parts of the militias not in actual service to the federal government, and of having those state-appointed officers govern the militias even when in such service, subject to the President's supreme authority. The provision regarding officers is why Hamilton could argue credibly in *The Federalist* that the states always would retain "a preponderating influence over the militia."[142] The Constitution, in elsewhere prohibiting states from "keep[ing] Troops, or Ships of War in time of peace," while still allowing them to "engage in War" if "actually invaded" or under an imminent threat, contemplates that the states will have, and have power to employ, usable militias to provide necessary defense and emergen-

---

[142] *The Federalist No. 29*, at 185 (Alexander Hamilton); *see also The Federalist No. 46*, at 321–22 (James Madison).

cy war-making ability.[143] More broadly, the states implicitly retain the power to call out the militia on their own for domestic purposes.[144]

The original Constitution also leaves to the states concurrent power to provide for organizing, arming, and disciplining their militias, so long as in so doing they do not interfere with the federal power. This interpretation has been recognized from the beginning: At the critical Virginia Ratifying Convention, Henry Lee (future Governor of Virginia and congressman), Edmund Randolph (a Framer who became the first Attorney General), Madison, and John Marshall all made this textual argument in response to attacks on the federal power to make such provision.[145] Story found the arguments for such a concurrent power "in their structure and reasoning satisfactory and conclusive."[146] The Supreme Court approved this reading in 1820 in *Houston v. Moore*,[147] and has recently reiterated it. Looking to the "general plan" of the Constitution, the Court noted in 1990 that, "Were it not for the Militia Clauses, it might be possible to argue," much as one could regarding federal power over foreign policy and the armed forces, "that the constitutional allocation of powers precluded the formation of organized state militia. The Militia Clauses, however, subordinate any such structural inferences to an express permission while also subjecting state militia to express federal limitations."[148] Even the Ninth Circuit in *Silveira* so interpreted Article I, Section 8, Clause 16: "The language indicates that the grant of power [to Congress] is permissive. . . . Nothing in the Article or elsewhere in the Constitution appears to bar the states from choosing to arm their respective militias as they wish."[149]

In at least two respects, the above militia powers in the Constitution suggest an individual right view of the Second Amendment. First, any constitutional amendment securing to the states power to maintain militias would have been largely redundant, whether the amendment protected the power through a "right" of states or a right restricted to persons serving in militia units that a state had organized. A provision should not be read to be redundant if another reasonable interpretation

---

[143] U.S. Const. art. I, § 10, cl. 3. *See Houston v. Moore*, 18 U.S. (5 Wheat.) 1, 52 (1820) (Story, J., dissenting); Va. Ratif. Conv., *in* 10 *Ratification*, *supra* note 67, at 1307 (remarks of John Marshall, June 16, 1788).

[144] *See* Story, *Abridgement*, *supra* note 66, § 593, at 425; Va. Ratif. Conv., *in* 10 *Ratification*, *supra* note 67, at 1304, 1311 (remarks of James Madison, June 16, 1788); *id*. at 1306–07 (remarks of John Marshall, same).

[145] *Compare* 9 *Ratification*, *supra* note 67, at 1074 (John P. Kaminski & Gaspare J. Saladino eds., 1990) (H. Lee, June 9, 1788), *id*. at 1102 (Randolph, June 10, 1788), 10 *id*. at 1273 (Madison, June 14, 1788), *id*. at 1306–08 (Marshall, June 14, 1788); *with* 9 *id*. at 957–58, 1066 (Patrick Henry, June 5 & 9, 1788), 10 *id*. at 1270–71 (George Mason, June 14, 1788), *id*. at 1305 (William Grayson, June 16, 1788). Henry Lee should not be confused with his Anti-Federalist cousin Richard Henry Lee.

[146] 3 Story, *Commentaries*, *supra* note 75, § 1202, at 85–86.

[147] 18 U.S. (5 Wheat.) 1 (1820). See Part IV.B.1 below.

[148] *Perpich*, 496 U.S. at 353–54 (footnotes omitted).

[149] 312 F.3d at 1081 n.43.

exists, and the individual right view of the Amendment is such an interpretation. Second, one also would expect a protection of the states' militia powers to use language analogous to that of Clause 16, which concludes by "*reserving to the States respectively*, the Appointment of the Officers, and *the Authority* of training the Militia according to the discipline prescribed by Congress."[150] Clause 16's parallel to the protection of state power in the Tenth Amendment, which provides that certain *powers* are "*reserved to the States respectively*" (while mentioning "the people" separately), is unmistakable, as is the contrast between such language and the Second Amendment's protection of a "right of the people." Given the ready availability of such language, it would be both surprising and inartful for a protection of state authority to create and maintain organized militias to be phrased as the Second Amendment is, whether one conceives of the protection as belonging to the states directly or to those serving it.

The Militia Clauses therefore suggest that the Second Amendment, to the extent that it furthers the states' authority to maintain organized militias, does so indirectly, as we discussed in Part II.C.2 & 3, by ensuring the minimum of a "well regulated Militia"—that the States' *people*, the pool for the citizen militia, would continue to be able to keep and to bear their private arms, having them ready and being familiar with them. Thus the Militia Clauses, along with the structure of the Bill of Rights and the preface of the Second Amendment, all support the personal, individual right to keep and bear arms that the Amendment's operative text sets out.

### III. The Original Understanding of the Right to Keep and Bear Arms

In the previous part, we focused on the text and structure of the Constitution, considering the meaning of the Second Amendment's words and phrases when they were adopted and how the Amendment's meaning is informed by its interrelation with the rest of the Constitution. In this part, we take a broader view and consider the Anglo-American right to arms as it existed at the time of the Founding and informed the adoption of the Second Amendment. This history, like the text, indicates that the Amendment secures an individual right.

We first consider the historical context of the right to arms, both (A) in England beginning with the Revolution of 1688–1689 and (B) in America through the American Revolution and the first state constitutions. The right was consistently a personal one. Beginning with the right of individual English subjects to have arms for their defense, it was supplemented in revolutionary America with the notion that a citizen militia, comprising the armed citizenry, was a particularly important means of securing free government. As one judge recently put it, the Americans of the Founding Generation "were the heirs of two revolutions," both of which had

---

[150] As we explain below in Part III.C, several state ratifying conventions unsuccessfully proposed similar language in suggested amendments distinct from those securing the right to bear arms.

impressed upon them the importance of an individual right to have and use arms.[151] This background understanding of the right is inconsistent with either the collective right or quasi-collective right views. Next, in Part III.C, we turn to (1) the framing and ratification of the Constitution and (2) the framing and ratification of the Second Amendment. This history demonstrates that the background understanding, far from being transformed or curtailed, was incorporated in that Amendment, just as the Bill of Rights incorporated many other traditional rights of individuals. By contrast, separate proposals to amend the Constitution to safeguard powers of the states to establish and maintain organized militias failed.

### A. The Right Inherited From England

As the Supreme Court has recognized, "[t]he historical necessities and events of the English constitutional experience . . . were familiar to" the Framers and should "inform our understanding of the purpose and meaning of constitutional provisions."[152] This rule is particularly applicable to provisions such as the Second Amendment, because "[t]he law is perfectly well settled that the first ten amendments to the Constitution, commonly known as the Bill of Rights, were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors."[153]

The right to arms that colonial Americans inherited from England had been set out first in the English Declaration of Rights of 1689, and then had been expounded by William Blackstone in his authoritative *Commentaries on the Laws of England* in the decade before the American Revolution. Both the Declaration and Blackstone made clear that the English right was a personal, individual one, not a "right" belonging to any government or restricted to persons in governmental service. The English right could not have been a federalism provision, because England lacked a federal structure; and neither the Declaration nor the law as expounded by Blackstone conditioned the right on a subject's service in any militia.

The Declaration of Rights was a product of the English Revolution of 1688–1689 (commonly known as the Glorious Revolution). In 1660, a special "Convention" Parliament had restored the English monarchy by crowning Charles II,[154] and two statutes enacted under him provided background for the Declaration's provisions on arms. First was the Militia Act, enacted by the royalist Parliament in

---

[151] *Silveira*, 328 F.3d at 580 (Kleinfeld, J., joined by Kozinski, O'Scannlain, and T.G. Nelson, JJ., dissenting from denial of rehearing en banc).

[152] *Loving v. United States*, 517 U.S. 748, 766 (1996).

[153] *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897), discussed further below in Part IV.D.

[154] *See* 1 William Blackstone, *Commentaries* *151.

1662.[155] It authorized militia officers on their own warrants "to search for and seize all arms" of anyone they judged "dangerous to the peace of the kingdom," including through entering houses by force if necessary, the arms to be handed over to the militia and no judicial recourse being available.[156] Charles II repeatedly used this power,[157] aided not only by the regular militia but also by a volunteer army that he had organized unilaterally,[158] and by a select militia of about 15,000 that he formed in 1666.[159] The second statute was the Game Act of 1671, which, in the name of protecting wildlife, was "the first law in English history that took from the majority of Englishmen the privilege of having firearms."[160] It outlawed possession of guns (not just their use in hunting) by anyone not among the few rich qualified to hunt game.[161]

Concerns escalated after the accession in 1685 of Charles's brother, King James II. He was openly Roman Catholic, at a time of sharp political distrust between England's Protestants and Catholics.[162] He disarmed the Protestant militia of Ireland by seizing their arms and placing them in government magazines, while returning the arms of Ireland's Roman Catholics. In England, he continued to use the militia to disarm persons of questioned loyalties, including through strictly

---

[155] The Founders were well aware of the events leading up to the Declaration. A delegate at the Massachusetts Ratifying Convention, warning against overreacting to the weakness of the Articles of Confederation, pointed to the Restoration, in which the people, "so vexed, harassed and worn down . . . [had] run mad with loyalty, and would have given Charles any thing he could have asked." 1 *Debate on the Constitution*, *supra* note 97, at 897 (remarks of Charles Turner, Jan. 17, 1788). A delegate at Virginia's convention drew the opposite lesson: The new Constitution would prevent the anarchy that had led England into the arms of Charles II. 2 *id.* at 756 (remarks of Zachariah Johnston, June 25, 1788).

[156] 13 & 14 Car. II, c. 3, § 14.

[157] Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 36, 38, 43, 45–48, 50–53, 85, 100, 115–16, 123; *see also id.* at 92–93, 95; Lois G. Schwoerer, *The Declaration of Rights, 1689*, at 76 (1981) ("Charles II had made effective use of" the militia acts "to try to snuff out political and religious dissent," disarming individuals and towns and confiscating weapons). He had begun doing so as soon as he assumed the throne. An interim act in 1661 approved his actions and provided indemnity to militiamen. 12 Car. II, c. 6, § 3 (favorably recognizing that "divers arms have been seized and houses searched for arms"); *cf. The Federalist No. 69*, at 465 n. (Alexander Hamilton) (discussing 1661 act).

[158] Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 36–39.

[159] *Id.* at 63. *See also* Schwoerer, *Declaration*, *supra* note 157, at 75–76 (describing Charles II's actions, including disarmament, and noting rise of complaints from Commons beginning in 1668).

[160] Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 12; *see id.* at 69–76; Schwoerer, *Declaration*, *supra* note 157, at 78 (describing it as "the most stringent and comprehensive of the game laws") (internal quotation marks omitted).

[161] 22 & 23 Car. II, c. 25, § 3 (providing that all who did not have estate "of the clear yearly value of one hundred pounds" per year were "not allowed to have or keep for themselves, or any other person or persons, any guns, bows, greyhounds . . . or other engines").

[162] *See* 4 William Blackstone, *Commentaries* *55 (explaining various legal disabilities on certain Roman Catholics, including several dating from English Revolution or earlier, by stating that such persons "acknowledge a foreign power, superior to the sovereignty of the kingdom"); *id.* at *58 (hoping that "a time . . . should arrive" soon when it would be safe to "review and soften these rigorous edicts").

enforcing the Game Act, although he ultimately preferred to undermine the militia (whose loyalty he questioned), by restricting musters. He also accelerated and expanded his brother's policy of purging opponents, and Protestants in general, from the militia's and army's officer corps, and geometrically enlarged the standing army.[163]

James II fled soon after William of Orange landed in England in late 1688 at the invitation of leading Englishmen. A Convention Parliament in early 1689 adopted the Declaration of Rights, which William and his wife Mary (James's daughter) accepted before Parliament proclaimed them King and Queen, and which the ensuing regular Parliament enacted as the Bill of Rights.[164] A hundred years later, Alexander Hamilton in *The Federalist* celebrated "the revolution in 1688," when at last "English liberty was completely triumphant."[165]

The Declaration first listed twelve indictments of James II for having attempted to subvert "the laws and liberties of this kingdom," including:

> 5. By raising and keeping a standing army within this kingdom in time of peace, without consent of parliament, and quartering soldiers contrary to law.

> 6. By causing several good subjects, being protestants, to be disarmed, at the same time when papists were both armed and employed, contrary to law.

Then, in a roughly parallel list of thirteen "ancient rights and liberties," the Declaration stated:

> 6. That the raising or keeping a standing army within the kingdom in time of peace, unless it be with consent of parliament, is against law.

> 7. That the subjects which are protestants may have arms for their defence suitable to their conditions and as allowed by law.

---

[163] *See* Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 95–106; Schwoerer, *Declaration*, *supra* note 157, at 71–73, 75–76; *see also The Federalist No. 26*, at 166 (Alexander Hamilton); *Marcus No. 4* (James Iredell) (1788), *reprinted in* 1 *Debate on the Constitution*, *supra* note 97, at 391; Mass. Ratif. Conv., *in id*. at 904 (remarks of Thomas Dawes, Jr., Jan. 24, 1788).

[164] The Bill of Rights is at 1 W. & M., 2d Sess., c. 2 (1689). Its first three sections, except for the initial preamble, consist of the Declaration, *see* Schwoerer, *Declaration*, *supra* note 157, at 295, App. 1 (reprinting Declaration), and it recounts the events of the Revolution. *See also* 1 W. & M., 1st Sess., c. 1, § 2 (1689) (noting presentation and acceptance of crown, and proclaiming Parliament to be regular from that date); *id*. c. 6 (establishing coronation oath); 1 William Blackstone, *Commentaries* *128, *152, *211–16, *245 (discussing events); *The Federalist No. 84*, at 578 (Alexander Hamilton) (similar).

[165] *The Federalist No. 26*, at 165–66. *See* Schwoerer, *Declaration*, *supra* note 157, at 289 (Americans greeted the revolution and Declaration "with enthusiasm").

This seventh article is most relevant here, and it set out a personal right. Neither this article nor the parallel sixth indictment ties possession of arms to service in the militia, which the Declaration never mentions. The sixth indictment instead indicates that being "armed" and being "employed" by the government are distinct—a distinction confirmed by the historical context, which, as we have explained, included subjects being disarmed *by* the militia. Furthermore, the right belonged to "subjects," not to any government, and these subjects were allowed arms "for *their* defence."[166]

Critics of the individual right view contend that the two concluding clauses of the seventh article—"suitable to their Conditions, and as allowed by Law"—so restricted the right that it was a dead letter. Among the restrictions to which these clauses referred was the Game Act, which literally, albeit likely not in practice, barred most subjects from owning firearms.[167] As Lois G. Schwoerer has argued: "English-men did not secure to 'ordinary citizens' the right to possess weapons. . . . Drafted by upper-class Protestants who had their own interests at heart, Article VII was a gun control measure."[168] The Declaration, therefore, the argument goes, could have had little relevance to the right in the Second Amendment.

But this argument regarding the *scope* of the right does not speak to the question that we consider here, which is whether the English right was a right of individuals, a right of government, or a right specifically connected with military service to the government. On that question, the answer is clear. Schwoerer herself recognizes that many articles of the Declaration "guaranteed rights to the individual," including the right "to bear arms (under certain restrictions)."[169] Class- and religion-based restrictions did not destroy the personal nature of the right, whatever its scope. The precedent for Americans was an individual right.

---

[166] Similarly, the same Parliament enacted a law providing that a "papist or reputed papist" could "have or keep . . . such necessary weapons, as shall be allowed to him by order of the justices of the peace . . . *for the defence of his house or person.*" 1 W. & M., 1st Sess., c. 15, § 3 (1688) (emphasis added).

[167] *See* Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 86–89 (noting effect of wealth qualification but also dearth of prosecutions merely for possession). Blackstone complained that there was "fifty times the property required to enable a man to kill a partridge, as to vote for a knight of the shire." 4 William Blackstone, *Commentaries* *175. In addition, these clauses probably referred to two statutes from the 1540s restricting ownership and use of short handguns based on wealth, outlawing shot, and regulating the use of guns in cities or towns, *see* 33 Hen. VIII, c. 6 (1541); 2 & 3 Edw. VI, c. 14 (1548), and they may also have referred to the Militia Act, *see* Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 120.

[168] Lois G. Schwoerer, *To Hold and Bear Arms: The English Perspective*, 76 Chi.-Kent L. Rev. 27, 59 (2000). She seems to misunderstand the individual right view as requiring an unlimited right. *See id*. at 56, 60.

[169] Schwoerer, *Declaration*, *supra* note 157, at 283; *see* Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 119–20. *See also* 2 De Lolme, *English Constitution*, *supra* note 139, at 886 (Declaration "expressly ensured to individuals the right of [petition and] of being provided with arms for their own defence").

In addition, that Article 7 of the Declaration (and the Bill) only recognized a right to possess arms "as allowed by Law" does not mean that it did not secure a true right. In England's constitutional tradition, particularly evident in the events surrounding the Declaration of Rights described above, formal English rights restricted only the Crown's prerogative, not the legislature's power, which was unrestricted. Thus, although Blackstone was able to explain many years after the English Revolution that a royal proclamation "for disarming any protestant subjects, will not bind,"[170] the right to arms, like all other English rights, remained subject to revision or abolition by Parliament.[171] That characteristic of English rights hardly prevented Americans from borrowing and adapting them to a different constitutional structure.

Finally, whatever the actual ability of ordinary English subjects to have arms for their defense in 1689, by the Founding, a hundred years later, the right to do so extended to most of the country. As Judge Kleinfeld of the Ninth Circuit recently observed, "[t]he historical context of the Second Amendment is a long struggle by the English citizenry to enable common people to possess firearms."[172] In new game laws, particularly that of 1706, Parliament deleted guns from the list of implements that those not qualified to hunt game were prohibited from owning.[173] The courts determined that Parliament had made this deletion "purposely."[174] Thus, notwithstanding the list's catch-all prohibition of "any other engines," they interpreted the deletion—together with the existence of "divers . . . lawful purposes" for which one might keep a gun, such as "for the defence of his house and family"—as protecting the right of individuals to keep guns even if they were not qualified to hunt game, so long as they did not hunt with them.[175] This

---

[170] 1 William Blackstone, *Commentaries* *271.

[171] *See The Federalist No. 84*, at 578–79 (Alexander Hamilton) (arguing "that bills of rights are in their origin, stipulations between kings and their subjects, abridgments of prerogative in favor of privilege, reservations of rights not surrendered to the prince," and "[s]uch . . . was the declaration of rights presented by the lords and commons to the prince of Orange in 1688, and afterwards thrown into the form of an act of parliament called the bill of rights").

[172] *Silveira*, 328 F.3d at 582 (Kleinfeld, J., joined by Kozinski, O'Scannlain, and T.G. Nelson, JJ., dissenting from denial of rehearing en banc).

[173] 5 Ann., c. 14, § 3 (1706); *see* 4 & 5 W. & M., c. 23, § 3 (1693) (similar). Parliament also repealed the later of the two statutes of the 1540s mentioned in note 167, noting its desuetude. 6 & 7 Will. III, c. 13, § 3 (1695). Enforcement of the other was, at least in the 1600s, lax and selective. *See* Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 80–81, 87. Efforts to revise the Militia Act failed, but the right in the Bill may have sufficed to restrain the King from disarming Protestants. *See id.* at 123–25; *see also* 1 William Blackstone, *Commentaries* *271; Schwoerer, *Declaration*, *supra* note 157, at 75–78, 267, 283.

[174] *Rex v. Gardner*, 87 Eng. Rep. 1240, 1241, 7 Mod. Rep. 279 (K.B. 1739).

[175] *Wingfield v. Stratford*, 96 Eng. Rep. 787, 787–88, Sayer Rep. 15 (K.B. 1752) (Lee, C.J., citing *Rex v. Gardner*, 2 Strange Rep. 1098 (K.B. 1738)); *Mallock v. Eastly*, 87 Eng. Rep. 1370, 1374, 7 Mod. Rep. 482 (C.P. 1744), respectively; *see also* Part II.B.1 (discussing use of "keep" in these and other cases); Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 128 (quoting commentator of early 1800s reaffirming rule of these cases). In addition, it appears that courts strictly interpreted indictments

interpretation of the 1706 game act was considered "settled and determined" by 1744, and in 1752 the Chief Justice of the King's Bench reaffirmed that it was "not to be imagined" that Parliament in that act had intended "to disarm all the people of England."[176] By 1780, London's Recorder—the city's legal adviser and the primary judge of its criminal court—in an opinion supporting the legality of the city's private armed associations formed for self-defense against riots, could announce as "most clear and undeniable" the "right of his majesty's Protestant subjects, to have arms for their own defence, and to use them for lawful purposes," adding that "this right, which every Protestant most unquestionably possesses individually," also "may, and in many cases must, be exercised collectively," subject to certain restrictions.[177] Similarly, an English commentator in the early 1790s wrote that "every one is at liberty to keep or carry a gun, if he does not use it for the destruction of game."[178]

Blackstone's *Commentaries*, first published in 1765–1769, were for the colonists and the Founding Generation the leading exposition of England's laws and constitution. In them, he confirmed that the English right to arms was an individual one and explained that it had grounds broader and deeper than the right that had been declared in the Revolution of 1688–1689.

In the first chapter of the first book, Blackstone detailed the "absolute rights of individuals,"[179] that is, "such as appertain and belong to particular men, merely as individuals or single persons" and which "every man is entitled to enjoy, whether out of society or in it."[180] It was the purpose of law "to maintain and regulate"

---

under the game laws. *See King v. Silcot*, 87 Eng. Rep. 186, 186 n.(b), 3 Mod. Rep. 280 (K.B. 1690) (reporter's note from 1793).

[176] *Mallock*, 87 Eng. Rep. at 1374; *Wingfield*, 96 Eng. Rep. at 787 (Lee, C.J.).

[177] Legality of the London Military Foot-Association, *supra* note 64, at 59–60 (italics omitted). For background, see Part II.B.2 above. The Recorder found it "a matter of some difficulty to define the precise limits and extent of the rights of the people of this realm to bear arms, and to instruct themselves in the use of them, *collectively*." *Id*. at 59. At the very least, he opined, such a group needed to (1) have a "lawful" "professed purpose and object," (2) "demean themselves in a peaceable and orderly manner" consistent with that purpose, (3) not assemble in numbers that "manifestly and greatly exceed" that purpose; and (4) not "act without the authority of the civil magistrate" except to suppress "sudden, violent, and felonious breaches of the peace." *Id*. at 62 (italics omitted). *See also* 1 William Hawkins, *A Treatise on the Pleas of the Crown* ch. 63, § 10, at 136 (1724; reprint 1972) (noting legality of person "arm[ing] himself to suppress dangerous Rioters, Rebels, or Enemies" and "endeavour[ing] to suppress or resist such Disturbers of the Peace or Quiet of the Realm"); *id*. ch. 65, § 21, at 161 (noting right to do so when assisting Justice of Peace against riot).

[178] *See* William Blackstone, 2 *Commentaries on the Laws of England* \*412 n.8 (William Draper Lewis ed., 1900) (reprinting annotation of Edward Christian). Christian's posthumous Blackstone was published in 1793–95, *see* Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 134, 210, and available in America, *see* 1 Tucker's Blackstone, *supra* note 60, at \*145 n.42. Although the law was clear, some questioned how much as a practical matter the revision of the game laws had benefited commoners, as we explain in the discussion of the Pennsylvania Constitution below in Part III.B.2.

[179] 1 William Blackstone, *Commentaries* \*121; *id*. at \*123, 124.

[180] *Id*. at \*123. He contrasted "relative" individual rights, "which are incident to [persons] as members of society, and standing in various relations to each other." *Id*.

these rights in society, but "wanton and causeless restraint" was "a degree of tyranny."[181] He delineated three "principal or primary . . . rights of the people of England": "the right of personal security, the right of personal liberty, and the right of private property."[182]

But Blackstone recognized that declaring these three primary rights would be "in vain" and a "dead letter of the laws, if the constitution had provided no other method to secure their actual enjoyment." He therefore identified five "auxiliary subordinate rights of the subject"—"outworks or barriers to protect and maintain" the principal rights.[183] The first two were maintaining the constitution of Parliament and clear limits on the King's prerogative. Because these were more properly issues of governmental structure, he postponed their discussion to later chapters.[184] The other three, however, were plainly individual rights: (a) the "right of every Englishman . . . of applying to the courts of justice for redress of injuries"; (b) the "right, appertaining to every individual . . . of petitioning the king, or either house of parliament, for the redress of grievances," so long as no "riot or tumult" resulted; and (c) the "right of the subject . . . of having arms for their defence suitable to their condition and degree, and such as are allowed by law." He noted that the latter two rights both had been recognized in the 1689 Bill of Rights.[185]

Blackstone explained the subject's right of having arms as "a public allowance, under due restrictions, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression."[186] By tying the right to the natural—and thus individual and pre-political—right of self-defense, he recognized a deeper foundation than its declaration and enactment in 1689 and confirmed that the right existed independently of any bearing of arms in service to the militia, a subject that he did not mention in connection with the right.[187]

He returned to the right in concluding the first chapter. Again grouping together the last three auxiliary rights (suing, petitioning, and having arms), he explained that all were means for "the subjects of England" to "vindicate" the three primary rights "when actually violated or attacked." Thus, subjects were "entitled . . . to

---

[181] *Id.* at *124–28.

[182] *Id.* at *129. These reappear throughout the American Constitution, in general protections against deprivations of "life, liberty, or property, without due process of law" and in specific rights. See, for example, St. George Tucker's footnotes annotating Blackstone's exposition of the three principal rights with parallels in the Constitution, 2 Tucker's Blackstone, *supra* note 60, at *129, *133–40.

[183] 1 William Blackstone, *Commentaries* *140–41.

[184] *See id.* at *141.

[185] *Id.* at *141, *143–44.

[186] *Id.* at *144.

[187] *See also* 4 *id.* at *55–58 (elsewhere describing prohibitions against certain Roman Catholics keeping arms as hopefully temporary suspensions of rights). He summarized the militia in Chapter 13, 1 *id.* at *412–13.

the right of having and using arms for self-preservation and defence."[188] By his repeated reference to "self-preservation" and his description of the right as including both "having and *using*" arms, Blackstone reiterated that the right had a personal aspect and was linked to self-defense—to the right to use one's "limbs . . . to protect himself from external injuries," which was part of the individual right of personal security.[189]

Finally, Blackstone's view of the right as belonging to individuals re-appears in his repeated disparagement of game laws as a pretext to undermine commoners' ability to use or have arms. He traced them to "slavery" imposed after the fall of the Roman Empire by invading generals, who sought to "keep the *rustici* or natives . . . in as low a condition as possible, and especially to prohibit them the use of arms." Thus, "we find, in the feudal constitutions, one and the same law prohibiting the *rustici* in general from carrying arms, and also proscribing the use of nets, snares, or other engines for destroying the game."[190] He denounced those arising in England after the Norman Conquest of 1066 as a "tyranny to the commons,"[191] and thought their real rationale was an aristocratic desire to "disarm[] the bulk of the people."[192] He briefly described England's existing criminal game laws as confused and having a "questionable" nature, their "rational footing" being elusive.[193] But he approved hunting restrictions against trespassing[194] and did not criticize several other restrictions on the use and carrying of arms, involving breaches of the peace.[195]

---

[188] 1 *id*. at *144.

[189] *Id*. at *130. *See id*. at *134 (summarizing common law's special protection for "those limbs and members that may be necessary to a man in order to defend himself or annoy his enemy").

[190] 2 *id.* at *412, 413.

[191] 4 *id.* at *416; *see* 2 *id.* at *415–16 (forest laws produced "the most horrid tyrannies and oppressions").

[192] 2 *id.* at *412. As an example, he cited a popular book, by a bishop (and thus lord), that praised banning "Peasants and Mechanics" from hunting game: "It was not at all for the *public Good* to suffer [them] . . . to run up and down the Woods and Forests, armed; which . . . draws them on to Robbery and Brigandage: Nor to permit the populace, in Towns and Cities, to have, and carry *Arms* at their pleasure; which would give opportunity and encouragement to Sedition, and Commotions." 1 William Warburton, *The Alliance Between Church and State: Or, the Necessity and Equity of An Established Religion and a Test Law Demonstrated* 324 (London 4th ed. 1766).

[193] 4 William Blackstone, *Commentaries* *174–75.

[194] *See* 2 *id*. at *411–12 (approving as "natural" a ban on unauthorized hunting on private property); *see* 4 *id*. at *174 (being less critical of the "forest law," which simply prohibited hunting in the king's forests).

[195] *See* 4 *id*. at *144 (unlawful hunting—being disguised and "armed with offensive weapons" in breach of peace and to terror of public); *id*. at *145 (affray (public fighting), including attack with or drawing of weapon on church grounds); *id*. at *148 (forcible entry or detainer, "such as is carried on and maintained with force, with violence, and unusual weapons"); *id*. at *149 ("*riding* or *going armed*, with dangerous or unusual weapons . . . by terrifying" the people); *see also id*. at *146–47 (riots, routs, unlawful assemblies, and tumultuous petitioning); *id*. at *168 (quasi-nuisance of "making, keeping, or carriage, of too large a quantity of *gunpowder* at one time or in one place or vehicle"); *cf. id*. at *182 (excusable homicide by misadventure, such as "where a person qualified to keep a gun is shooting at a

Thus, the right to arms that America inherited from England was a right of individuals, and had deep roots by the time of the Framing. It did not depend on service in the government's militia, nor was it a federalism-related "right" of any government. It therefore provides no warrant for a quasi-collective right or collective right view of the Second Amendment. And, absent any evidence that Americans wished to abridge this individual right or transform it substantially, a question that we consider next, the English precedent supports an individual right view of that Amendment.

## B. The Right in America Before the Framing

The English colonists in America recognized this right of individual subjects to have and use arms, and they retained it as they broke from the mother country. They also recognized that it furthered the citizen militia to which they looked as a security for their freedom. These related ideas of an individual right to arms and regard for the citizen militia formed the backdrop for the Second Amendment. We first consider the history of the American Revolution and then review the states' first constitutions, written during that war.

### 1. The Experience of the Revolution

As the Revolution approached and conflicts with royal authorities rose, colonial leaders both reaffirmed the individual right to arms inherited from England and praised the shared duty of being armed imposed by local law. The colonial militias were broad-based, composed of all able-bodied white men, who were expected to be armed with the private weapons that all households were required to keep (regardless of eligibility for militia duty), there being a "general obligation of all adult male inhabitants to possess arms, and, with certain exceptions, to cooperate in the work of defense."[196] Citizens sometimes were required not only to own

---

mark and undesignedly kills a man: for the act is lawful, and the effect is merely accidental"); 3 *id*. at *4 (noting limitation of self-defense to "resistance" that "does not exceed the bounds of mere defence and prevention").

[196] *United States v. Miller*, 307 U.S. 174, 179–80 (1939) (internal quotation marks omitted). *See* Kates, *supra* note 33, 82 Mich. L. Rev. at 215–16 ("With slight variations, the different colonies imposed a duty to keep arms and to muster occasionally for drill upon virtually every able-bodied white man between the age of majority and a designated cut-off age. Moreover, the duty to keep arms applied to *every* household, not just to those containing persons subject to militia service. Thus, the over-aged and seamen, who were exempt from militia service, were required to keep arms for law enforcement and for the defense of their homes from criminals or foreign enemies.") (footnotes omitted). In Virginia, "Every able-bodied freeman, between the ages of 16 and 50, is enrolled in the militia. . . . The law requires every militia-man to provide himself with the arms usual in the regular service." That requirement "was always indifferently complied with," and the militia's arms were "frequently called for to arm the regulars," so that "in the lower parts of the country they are entirely disarmed." But "[i]n the middle country a fourth or fifth part of them may have such firelocks as they had provided to destroy the noxious animals which infest their farms; and on the western side of the

weapons but also to carry them, and the class-based distinctions of England generally did not apply.[197] America had its own set of distinctions, based on race, but even free blacks were often allowed to possess arms as individuals, even though usually barred from militia service.[198]

Boston was the focus of early opposition to Britain, and its leaders invoked both the individual right to arms (as secured by the 1689 Bill of Rights and also as expounded by Blackstone) and the local duty of being armed. A 1768 town meeting led by Samuel Adams, John Hancock, and others resolved that the right enacted in the English Bill of Rights was "founded in Nature, Reason and sound Policy, and is well adapted for the necessary Defence of the Community," while also praising the colony's law requiring "every listed Soldier and other House-holder" to be armed. The resolution thus requested that any Bostonian lacking arms "duly . . . observe the said Law."[199] Boston newspapers defended the meeting's actions:

> [I]t is certainly beyond human art and sophistry, to prove the British subjects, to whom the *privilege* of possessing arms is expressly rec-ognized by the Bill of Rights, and, who live in a province where the law requires them to be equip'd with *arms*, &c. are guilty of an *ille-gal act*, in calling upon one another to be provided with them, as the *law directs*.[200]

---

Blue [R]idge they are generally armed with rifles." Jefferson, *Notes*, *supra* note 56, at 88. For more regarding the militia, see Part II.C.2–4 above.

[197] *See* Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 139 (quoting colonial statutes from Rhode Island, Virginia, and Georgia); Kates, *supra* note 33, 82 Mich. L. Rev. at 216 (discussing Georgia law); *id.* at 240 ("the English Game Acts . . . had never been a part of the colonial law"); 5 Tucker's Blackstone, *supra* note 60, at *175 n.16 (describing game laws of Virginia, limited to prohibiting trespass and conversion and establishing hunting season for deer).

[198] *See* Cottrol & Diamond, *supra* note 33, 80 Geo. L.J. at 323–27 (noting that "the traditional English right" became "a much broader American one" as part of "a more general lessening of class, religious, and ethnic distinctions among whites in colonial America," but that "the law was much more ambivalent with respect to blacks"; surveying varying colonial laws regarding right of blacks to carry weapons or keep them in their homes, and noting usual exclusion from militia duty, except in "times of crisis"); Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 140–41 ("The second group [after Indians] forbidden to possess weapons were black slaves, with restrictions sometimes extended to free blacks . . . . Northern colonies were ambivalent about blacks possessing firearms"; surveying colonial laws and drawing parallel to England's ambivalent treatment of right of Roman Catholics to have arms).

[199] Boston Chron., Sept. 19, 1768, at 363, col. 2, *quoted in* Halbrook, *Right to Bear Arms*, *supra* note 56, at 1–2. This resolution was republished in the *Maryland Gazette*. *See id.* at 61.

[200] Bos. Gazette, and Country J., Jan. 30, 1769, at 2, col. 1, *quoted in* Halbrook, *Right to Bear Arms*, *supra* note 56, at 6; *see Boston Under Military Rule, 1768–1769, as Revealed in a Journal of the Times* 61 (Oliver Morton Dickerson ed., 1936) (reprinting same passage from Boston Evening Post, Apr. 3, 1769).

A subsequent article by Adams recounted the English Revolution and then quoted both of Blackstone's primary discussions of the right to arms. Adams attacked critics of the "late vote of this town, calling upon the inhabitants to *provide themselves with arms for their defence*," as insufficiently "attend[ing] to the rights of the constitution."[201] The *New York Journal Supplement* reiterated this argument:

> It is a natural right which the people have reserved to themselves, confirmed by the Bill of Rights, to keep arms for their own defence; and as Mr. Blackstone observes, it is to be made use of when the sanctions of society and law are found insufficient to restrain the violence of oppression.[202]

The individual's right to have and use arms for self-defense was reaffirmed in the celebrated "Boston Massacre" murder trial, in 1770, of British soldiers for firing on a harassing crowd. (Soldiers had been garrisoned in Boston since late 1768.) John Adams, counsel for the soldiers, argued that they had acted in self-defense. In his closing argument, he quoted William Hawkins's *Treatise on the Pleas of the Crown* to establish that "'every private person seems to be authorized by the law, to arm himself'" to defend against dangerous rioters. Adams added: "Here every private person is authorized to arm himself, and on the strength of this authority, I do not deny the inhabitants had a right to arm themselves at that time, for their defence . . . ."[203] Adams reiterated that view in his 1787 *Defence of the Constitutions of Government of the United States of America*, recognizing the propriety of "arms in the hands of citizens, to be used . . . in private self-defence."[204]

British authorities, much like Charles II and James II a century before, moved to disarm the colonists as hostilities mounted in 1774. Britain banned the export of arms and ammunition to any of the colonies and ordered General Gage to consider how to disarm residents of rebellious areas. At least in Massachusetts, some disarmament occurred, and in the "Powder Alarm" of September 1, 1774, British

---

[201] Samuel Adams, Boston Gazette, Feb. 27, 1769, *reprinted in* 1 *Founders' Constitution*, note 118, at 90. Adams quoted 1 William Blackstone, *Commentaries* *143–44 & *144.

[202] *Boston, March 17*, N.Y.J. Supp., Apr. 13, 1769, at 1, col. 3, *reprinted in Boston Under Military Rule* at 79; *see* Halbrook, *Right to Bear Arms*, *supra* note 56, at 7 (quoting same passage).

[203] 3 *Legal Papers of John Adams* 248 (L. Kinvin Wroth & Hiller B. Zobel eds., 1965) (quoting "Hawkins p. 71, § 14"). For the facts, see *id*. at 1 (note). Adams secured several acquittals. *Id*. at 29.

[204] 3 John Adams, *A Defence of the Constitutions of Government of the United States of America* 475 (1787). The Ninth Circuit selectively quoted this sentence to claim that Adams "ridiculed . . . an individual right to personal arms" and asserted that "the general availability of arms" would "'demolish every constitution, and lay the laws prostrate, so that liberty can be enjoyed by no man—it is a dissolution of the government.'" *Silveira*, 312 F.3d at 1085. In these portions, Adams was merely arguing against command of the militia by private persons or localities, while also expressly reiterating the right of arming for private self-defense.

soldiers seized ammunition belonging to the colonial militia.[205] These actions stiffened resistance throughout the colonies[206] and led the colonists to form independent local militias with broad membership, the "Minutemen."[207] Gage's attempts in late 1774 and early 1775 to seize these groups' arms across Massachusetts provoked confrontations with large forces of armed colonists, and the Revolution was famously ignited by his efforts to do so at Concord and Lexington in April 1775.[208] Virginia Governor Dunmore's raid on an ammunitions store in Williamsburg soon thereafter prompted a similar response, as militiamen surrounded his home.[209] British authorities' continuing efforts to disarm colonists were among the actions that the Continental Congress cited when, in July 1775, it declared the colonies' reasons for taking up arms.[210]

As the colonists armed and organized themselves, their leaders continued to turn to their rights as British subjects and praised the citizen militias that these rights made possible. George Mason's actions in Virginia (in conjunction with George Washington and others) provide an example. In September 1774, he chaired a meeting of Fairfax County citizens to form a private militia association known as the Fairfax Independent Company. Being "threat'ned with the Destruction of our Civil-rights, & Liberty, and all that is dear to British Subjects & Freemen," members promised to keep themselves well armed and to train together under elected officers.[211] The following January, in a document attributed to Mason, the county's Committee of Safety recommended a tax to purchase ammunition, resolved that "a well regulated Militia, composed of gentlemen freeholders, and other freemen, is the natural strength and only stable security of a

---

[205] *See* Hardy, *supra* note 33, 9 Harv. J.L. & Pub. Pol'y at 590; Halbrook, *Right to Bear Arms*, *supra* note 56, at 9, 16, 72. Soldiers seized provincial armories in Cambridge and Charlestown. In response, "twenty thousand Yankees picked up their muskets and headed for Boston" to confront the British. Robert A. Gross, *The Minutemen and Their World* 55 (1976).

[206] *See* First Continental Congress, Appeal to the Inhabitants of Quebec (Oct. 1774), *reprinted in* 1 *American Political Writing During the Founding Era, 1760–1805*, at 237 (Charles S. Hyneman & Donald S. Lutz eds., 1983) ("The injuries of Boston have roused and associated every colony."); Halbrook, *Right to Bear Arms*, *supra* note 56, at 88–89 (quoting warning of South Carolina's governing body in 1774 against British "design of disarming the people of America" through the embargo).

[207] *See* Gross, *Minutemen*, *supra* note 205, at 59. In Concord, "Minutemen trained twice a week on the common and carried their muskets everywhere, in the fields, in shops, even in church." When they were mustered in March 1775, it "presented a revealing portrait of the community. This was a citizen army of rural neighbors. . . . The Concord militia included nearly everyone between the ages of sixteen and sixty." *Id.* at 69–70.

[208] Hardy, *supra* note 33, 9 Harv. J.L. & Pub. Pol'y at 590–91; Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 145–46.

[209] Hardy, *supra* note 33, 9 Harv. J.L. & Pub. Pol'y at 592; Halbrook, *Right to Bear Arms*, *supra* note 56, at 16.

[210] 1 *Journals of Congress* 137 (July 6, 1775) (1800); *see* Halbrook, *Right to Bear Arms*, *supra* note 56, at 13–15; Hardy, *supra* note 33, 9 Harv. J.L. & Pub. Pol'y at 591.

[211] 1 *Mason Papers*, *supra* note 56, at 210–11.

free Government," and urged residents "from sixteen to fifty years of age" to choose officers, "provide themselves with good Firelocks," and train.[212] In April 1775, Mason addressed the Company and praised it as formed "for the great and useful purposes of defending our country, and preserving those inestimable rights which we inherit from our ancestors." In a time of "threatened . . . ruin of that constitution under which we were born," it was a security "that in case of absolute necessity, the people might be the better enabled to act in defence of their invaded liberty."[213]

Similar sentiments appeared in North Carolina. Soon after Lexington and Concord, the royal Governor denounced those urging people "to be prepared with Arms" and train under committees of safety.[214] But in July 1775, North Carolina's delegates to the Continental Congress urged the committees to "form yourselves into a Militia" in the exercise of "the Right of every *English* Subject to be prepared with Weapons for his Defense."[215]

In October 1775, Britain declared the colonies in rebellion,[216] but organizational efforts continued. John Adams, in his *Thoughts on Government* written in early 1776 in response to requests for advice, recommended a "Militia Law requiring all men, or with very few exceptions, besides cases of conscience, to be provided with arms and ammunition, to be trained at certain seasons." Such a law would be "always a wise institution" but was "in the present circumstances of our country indispensable."[217]

Many lauded the citizen militias that fought in the Revolution. American General Nathanael Greene, writing to Thomas Jefferson, remarked on the "Enterprize and Spirit" of "this Great Bulwark of Civil Liberty [that] promises Security and Independence to this Country."[218] Americans credited crucial early victories to the citizen militias, even while recognizing their limitations.[219] Well after the war,

---

[212] *Id.* at 212.

[213] *Id.* at 229–31.

[214] *See* Halbrook, *Right to Bear Arms*, *supra* note 56, at 29–30.

[215] Richard Caswell, William Hooper, & Joseph Hewes, *To the Committees of the Several Towns and Counties of the Province of North Carolina*, N.C. Gazette (Newburn), July 7, 1775, at 2, col. 3, *excerpted in* Halbrook, *Right to Bear Arms*, *supra* note 56, at 29.

[216] *See* 4 *Papers of John Adams* 78 n.6 (Robert J. Taylor ed., 1979) (editorial note).

[217] John Adams, *Thoughts on Government* (Apr. 1776), *reprinted in* 4 *id.* at 91. This pamphlet, written for political leaders in North Carolina, Virginia, and New Jersey, was widely reprinted and discussed for several years. *See id.* at 65, 68–72 (editorial note).

[218] Letter from Greene to Jefferson (Nov. 20, 1780), *in* 4 *Jefferson Papers*, *supra* note 62, at 130–31.

[219] *See, e.g.*, A Democratic Federalist, Penn. Herald, Oct. 17, 1787, *reprinted in* 2 *Ratification*, *supra* note 67, at 197 (arguing that "a well-regulated militia" is "sufficient for every purpose of internal defense," as shown by victories at Lexington and Bunker Hill); Va. Ratif. Conv., *in* 9 *Ratification*, *supra* note 67, at 981 (remarks of Edmund Randolph, June 6, 1788) ("I will pay the last tribute of gratitude to the militia of my country: They performed some of the most gallant feats during the last war, and acted as nobly as men enured to other avocations could be expected to do: But, Sir, it is

James Madison could argue in *The Federalist* that an oppressive army would be no match for citizen militias, as "[t]hose who are best acquainted with the late successful resistance of this country against the British arms" would recognize. He also pointed to "the advantage of being armed, which the Americans possess over the people of almost every other nation," governments in most of the world being "afraid to trust the people with arms."[220]

## 2. Early Constitutional Recognition of the Right

One product of this experience of the American Revolution was that several states included explicit right to bear arms provisions in declarations of rights that they adopted during the war. These appeared in Pennsylvania, North Carolina, Vermont, and Massachusetts. In the identical provisions of Pennsylvania and Vermont, the language plainly reaffirmed the established right of individuals to arm themselves for self-defense. In the provisions of North Carolina and Massachusetts, although the express scope of the right may have been narrower, the right still belonged to individuals—these state provisions could not have been intended to protect the states' prerogatives, nor did they restrict the right to participants in militia units. Other states, most notably Virginia, did not include any provision regarding the right to bear arms in their declarations but did praise "a well regulated Militia."[221]

*Virginia.* Virginia's Declaration of Rights, adopted a month before the Declaration of Independence, was the country's first. Section 13 provided:

> That a well regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defence of a free State: that standing armies, in time of peace, should be avoided, as dangerous to liberty; and that in all cases the military should be under strict subordination to, and governed by, the civil power.[222]

---

dangerous to look to them as our sole protectors."); *The Federalist No. 25*, at 161–62 (Alexander Hamilton) (praising militias' valor but emphasizing insufficiency for defense). General Greene recognized that the militia should "not [be] depended upon as a principal but employed as an Auxilliary." Letter to Jefferson, *reprinted in* 4 *Jefferson Papers*, *supra* note 62, at 131.

[220] *The Federalist No. 46*, at 321–22.

[221] The first constitutions of New Jersey, South Carolina, Georgia, and New York did not include separate bills of rights. Their constitutions did protect a few rights, but did not include the right to arms or general statements regarding the militia. *See* 1 Schwartz, *Bill of Rights*, *supra* note 67, at 256 (N.J. 1776); *id.* at 291 (Ga. 1777); *id.* at 301 (N.Y. 1777); *id.* at 325 (S.C. 1778). Georgia did provide for forming a militia battalion in any county with "two hundred and fifty men, and upwards, liable to bear arms," *id.* at 297, and New York declared the duty of all to provide personal service to protect society, *see id.* at 312, much as the Pennsylvania Declaration, discussed below, did. Connecticut and Rhode Island did not adopt new constitutions. *Id.* at 289.

[222] Va. Bill of Rights § 13 (1776), *reprinted in* 7 *Federal and State Constitutions*, *supra* note 78, at 3814.

This provision expressly recognizes the background definition of "militia" explained in Part II.C: It was not a specialized or select force, but rather a force of the people. Such an understanding of the militia is consistent with the right of individuals to have arms—particularly given that, as we have explained, the citizen militia was supposed to be "trained to" its members' private arms.[223] Significantly, the provision's primary author was George Mason,[224] whose public views have already been noted and who would play a leading role twelve years later, explained below, in authoring the proposal of Virginia's ratifying convention that placed together in a single article the individual right and this praise of the citizen militia.[225]

*Pennsylvania.* Pennsylvania adopted its Declaration of Rights in September 1776. Article 13, immediately following an article providing "[t]hat the people have a right to freedom of speech," read:

> That the people have a right to bear arms for the defence of themselves and the state; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; And that the military should be kept under strict subordination to, and governed by, the civil power.[226]

While following the same structure as Virginia's (of which the convention members were well aware[227]), this article replaced the praise of the well-regulated citizen militia with a right—a right of "the people," who, just as they had an individual right to speak, also had an individual right to "bear arms," for either of the dual purposes of defending "themselves and the state." The article does not restrict the right to those in militia service, which it does not mention and which Pennsylvania addressed separately: Article 8 broadly provided that "every member of society," receiving protection from it, was bound to contribute money and "his

---

[223] Regarding this point and the meaning of both "militia" and "well regulated militia," see above Parts II.C.2–4 and III.B.1, at note 196 (quoting Jefferson's *Notes on the State of Virginia*, *supra* note 56).

[224] *See* 1 *Mason Papers*, *supra* note 56, at 274–75, 286 (editorial notes); *id.* at 287 (final draft).

[225] Delaware, Maryland, and New Hampshire adapted Virginia's language, omitting definition of the militia and changing "free state" to "free government" while retaining the implicit connection between "a well regulated militia" and the avoidance of standing armies and military insubordination. *See* Del. Decl. of Rights §§ 18–20 (1776), *reprinted in* 5 *Founders' Constitution*, note 118, at 5, 6; Md. Decl. of Rights §§ 25–27 (1776), *reprinted in* 3 *Federal and State Constitutions*, *supra* note 78, at 1688; N.H. Const. pt. I, arts. 24–26 (1784), *reprinted in* 4 *Federal and State Constitutions*, *supra* note 78, at 2456. The Delaware Constitution also specially provided that "[t]o prevent any violence or force being used at . . . elections, no person shall come armed to any of them, and no muster of the militia shall be made on that day." Del. Const. art. XXVIII (1776), *reprinted in* 1 *Federal and State Constitutions*, *supra* note 78, at 567.

[226] *Reprinted in* 5 *Federal and State Constitutions*, *supra* note 78, at 3083.

[227] *See* 1 *Mason Papers*, *supra* note 56, at 276 (note discussing "the widespread and almost immediate influence of the Virginia Declaration of Rights on other nascent states," including Pennsylvania).

personal service when necessary," while allowing an exception for anyone "conscientiously scrupulous of bearing arms, . . . if he will pay [an] equivalent."[228] And the plan of government, adopted concurrently, provided for a militia of "[t]he freemen of this commonwealth and their sons."[229]

The plan of government also provided that persons could use their arms to hunt (without trespassing): "The inhabitants of this state shall have liberty to fowl and hunt in seasonable times on the lands they hold, and on all other lands therein not inclosed."[230] Regardless of the relevance of this provision to the contours of the right to bear arms (a question beyond the scope of this memorandum), the provision does seem to have been viewed as a practical security for, and thus a way of emphasizing the importance of, the right of individuals that Pennsylvania had elsewhere secured. The view that the English game laws—which had provided for disarming many in the name of the hunting privileges of a few—had been a pretext for undermining the right in practice was prevalent at the time. Thomas Paine had criticized the game laws in the *Pennsylvania Magazine* the year before Pennsylvania adopted its constitution, and one newspaper article, although recognizing that the newer game acts did not prohibit merely keeping a gun, argued that English aristocrats still used them to disarm commoners, by procuring witnesses to claim that defendants had used their arms for hunting.[231]

Pennsylvania held another convention from November 1789 through September 1790, as the Second Amendment was before the states for ratification. The resulting constitution retained essentially the same individual right. Section 21 of the declaration of rights, immediately following a section providing "[t]hat the citizens have a right" to assemble and petition, provided:

> That the right of the citizens to bear arms, in defence of themselves and the State, shall not be questioned.[232]

---

[228] 5 *Federal and State Constitutions*, *supra* note 78, at 3083. Such personal service would be difficult if one could not own private arms. This duty may have been broader than the obligation of militia duty, perhaps including the posse comitatus. *See generally The Federalist No. 29*, at 182–83 (Alexander Hamilton). New Hampshire's constitution, while praising the well-regulated militia, recognized this duty separately, N.H. Const. pt. I, arts. 12–13, *reprinted in* 4 *Federal and State Constitutions*, *supra* note 78, at 2455, although New York's connected the two, N.Y. Const. § 40 (1777), *reprinted in* 5 *id*. at 2637.

[229] Pa. Plan or Frame of Gov't § 5 (1776), *reprinted in* 5 *Federal and State Constitutions*, *supra* note 78, at 3084.

[230] *Id*. § 43, *reprinted in* 5 *Federal and State Constitutions*, *supra* note 78, at 3091.

[231] *See* Halbrook, *Right to Bear Arms*, *supra* note 56, at 23–25. Some in England shared this concern. *See* Schwoerer, *supra* note 168, 76 Chi.-Kent L. Rev. at 52–53.

[232] Pa. Const. art. IX, §§ 20 & 21, *reprinted in* 5 *Federal and State Constitutions*, *supra* note 78, at 3101. Section 22 addressed standing armies and civilian control of the military. Kentucky, admitted in 1791 as the fifteenth state, copied this language on the right verbatim. *See* Ky. Const. art. XII, § 23 (1792), *reprinted in* 3 *Federal and State Constitutions*, *supra* note 78, at 1275.

Separately, in the body of the constitution, the protection of conscientious objectors was combined with the provision relating to the citizen militia:

> The freemen of this commonwealth shall be armed and disciplined for its defence. Those who conscientiously scruple to bear arms shall not be compelled to do so, but shall pay an equivalent for personal service. The militia officers shall be appointed in such manner and for such time as shall be directed by law.[233]

Thus, the *right* to "bear arms" remained with individual people, now "the citizens," and existed for the dual purpose of facilitating the defense of individuals and the state. Neither purpose was expressly tied to, let alone limited to, service in the militia. And the *duty* of "freemen" to "bear arms," including possible exemption from that duty, was distinct and was tied to the militia. In both the 1776 and 1790 Pennsylvania constitutions, "bear arms" could and did bear both meanings.

**North Carolina.** North Carolina adopted its constitution and declaration of rights in December 1776. Article 17 of the declaration provided:

> That the people have a right to bear arms, for the defence of the State; and, as standing armies, in time of peace, are dangerous to liberty, they ought not to be kept up; and that the military should be kept under strict subordination to, and governed by, the civil power.[234]

This article mentions only the right of the people to bear arms for "the defence of the State." Regardless of the provision's scope, however, the right still belonged to individuals, just as the immediately following Article 18 set out a right of individuals in providing "[t]hat the people have a right to assemble together," and in contrast with Article 25's declaration, in delineating the state's boundaries, of "the essential rights of the collective body of the people" in the "property of the soil."[235] It would not have made sense, in the context of a state constitution, for a "right" of "the people" to protect only the prerogatives of the state. And the provision's text indicates that all of the people (not just those organized by the state into militia units) had a right to bear arms, at least in defense of the state. As an early North Carolina Supreme Court decision recognized, the right in Article 17 belonged "to every man indeed" and "secur[ed] to him a *right* of which he cannot

---

[233] Pa. Const. art. VI, § 2, *reprinted in* 5 *Federal and State Constitutions*, *supra* note 78, at 3099. Kentucky also copied this provision. *See* Ky. Const. art. VI, § 2, *reprinted in* 3 *Federal and State Constitutions*, *supra* note 78, at 1271.

[234] *Reprinted in* 5 *Federal and State Constitutions*, *supra* note 78, at 2788.

[235] *Id.*

be deprived," to be exercised "for the safety and protection of his country."[236] Moreover, by expressly protecting the right of the people to bear arms "for the defence of the State" (something that North Carolinians were then doing against the British), the drafters of the North Carolina Constitution do not appear to have intended to abrogate the arguably more modest individual English right.[237] Indeed, the president of the constitutional convention, who served on the committee that wrote the declaration, had been one of the three congressional delegates who the year before, as discussed above, had urged North Carolinians to exercise "the Right of every *English* Subject to be prepared with Weapons for his Defense."[238]

*Vermont.* The Vermont constitution approved in July 1777 provided that "the people have a right to bear arms for the defence of themselves and the State," in an article identical to Article 13 of Pennsylvania's Declaration.[239] As in Pennsylvania, this individual right immediately followed the individual right of "the people . . . to freedom of speech," and the constitution separately included a hunting guarantee, citizen militia provisions, and an exception for conscientious objectors.[240] All of these remained in Vermont's 1786 and 1793 constitutions.[241]

*Massachusetts.* Article 17 of the Massachusetts Declaration of Rights of 1780 provided:

> The people have a right to keep and to bear arms for the common defence. And as, in time of peace, armies are dangerous to liberty, they ought not to be maintained without the consent of the legislature; and

---

[236] *State v. Huntly*, 25 N.C. (3 Ired.) 418, 1843 WL 891, at *2. Another early decision recognized that the right of "free people of color" to bear arms might be abridged—but only because the court believed that they "cannot be considered as citizens," or at least not full citizens, not because of any exclusion from the militia (a subject the court did not mention). *State v. Newsom*, 27 N.C. (5 Ired.) 250, 1844 WL 1059, at *1, *2.

[237] See below note 239.

[238] This was Richard Caswell, who became the first governor. Another member of the committee also had been one of the three delegates. *See* Halbrook, *Right to Bear Arms*, *supra* note 56, at 29–31; *see also* 5 *Federal and State Constitutions*, *supra* note 78, at 2794.

[239] Vt. Const. ch. I, § 15, *reprinted in* 6 *Federal and State Constitutions*, *supra* note 78, at 3741. The constitution also asserted independence from New York. *Id*. at 3738–39 (preamble); *see* Halbrook, *Right to Bear Arms*, *supra* note 56, at 37 ("Recognition of bearing arms to defend the state was more radical than self-defense, since it justified action by armed private citizens to defend an incipient state from the constituted authorities of both New York and Great Britain."). The First Congress admitted Vermont as the fourteenth state, *see* Act of Feb. 18, 1791, 1 Stat. 191, in time for it to ratify the Bill of Rights, *see* 2 Schwartz, *Bill of Rights*, *supra* note 67, at 1202–03.

[240] Vt. Const. ch. I, § 14, *reprinted in* 6 *Federal and State Constitutions*, *supra* note 78, at 3741 (speech); *id*. § 9, at 3740–41 (duty of personal service, and conscientious objectors); *id*. ch. II, § 5, at 3742 (militia of "freemen . . . and their sons"); *id*. § 39, at 3748 (hunting).

[241] *See* Vt. Const. ch. I, §§ 10, 15 & 18 (1786), *reprinted in* 6 *id*. at 3753 (duty of personal service and conscientious objectors, speech, and arms, respectively); *id*. ch. II, § 19, at 3758 (militia, including all "inhabitants" rather than all freemen and their sons); *id*. § 37, at 3760 (hunting); Vt. Const. ch. I, arts. 9, 13 & 16 (1793), *reprinted in id*. at 3763–64 (duty of personal service and conscientious objectors, speech, and arms, respectively); *id*. ch. II, § 22, at 3768 (militia); *id*. § 40, at 3770 (hunting).

the military power shall always be held in an exact subordination to the civil authority, and be governed by it.[242]

In addition, Article 1 announced as among the "natural, essential, and unalienable rights" of all men "the right of enjoying and defending their lives and liberties" and "of acquiring, possessing, and protecting property."[243] Massachusetts was the first state to add "keep" to "bear." But this double right was said to be "for the common defence," a phrase that arguably limits the purposes for which one might exercise it. Two towns had unsuccessfully proposed adding "their own and" before that phrase, one arguing that this change would make Article 17 "harmonize much better with" Article 1.[244]

Even assuming that the phrase "for the common defence" limited the purposes for which arms could be kept and borne, the "right" remained an individual one—residing in "the people," just as Article 19 set out an individual right in providing that "[t]he people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good."[245] Nothing in Article 17 or any other provision connected the right to service in the militia, much less indicated that this "right" of the "people" belonged to the state or was intended to protect its prerogatives.[246] Moreover, the addition of the word "keep" to the right of the people reinforced the individual nature of the right, because, as explained above in Part II.B.1, the phrase "keep arms" commonly referred to individuals privately possessing their private arms.

The history of the provision reinforces this understanding of its text as securing an individual right. The principal draftsman was John Adams, joined by his cousin Samuel Adams and another individual.[247] As explained above, John Adams publicly acknowledged the individual right inherited from England both before and after he wrote the Declaration, and Samuel Adams both helped lead the Boston town meeting that had urged Bostonians to exercise that individual right

---

[242] *Reprinted in* 3 *Federal and State Constitutions*, *supra* note 78, at 1892.

[243] Mass. Const. pt. I, art. 1 (1780), *reprinted in id*. at 1889.

[244] *See* Halbrook, *Right to Bear Arms*, *supra* note 56, at 41–42.

[245] Mass. Const. pt. I, art. 19, *reprinted in* 3 *Federal and State Constitutions*, *supra* note 78, at 1892. An early decision of the state's supreme court, interpreting the Declaration's protection of the individual's "liberty of the press" as not protecting common law libel, drew a parallel to "the right to keep fire arms, which does not protect him who uses them for annoyance or destruction." *Commonwealth v. Blanding*, 20 Mass. 304, 338 (1825). Whether the court had in mind Article 17 or the right from England is unclear, but in either case it recognized a right of individuals to keep arms.

[246] In addition, the purposes of calling out the militia seem to have been narrower than whatever "for the common defence" signified, as the governor was authorized to call it out "for the special defence and safety of the commonwealth," which appears to have meant war, invasion, or rebellion. Mass. Const. pt. II, ch. 2, § 1, art. 7, *reprinted in* 3 *Federal and State Constitutions*, *supra* note 78, at 1901.

[247] 1 Schwartz, *Bill of Rights*, *supra* note 67, at 337. The only change between their draft and the final was the deletion of "standing" before "armies." *Id*. at 372 (draft); *id*. at 364 (deletion).

and publicly defended its resolution on the authority of the English Bill of Rights and Blackstone.[248] Much like Mason, Samuel Adams also would, during the ratification debate, urge that the Constitution protect that right, as we explain below.

Thus, the right of individual English subjects was transplanted to America. Americans also, from their experience in the American Revolution, came to emphasize the citizen militia, which they recognized was furthered by the individual right to private arms. But the English right as Americans came to understand it was not, as a result, somehow newly restricted to a person's service in that militia, much less to service in a select militia. Nor did early Americans see the right as a federalism protection (which would not have made sense in the context of *state* constitutions) or otherwise the property of the state rather than its citizens.

## C. The Development of the Second Amendment

The proposed Constitution that emerged from the Constitutional Convention in 1787 did not have a bill of rights, notwithstanding a late effort by Mason, joined by Elbridge Gerry, to have one drawn up "with the aid of the State declarations."[249] It did contain a careful compromise regarding the militia. The federal government received, in Article I, Section 8, the powers to call out the militia "to execute the Laws of the Union, suppress Insurrections, and repel Invasions," to provide for "organizing, arming, and disciplining" it, and to govern any part of it in the service of the federal government (during which the President would be its Commander in Chief); states expressly retained the authority to appoint officers and to train the militia.[250]

---

[248] As with North Carolina's emphasis on the "defence of the State," Massachusetts's emphasis on the "common defence" may have represented the assertion of a right that went beyond the traditional English one. "Common" had been deleted from a similar clause ("for their common defence") in a draft of the English Declaration, perhaps at the urging of William of Orange or conservative Lords, who objected to suggestion of a popular right to check royal power. *See* Malcolm, *To Keep and Bear Arms*, *supra* note 33, at 119–21.

[249] Madison, *Notes of Debates*, *supra* note 44, at 630 (Sept. 12, 1787).

[250] U.S. Const. art. I, § 8, cls. 15 & 16, and art. II, § 2, cl. 1. The Ninth Circuit claims that there was "disagreement among the delegates" over whether Congress's power to arm the militias "should be exclusive or concurrent" with the states. *Silveira*, 312 F.3d at 1079. But the court only cites *Perpich v. Dep't of Defense*, 496 U.S. 334, 340 (1990), which does not support this claim; nor do the debates of the Convention, where the focus was on the extent of any federal authority to establish uniform discipline and regulation of the militia (including providing for arms), not on whether the states would retain concurrent authority in areas where federal power was granted. For the two chief debates, see Madison, *Notes of Debates*, *supra* note 44, at 478, 483–85 (Aug. 18, 1787); *id.* at 512–16 (Aug. 23, 1787). Similarly, the Third Circuit has cited, in support of the collective right view, a statement by Roger Sherman that states should retain power to use their militias for internal needs. *See United States v. Tot*, 131 F.2d 261, 266 (1942), *rev'd on other grounds*, 319 U.S. 463 (1943) (citing 5 *Elliot's Debates* 445 (2d ed. 1901)). We fail to see how this statement supports that view, particularly given that no one appears to have disagreed with Sherman; that he served on the committee that drafted what

Proposed bills of rights emerged from the ratifying conventions of several of the states. Many of these included protection for the right to arms—usually in language borrowed or adapted from the individual right to arms in the states' declarations of rights, and in any event always in language indicating an individual right. In those proposals, several states for the first time in a single constitutional provision both set out an individual right to arms and praised the citizen militia, uniting language from the different state declarations discussed above. In addition, some Anti-Federalists, concerned about the Constitution's allocation of powers over the militia, sought to protect the ability of the states to maintain effective militias. They proposed to do so expressly, in amendments using language similar to that of Article I, Section 8, and to be placed in the body of the Constitution, not in a bill of rights.[251]

Yet it was the former proposals that laid the foundation for the Second Amendment. And the latter proposals failed in the Federalist-controlled First Congress, which was, as many recognized at the time, willing to protect individual rights but not to alter the balance of power struck by the new Constitution between the states and the nascent federal government. Thus, the evidence points to an understanding of the Amendment as securing the individual right to arms already well established in America, rather than safeguarding the ability of states to establish well-regulated militias, whether through a "collective right" of states or a quasi-collective right of militiamen. Rather than "lay down any novel principles of government," the Second Amendment embodied the individual "guarant[ee] and immunit[y]" to which Americans were accustomed.[252]

### 1. Recommendations From the Ratification of the Original Constitution

Although the right of individuals to have arms was not a subject of much direct discussion in the ratification debates, two major topics are relevant. First, Anti-

---

became the final version of Article I, Section 8, Clause 16, Madison, *Notes of Debates* at 480, 485 (Aug. 18, 1787); *id.* at 494–95 (Aug. 21, 1787), and generally supported its compromise, *id.* at 513–14; and that he saw no need for amendments, *see A Countryman No. 2* (1787), *reprinted in* 14 *Ratification*, *supra* note 67, at 172 (John P. Kaminski & Gaspare J. Saladino eds., 1983); *A Countryman No. 3* (1787), *reprinted in id.* at 296; *A Citizen of New Haven* (1789), *reprinted in Creating the Bill of Rights*, *supra* note 82, at 220.

[251] The Ninth Circuit in *Silveira* did not mention this latter set of proposals, and the court presented the comments in the ratification debates most relevant to these separate proposals as if they instead related to the Second Amendment. *See* 312 F.3d at 1082–83; *see also id.* at 1078 (claiming without citation that "[t]he compromise that the convention eventually reached, which granted the federal government the dominant control over the national defense, led ultimately to the enactment of the counter-balancing Second Amendment").

[252] *Robertson*, 165 U.S. at 281 (discussing Bill of Rights in general); *see Silveira*, 328 F.3d at 584 (Kleinfeld, J., joined by Kozinski, O'Scannlain, and T.G. Nelson, JJ., dissenting from denial of rehearing en banc) ("The Second Amendment was not novel, but rather codified and expanded upon long established principles.").

Federalists objected to the absence of a bill of rights, often pointing to the English Bill of Rights (as well as the declarations of the states) as models.[253] The Federalists' response likewise recognized the English precedent, but sought to distinguish it on various grounds or to argue that many rights, such as the English Bill of Rights' ban on "cruel and unusual punishments," or "the liberty of the press" (which developed after the Bill), were too indefinite to provide dependable legal protections.[254]

Second, Anti-Federalists denounced the militia powers to be granted to the federal government, warning that it would destroy the militia through any number of means—by neglecting it, by creating a select militia and then neglecting the general militia, or (somewhat inconsistently[255]) by destroying the militia through onerous discipline and excessive deployment. The arguments from neglect rested on the premise that Congress's power of organizing, arming, and disciplining the militia would foreclose any such state power. If true, the militia might be left without any government ensuring its arming and training. The arguments also were premised on the common understanding of the "militia" as the citizen militia: The Federal Farmer, the leading Anti-Federalist essayist, admonished that "to preserve liberty, it is essential that the whole body of the people always possess arms, and be taught alike, especially when young, how to use them," and Patrick Henry, leader in the Virginia Ratifying Convention, warned, "The great object is, that every man be armed. . . . When this power is given up to Congress without limitation or bounds, how will your militia be armed?"[256] Anti-Federalists also warned that Congress would use its power to establish a standing army to trample

---

[253] *See, e.g.*, 2 *Complete Anti-Federalist*, *supra* note 101, at 7, 11 (public objections of Mason and Gerry); Va. Ratif. Conv., *reprinted in* 10 *Ratification*, *supra* note 67, at 1212 (remarks of Patrick Henry, June 12, 1788) (invoking English Bill and state declarations); Address by Sydney (Robert Yates) (1788), *reprinted in* 6 *Complete Anti-Federalist*, *supra* note 101, at 107, 109 (similar to Henry). One of the leading arguments of this point was by the Federal Farmer. *See Federal Farmer No. 16* (1788), *reprinted in* 2 *Complete Anti-Federalist*, *supra* note 101, at 323.

[254] *See, e.g.*, *The Federalist No. 84*, at 575–81 (Alexander Hamilton); *Marcus No. 1, Answer to Mr. Mason's Objections* (James Iredell) (1788), *reprinted in* 1 *Debate on the Constitution*, *supra* note 97, at 363–64; *Marcus No. 4* (1788), *reprinted in id.* at 387–90; *America, To the Dissenting Members of the late Convention of Pennsylvania* (Noah Webster) (1787), *reprinted in* 1 *Debate on the Constitution*, *supra* note 97, at 555–60.

[255] As one Federalist criticized Luther Martin, an Anti-Federalist who had been a delegate to the Constitutional Convention: "One hour you sported the opinion, that Congress, afraid of the militia resisting their measures, would neither arm nor organize them: and the next, as if men required no time to breathe between such contradictions, that they would harass them by long and unnecessary marches, till they wore down their spirit and rendered them fit subjects for despotism." *The Landholder No. 10* (1788), *reprinted in* 16 *Ratification*, *supra* note 67, at 265, 267 (John P. Kaminski & Gaspare J. Saladino eds., 1986).

[256] *Federal Farmer No. 18* (1788), *reprinted in* 2 *Complete Anti-Federalist*, *supra* note 101, at 342; Va. Ratif. Conv., *in* 10 *Ratification*, *supra* note 67, at 1276 (Henry, June 14, 1788).

traditional liberties, particularly after it had destroyed the militia.[257] The Federalists' response emphasized the same understanding of the citizen militia, asking how the federal government could tyrannize over a populace armed as America's was.[258] As already noted in Part II.D.2 above, they also argued that, in any event, the states would retain a concurrent power over their militias, including a power to arm them.[259]

Two separate categories of proposed amendments resulted from these two sets of arguments. Proposed amendments to protect the right to keep and bear arms not only were phrased as individual rights (even when accompanied by language concerning the militia and civilian control of the military) but also were distinct from proposals that would safeguard state powers over the militia or restrain federal power to create a standing army. (Restriction on standing armies would

---

[257] See, e.g., regarding all of these concerns, *John De Witt No. 5* (1787), *reprinted in* 4 *Complete Anti-Federalist*, *supra* note 101, at 36–37 (warning that federal government would neglect to arm militia, not trusting the people, and enforce unjust laws through standing army); Pa. Ratif. Conv., *in* 2 *Ratification*, *supra* note 67, at 509 (remarks of John Smilie, Dec. 6, 1787) ("When a select militia is formed; the people in general may be disarmed."); *Federal Farmer No. 3* (1787), *reprinted in* 2 *Complete Anti-Federalist*, *supra* note 101, at 242 (discounting safeguard of armed "yeomanry of the people," whom Congress would undermine through creating select militia); *The Genuine Information Delivered to the Legislature of the State of Maryland Relative to the Proceedings of the General Convention Lately Held at Philadelphia; By Luther Martin, Esquire* (1788), *reprinted in* 2 *Complete Anti-Federalist*, *supra* note 101, at 59–60 (warning that Congress would use its militia and army powers "to *subvert* the *liberties* of the *States* and *their citizens*, since we [allow an unlimited standing army and,] by placing the militia under *its* power, enable it to leave the militia *totally unorganized*, *undisciplined*, and *even to disarm them*"); Va. Ratif. Conv., *in* 10 *Ratification*, *supra* note 67, at 1271 (remarks of Mason, June 14, 1788) (warning that Congress would "disarm the people" gradually, rather than "openly," by "totally disusing and neglecting the militia"). Henry repeatedly denounced the allegedly exclusive power. *See* 9 *Ratification*, *supra* note 67, at 957 (June 5) ("Of what service would militia be to you, when most probably you will not have a single musket in the State; for as arms are to be provided by Congress, they may or may not furnish them."); *id*. at 1066 (June 9) ("The power of arming the militia, and the means of purchasing arms, are taken from the States . . . . If Congress will not arm them, they will not be armed at all.").

[258] *See, e.g.*, *The Federalist No. 46*, at 321–22 (James Madison) (contrasting the "advantage of being armed, which the Americans possess," with the circumstances in "several kingdoms of Europe . . . [where] the governments are afraid to trust the people with arms"); *An American Citizen IV: On the Federal Government* (Tench Coxe) (1787), *reprinted in* 13 *Ratification*, *supra* note 67, at 433 (John P. Kaminski & Gaspare J. Saladino eds., 1981) (arguing that, if tyranny threatened, the "*friends to liberty* . . . using those arms which Providence has put into their hands, will make a solemn appeal '*to the power above*'"); A Citizen of America, *An Examination Into the Leading Principles of the Federal Constitution* (Noah Webster) (1787), *reprinted in* 1 *Debate on the Constitution*, *supra* note 97, at 155 ("Before a standing army can rule the people must be disarmed; as they are in almost every kingdom in Europe. The supreme power in America cannot enforce unjust laws by the sword; because the whole body of the people are armed").

[259] John Marshall, for example, provided a standard analysis: "The truth is, that when power is given to the General Legislature, if it was in the State Legislatures before, both shall exercise it; unless there be an incompatibility in the exercise by one, to that by the other; or negative words precluding the State Governments from it. But there are no negative words here. It rests therefore with the States." Va. Ratif. Conv., *in* 10 *Ratification*, *supra* note 67, at 1307 (June 16, 1788).

help ensure that the new government maintained the militia, by ensuring the government's dependence on it.)

Pennsylvania's Convention, the second to meet, ratified the Constitution by a 2 to 1 margin in December 1787, without proposing amendments.[260] A week later, 21 of the 23 dissenting delegates published their *Address and Reasons of Dissent* ("Minority Report"), including amendments that they had proposed but the convention had refused to consider. It drew heavily from the 1776 Pennsylvania Declaration of Rights. The proposal regarding arms was Article 7, immediately following one stating that "the people have a right to the freedom of speech," and it read as follows:

> That the people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals; and as standing armies in the time of peace are dangerous to liberty, they ought not to be kept up; and that the military shall be kept under strict subordination to, and be governed by the civil powers.[261]

Article 8, immediately following, protected the right to hunt on one's private property and certain other lands.[262]

Separately, the Minority sought, in Article 11, both to restrict Congress's Article I, Section 8, Clause 16 powers over the militia and to protect state authority over it, by providing "[t]hat the power of organizing, arming and disciplining the militia (the manner of disciplining the militia to be prescribed by Congress), remain with the individual States."[263] They warned that, without *this* restriction, Congress's power over the militia could place "every man, probably from sixteen to sixty years of age" under Congress's power and military discipline—

---

[260] Delaware already had ratified unanimously. After Pennsylvania's vote, New Jersey, Georgia, and Connecticut ratified by large majorities. No proposed amendments emerged from these conventions. *See* 2 Schwartz, *Bill of Rights, supra* note 67, at 627, 674. Maryland ratified on April 26, 1788, without proposing amendments, although a committee had approved several, including a prohibition on subjecting the militia to martial law "except in time of war, invasion, or rebellion." The committee understood the militia to consist of "all men, able to bear arms," which would make martial law for the militia a pretext for applying it to the populace. *See id.* at 729–30, 734–35.

[261] 2 Schwartz, *Bill of Rights, supra* note 67, at 665. Tench Coxe, in a critique of the Minority, described this proposal as a "provision against disarming the people." *Philanthropos*, Penn. Gazette, 1788, *reprinted in* 15 *Ratification, supra* note 67, at 391, 393.

[262] 2 Schwartz, *Bill of Rights, supra* note 67, at 665. Noah Webster suggested that the Minority also propose "[t]hat Congress shall never restrain any inhabitant of America from eating and drinking, *at seasonable times.*" His serious criticism of Article 8 was that it was useless because aimed at game laws, which had never existed in America. He did not comment on Article 7. *America*, Daily Advertiser, 1787, *reprinted in* 1 *Debate on the Constitution, supra* note 97, at 559–60.

[263] 2 Schwartz, *Bill of Rights, supra* note 67, at 665.

particularly "our young men, . . . as a select militia, composed of them, will best answer the purposes of government"—and also could leave conscientious objectors compelled to bear arms in the militia.[264] As in Pennsylvania's 1776 declaration and constitution, a right to bear arms was distinct from bearing arms in service to the government. There was no suggestion that the individual right somehow would directly guard the states' power, and this separate proposal and comment indicate that the Minority believed that it would not.

The Massachusetts Convention was the first to include with its ratification, in February 1788, a list of recommended amendments. The Federalists prepared and had John Hancock introduce the nine proposals to woo marginal Anti-Federalists. Samuel Adams, while supporting Hancock's list, also led an effort to add several rights that would appear in the First, Second, and Fourth Amendments, plus a ban on standing armies "unless when necessary for the defence of the United States, or of some one or more of them." Regarding arms, he proposed that the Constitution "be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms." This language indicated that the "people" consisted of the "citizens," who would, so long as they were peaceable, individually keep private arms. Adams's proposed additions were voted down, and the Convention then narrowly voted to ratify and to recommend the Federalists' list.[265]

Four months later, New Hampshire's Convention, also closely divided, adapted some of Adams's proposals.[266] It recommended the nine amendments that Massachusetts had, but added three: one calling for a supermajority before Congress could keep up a standing army in peacetime; the next barring Congress from making laws regarding religion or infringing the rights of conscience; and the final one providing that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion."[267] New Hampshire thus became the first state whose ratifying convention as a body recommended that the Constitution protect a right to arms. Again, the right belonged to the individual citizen.

Although New Hampshire had provided the crucial ninth state for the Constitution to take effect,[268] the convention of Virginia, occurring simultaneously and concluding four days later (on June 25, 1788), had particular importance, not only because of the possibility that Virginia would be the ninth state to ratify but also because of the state's significance, the prominence of its leaders, and the strength

---

[264] *Id*. at 671–72.

[265] *Id*. at 674–75, 681. South Carolina ratified in May 1788 without proposing any relevant amendments. *See id*. at 739, 756–57.

[266] The convention had adjourned in February 1788 to avoid a vote against ratification. When it reconvened in the summer, it ratified by a vote of 57 to 47. *See id*. at 758.

[267] *Id*. at 761; *see id*. at 758 (noting that the first nine New Hampshire amendments "were taken almost verbatim from those proposed by Massachusetts").

[268] *Id*. at 758. *See* U.S. Const. art. VII.

of the Anti-Federalists, led by Patrick Henry.[269] The convention did vote to ratify, but also recommended numerous amendments. Written by a committee of Mason, Henry, Madison, George Wythe, and John Marshall, twenty were proposed for a separate bill of rights and twenty for the body of the Constitution. Those in the former category amounted to the first full bill of rights proposed by a state convention, and most made their way into the federal Bill of Rights.[270]

The proposal regarding arms appeared in the bill, immediately after the "right[s]" of "the people" to assemble and petition and to speak, write, and publish. It was a synthesis from the leading state declarations, providing:

> That the people have a right to keep and bear arms; that a well-regulated militia, composed of the body of the people trained to arms, is the proper, natural, and safe defence of a free state; that standing armies, in time of peace, are dangerous to liberty, and therefore ought to be avoided, as far as the circumstances and protection of the community will admit; and that, in all cases, the military should be under strict subordination to, and governed by, the civil power.[271]

The two strands evident in the Revolutionary Era—an individual right to arms and high regard for the citizen militia—were brought together: The proposal combined an individual right to arms provision such as those from the Pennsylvania and Massachusetts Declarations with the praise of the militia from Virginia's. The "people" would have a right to keep and bear arms, and a well-regulated militia composed "of the *body* of the people"—the people as an organized whole—would protect "a free state." This language became the foundation for the Second Amendment. In addition, the combination of the two clauses indicates (as the differing first clauses of the analogous articles in the Virginia and Pennsylvania Declarations had done separately) that the individual right and the well-regulated militia *both* would contribute to the avoidance of standing armies and to civilian rule.

Only in its separate list of amendments for the body of the Constitution did the Virginia convention directly protect the power of states to maintain militias and restrict the federal power to raise standing armies. It recommended a supermajority vote for Congress to maintain a peacetime army (in the spirit of Samuel Adams and the New Hampshire Convention), and it sought to protect state power over the militia (much as the Pennsylvania Minority had) with the following provision:

---

[269] *See* 2 Schwartz, *Bill of Rights*, *supra* note 67, at 762, 764.

[270] *See id*. at 765–66.

[271] 2 Schwartz, *Bill of Rights*, *supra* note 67, at 842. Mason drafted this provision. *See* 9 *Ratification*, *supra* note 67, at 821 (reprinting Mason's draft). Two articles later, Virginia also proposed exemptions for those "religiously scrupulous of bearing arms," again borrowing from Pennsylvania's Declaration. 2 Schwartz, *Bill of Rights*, *supra* note 67, at 842.

> That each state respectively shall have the power to provide for or-
> ganizing, arming, and disciplining its own militia, whensoever Con-
> gress shall omit or neglect to provide for the same.[272]

These distinct proposals confirm what is evident from the declarations included with the proposal for the bill of rights: The individual right of the people to keep and bear arms does not directly guard any power of states to maintain militias. (Much less does it guarantee against standing armies.) But it does *indirectly* further the policy of having a well-regulated militia of the body of the people, as well as that of mitigating the need for and risk from a standing army.

The New York Convention, voting just over a month after Virginia's (and ratifying by only 30–27), followed Virginia's model. The separate declaration of rights included both an individual right to keep and bear arms (immediately after the "right" of "the People" to free exercise of religion) and declarations regarding the militia and standing armies:

> That the People have a right to keep and bear Arms; that a well regu-
> lated Militia, including the body of the People capable of bearing
> arms, is the proper, natural, and safe defence of a free State.
>
> . . . .
>
> That standing Armies in time of Peace are dangerous to Liberty, and
> ought not to be kept up, except in Cases of necessity; and that at all
> times, the Military should be under strict Subordination to the civil
> Power.[273]

For the body of the Constitution, New York proposed, like New Hampshire and Virginia, an amendment requiring a supermajority for Congress to maintain a peacetime standing army. It did not propose express protection of state power over the militia.[274]

The force of Virginia's proposals is evident not only in New York's borrowing but also in the first North Carolina Convention. On August 1, 1788, North Carolina became the only state to decline to ratify until the Constitution had been amended to include a bill of rights (Rhode Island had declined even to call a convention), and it proposed verbatim the amendments that Virginia had proposed—including the individual right to keep and bear arms and the *separate* proposals, for the body of the Constitution, guarding state power over the militias and mandating supermajorities for standing armies. North Carolina's actions made

---

[272] 2 Schwartz, *Bill of Rights*, *supra* note 67, at 843.

[273] *Id*. at 912. New York did not propose any protection for conscientious objectors.

[274] *Id*. at 915, 918.

the momentum for a bill of rights "virtually irresistible," and, two months after Congress approved one, a new convention ratified.[275]

Every recommendation in these state conventions regarding the right to arms sought to protect an individual right—not a "right" to maintain well-regulated state militias, whether belonging to the states or to those serving in such entities (much less belonging just to those serving in well-regulated *select* militias). Virginia, New York, and North Carolina also appended declaratory clauses to the right suggesting that it would benefit the citizen militia, preserve the freedom of the state, and reduce the need for or risk from a standing army. But those states that wanted to protect state authority to maintain militias (Virginia and North Carolina) followed the lead of the Pennsylvania Minority by proposing separate amendments doing so directly, intended not for the bill of rights but for the body of the Constitution. Thus, regarding the right to arms, those who ratified the Constitution did nothing novel, but rather followed the path marked by the state declarations and the earlier right from England. They proposed an individual right, not a "right" of states and not a right restricted to their militias or militiamen. As the First Congress met, it had before it numerous proposals for an individual right to arms and a few proposals for safeguarding state militias by directly protecting state authority, but none for protecting that authority through a collective or quasi-collective "right" to arms.

## 2. The Drafting and Ratification of the Second Amendment

When the First Congress convened in 1789, Federalist Congressman James Madison moved quickly to win over marginal Anti-Federalists by responding to the calls for a bill of rights. The House soon approved seventeen amendments. The Senate reduced these to twelve, of which the states ratified the ten that form the Bill of Rights.

The Federalists, victorious in ratification and dominant in Congress, openly avoided any amendment that would materially alter the balance of power with the states or otherwise threaten legitimate federal powers. Thus, the amendments that Congress approved were devoted almost exclusively to protecting individual rights. Of the categories of proposals discussed in the previous subpart, only the first—the individual right of the people to keep and bear arms—received approval. The separate proposals for protecting state power to organize, discipline, and arm the militia and for restricting federal power to maintain standing armies failed.

President Washington set the stage in his inaugural address, urging Congress to consider amendments out of "a reverence for the characteristic rights of freemen" but "carefully avoid every alteration which might endanger the benefits of an

---

[275] *Id*. at 932–33, 968–69; Halbrook, *Right to Bear Arms*, *supra* note 56, at 33–34.

united and effective government."[276] Madison reiterated this view in introducing his proposals in June 1789:

> It will be a desirable thing to extinguish from the bosom of every member of the community, any apprehensions that there are those among his countrymen who wish to deprive them of the liberty for which they valiantly fought and honorably bled.
>
> . . . .
>
> I should be unwilling to see a door opened for a re-consideration of the whole structure of the government, for a re-consideration of the principles and the substance of the powers given . . . . But I do wish to see a door opened to consider, so far as to incorporate those provisions for the security of rights . . . .
>
> . . . .
>
> I believe that the great mass of the people who opposed [the Constitution], disliked it because it did not contain effectual provision against encroachments on particular rights, and those safeguards which they have been long accustomed to have interposed between them and the magistrate who exercised the sovereign power.[277]

Madison also urged Congress to "expressly declare the great rights of mankind" and provide "those securities for liberty" demanded by North Carolina and Rhode Island. In contrast, he was confident that those who opposed the Constitution's "structure," powers, or restrictions on state powers were a much smaller group.[278] Other congressmen similarly hoped that such an approach would win over many of the disaffected in various states.[279]

Anti-Federalist leaders recognized this focus on individual rights. Richard Henry Lee, one of Virginia's first senators, reported to Patrick Henry about a week before Madison's speech "that many of our amendments will not succeed, but my

---

[276] First Inaugural Address (Apr. 30, 1789), *reprinted in* 1 *A Compilation of the Messages and Papers of the Presidents* 43, 45 (James D. Richardson ed., 1897).

[277] Speech of Madison (June 8, 1789), *reprinted in Creating the Bill of Rights*, *supra* note 82, at 78–79.

[278] *Id.*

[279] *See* Letter from Rep. Fisher Ames to George R. Minot (July 23, 1789) (discussing North Carolina), *reprinted in Creating the Bill of Rights*, *supra* note 82, at 269; Letter from Rep. William L. Smith to Edward Rutledge (Aug. 9, 1789) (North Carolina; noting disposition of House to "agree to some, which will more effectually secure private rights"), *reprinted in id.* at 272–73; Letter from Rep. Frederick A. Muhlenberg to Benjamin Rush (Aug. 18, 1789) (Pennsylvania Minority), *reprinted in id.* at 280.

hopes are strong that such as may effectually secure civil liberty will not be refused."[280] Soon after Madison spoke, Virginia's other senator, William Grayson, wrote to Henry that Madison's proposals "altogether respected personal liberty."[281]

Among Madison's proposals was the following, which became the Second Amendment:

> The right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: but no person religiously scrupulous of bearing arms, shall be compelled to render military service in person.[282]

The first and second clauses resembled the proposals of the Virginia, New York, and North Carolina conventions, including by making the connection between the individual right and the militia. The first clause stated, as they had, a right both to keep and to bear arms, which belonged to "the people." Having made this into a full sentence, Madison made the second clause, which had been free-standing in the Virginia, New York, and North Carolina proposals, subordinate to the first. In shortening the second clause, he omitted the definition of the militia, just as Delaware, Maryland, and New Hampshire had done in their declarations of rights.[283] He also omitted the conventions' disparagement of standing armies and admonition to civilian rule, and appended protection for conscientious objectors, which the Pennsylvania Minority, Virginia, and North Carolina had separately requested. As the Pennsylvania and Vermont Declarations had shown even before ratification, there was no inconsistency in recognizing both an individual right to "bear arms" and an individual exemption from being compelled to "bear arms" in military service.

That Madison envisioned this proposed "right of the people" to secure an individual right is confirmed by the notes for his speech, in which he wrote that those provisions "relat[ing] to what may be called a bill of rights," including this one, "relate . . . to *private rights*";[284] by his using in his speech the same language to discuss both the rights of English subjects and those in his proposed bill;[285] and by

---

[280] Letter from Lee to Henry (May 28, 1789), *reprinted in Creating the Bill of Rights*, *supra* note 82, at 241.

[281] Letter from Grayson to Henry (June 12, 1789), *reprinted in id.* at 249. *See also* Letter from Joseph Jones to Madison (June 24, 1789), *reprinted in id.* at 253 (describing Madison's proposed amendments as well "calculated to secure the personal rights of the people").

[282] Madison Resolution (June 8, 1789), *reprinted in id.* at 12.

[283] See above Part III.B.2, at note 225 (discussing differences from Virginia Declaration).

[284] Notes for Speech in Congress (ca. June 8, 1789), *reprinted in* 12 *The Papers of James Madison* 193, 193 (Charles F. Hobson et al. eds., 1979) (emphasis added); *see id.* at 194–95; Speech of Madison, *reprinted in Creating the Bill of Rights*, *supra* note 82, at 80.

[285] *Compare* Speech of Madison, *reprinted in Creating the Bill of Rights*, *supra* note 82, at 80 (discussing "the declaration of rights" of England), *with id.* at 84 (concluding by describing his proposals "as a declaration of the rights of the people"). In his notes, although apparently not in his

the location in the body of the Constitution in which he proposed to place these amendments. He recommended that the right to arms, along with antecedents of the First, Third, Fourth, Eighth, Ninth, and portions of the Fifth and Sixth Amendments, be added in Article I, Section 9, immediately after clauses protecting three other individual rights: the writ of habeas corpus and the prohibitions against *ex post facto* laws and bills of attainder.[286] It is reasonable to assume that Madison viewed the additional rights as likewise belonging to the individual.[287] Had he instead intended to protect state militias (whether directly through a collective right or indirectly through a quasi-collective right), a more reasonable location would have been in or near the two clauses in Article I, Section 8, that granted congressional power over the militia, one of which already "reserv[ed] to the States" certain powers over the militia. And Madison likely would have drawn from the separate language that Virginia and others had proposed for just this purpose—but those proposals had the potential to threaten the balance of powers, at least by inviting disputes over whether the federal government had "neglect[ed]" the militia.

Others also understood Madison's proposal to secure an individual right to keep and bear arms. Leading Federalist Congressman Fisher Ames wrote: "Mr. Madison has introduced his long expected Amendments. . . . It contains a Bill of Rights . . . [including] the right of the people to bear arms."[288] Elsewhere he wrote: "The rights of conscience, of bearing arms, of changing the government, are declared to be inherent in the people."[289] Tench Coxe took the same view in his *Remarks on the First Part of the Amendments to the Federal Constitution*, published in the major cities. Writing as "A Pennsylvanian" (a pseudonym that he had used during the ratification debates), he explained the right that Madison's proposal protected as follows:

---

speech, he pointed out that the English right to arms was limited to Protestants. 12 *Madison Papers*, *supra* note 284, at 193–94.

[286] *See Creating the Bill of Rights*, *supra* note 82, at 12 (Madison's proposal); *id*. at 80, 84 (Madison's speech). His separate proposal of what would become the Tenth Amendment was to be placed between Articles 6 and 7, as its own article. *Id*. at 13–14.

[287] The arguable exception, as discussed above in Part II.D.1 regarding the Establishment Clause, was a prohibition on "any national religion." Madison proposed other amendments that did not relate to private rights, such as altering the ratio of representation in the House of Representatives and banning increases of legislator pay without an ensuing election, but he proposed to place these elsewhere in the Constitution. *Id*. at 12.

[288] Letter from Ames to Thomas Dwight (June 11, 1789), *reprinted in Creating the Bill of Rights*, *supra* note 82, at 247.

[289] Letter from Ames to George R. Minot (June 12, 1789), *reprinted in Creating the Bill of Rights*, *supra* note 82, at 247–48. The right of "changing the government" to which Ames referred was a provision, in a separate section of Madison's proposal, affirming the right of the people "to reform or change their government, whenever it be found adverse or inadequate to the purposes of its institution." Regarding such usage of the "the people," see Part II.A above.

> As civil rulers, not having their duty to the people duly before them, may attempt to tyrannize, and as the military forces which must be occasionally raised to defend our country, might pervert their power to the injury of their fellow citizens, the people are confirmed by the . . . article in their right to keep and bear their private arms.[290]

Coxe recognized that the "right" of "the people" belonged to the "citizens," who could both keep and bear "private" arms. He sent his *Remarks* to Madison the day that they were published, and Madison six days later returned thanks for his "explanatory strictures" and the "co-operation of your pen," noting from New York City that the *Remarks* "are already I find in the Gazettes here."[291] Neither Madison nor, it appears, anyone else disputed Coxe's interpretation.[292] Samuel Nasson, who had been an Anti-Federalist delegate to the Massachusetts Ratifying Convention, described the right similarly in a letter to a Federalist congressman from the state a month after Madison introduced his proposals:

> I find that Ammendments are once again on the Carpet. I hope that such may take place as will be for the Best Interest of the whole[.] A Bill of rights well secured that we the people may know how far we may Proceade in Every Department[,] then their will be no Dispute Between the people and rulers[.] [I]n that may be secured the right to keep arms for Common and Extraordinary Occasions such as to se-cure ourselves against the wild Beast and also to amuse us by fowl-ing and for our Defence against a Common Enemy[.] [Y]ou know to learn the Use of arms is all that can Save us from a forighn foe that may attempt to subdue us[,] for if we keep up the Use of arms and become acquainted with them we Shall allway be able to look them in the face that arise up against us[.][293]

---

[290] Philadelphia Fed. Gazette, June 18, 1789, at 2, *excerpted in* Kates, *supra* note 33, 82 Mich. L. Rev. at 224 & nn. 81–82. The *Remarks* were reprinted within three weeks in newspapers in Boston (on the front page of a special July 4 issue) and New York. *See* Stephen P. Halbrook & David B. Kopel, *Tench Coxe and the Right to Keep and Bear Arms, 1787–1823*, 7 Wm. & Mary Bill Rts. J. 347, 367 (1999).

[291] *See* Letter from Coxe to Madison (June 18, 1789), *reprinted in Creating the Bill of Rights*, *supra* note 82, at 252–53; Letter from Madison to Coxe (June 24, 1789), *reprinted in* 12 *Madison Papers*, *supra* note 284, at 257; *see also Creating the Bill of Rights*, *supra* note 82, at 254 (excerpting Madison's letter).

[292] *See* Halbrook, *That Every Man Be Armed*, *supra* note 33, at 77 (noting that author's "search of the literature of the time reveals that no writer disputed or contradicted Coxe's analysis").

[293] Letter from Nasson to Thatcher (July 9, 1789), *reprinted in Creating the Bill of Rights*, *supra* note 82, at 260–61 (sic); *see id*. at 309 (brief biography of Nasson).

Like Coxe and others, Nasson understood "the people" as distinct from the government, and included in "the right" of the people private ownership and private uses of arms.

In late July 1789, a committee, to which had been referred both Madison's proposals and all amendments that ratifying conventions had proposed, issued a revised draft. It provided:

> A well regulated militia, composed of the body of the people, being the best security of a free state, the right of the people to keep and bear arms shall not be infringed, but no person religiously scrupulous shall be compelled to bear arms.[294]

The Committee had left unchanged the text of Madison's independent clause stating the right. But it had inverted the first two clauses, modified the language regarding the militia to return it somewhat to what had been proposed by some of the state conventions (including by defining the militia), and revised the conscientious objector clause.

There is no reason to suppose that the mere reversal of order, or any of the other changes, had altered the right that Madison, and the ratifying conventions before him, had set out: The operative text of the independent clause was unchanged from Madison's draft, with the militia clause retaining its subordinate relationship; Madison had served on the committee, which does not seem to have had any serious disagreements over content;[295] and the committee had retained Madison's proposal that this amendment, along with the rest of the "Bill of Rights," be placed among the three pre-existing individual rights in Article I, Section 9, albeit moved forward one clause.[296] In the ensuing debates, no member of the House suggested that any change in the right had occurred. The Speaker of the House, from Pennsylvania, wrote to a leading fellow Federalist in the state that the committee's proposals "take[] in the principal Amendments which our Minority had so much at heart"; the Minority had, as discussed above, proposed an individual right to bear arms.[297] And an article in Boston, reprinted in Philadelphia, described the committee's proposal as containing "[e]very one of" the amendments "introduced to the convention of this common-

---

[294] *Creating the Bill of Rights*, *supra* note 82, at 30.

[295] *Id*. at 6, 102–03; *see* Letter from Madison to Wilson Cary Nicholas (Aug. 2, 1789), *reprinted in id*. at 271 (referring to "the concord" of the committee); Letter from Roger Sherman to Henry Gibbs (Aug. 4, 1789), *reprinted in id*. (another committee member, predicting that committee's proposals "will probably be harmless & Satisfactory to those who are fond of Bills of rights," although noting his desire to place them at the end of the Constitution).

[296] *See id*. at 30. The separate placement of what would become the Tenth Amendment remained unchanged, and Madison's other proposals, noted above, also remained separate.

[297] Letter from Rep. Frederick A. Muhlenberg to Benjamin Rush (Aug. 18, 1789), *reprinted in Creating the Bill of Rights*, *supra* note 82, at 280 (writing after the first day of debate that involved the arms provision, in which no changes were made, and describing proposed amendments to date as "nearly the same as" the committee "had reported them").

wealth by . . . Samuel Adams" (except the restriction against a standing army), including that "the said constitution be never construed . . . to prevent the people of the United States who are peaceable citizens, from keeping their own arms."[298] Clearly, the committee's proposed amendment on arms, like Madison's and like Adams's, was understood to protect an individual right.

In floor debate that began in mid-August, the focus was on the concluding exemption for conscientious objectors and thus on militia service rather than "the right of the people" that the committee's draft secured. Representative Gerry of Massachusetts, who had refused to sign the Constitution and was a leading Anti-Federalist,[299] objected that this final clause would enable the federal government to "declare who are those religiously scrupulous, and prevent them from bearing arms." This, he warned, "together with [Congress's] other powers," would enable Congress to "destroy the militia" and establish "a standing army, the bane of liberty."[300] He moved to narrow the clause, but after a debate, including an effort to delete it, the House approved the committee's draft. Immediately after, it resoundingly defeated another Anti-Federalist's motion to require a supermajority to authorize a standing army in peacetime.[301]

It does not appear from the debates that any congressman shared Gerry's concern, but, in any event, his concern seems more consistent with a view that the amendment secured an individual right than with the alternative views. Gerry presumed that the first two clauses—praising the well-regulated militia and setting out the right of the people—would not suffice to protect the militia in the face of affirmative federal efforts to undermine it. The individual right was inadequate to do so. That understanding is consistent with the individual right view, as we explained above in Part II.C. It also was the understanding, and concern, implicit in the dual recommendations of Virginia, North Carolina, and the Pennsylvania Minority, which sought separately to protect both state militia powers and the individual right to arms. In addition, if the "right of the people . . . to bear arms" meant some right restricted to serving in an organized militia, rather than a personal right, Gerry's concern would not have made sense: Persons whom Congress declared religiously scrupulous pursuant to the proposed amendment, although therefore not "*compelled* to bear arms" in the militia, still would, under a

---

[298] From the Bos. Indep. Chronicle, Phila. Indep. Gazetteer, Aug. 20, 1789, at 2, *excerpted in* Halbrook, *Right to Bear Arms*, *supra* note 56, at 45.

[299] At the Constitutional Convention, Gerry had bitterly opposed the federal powers over the militia in Article I, Section 8, Clause 16. Madison, *Notes of Debates*, *supra* note 44, at 513–16 (Aug. 23, 1787). Regarding his Anti-Federalist writings during ratification, *see* 1 Schwartz, *Bill of Rights*, *supra* note 67, at 464–65, 480–93, he had attended the Massachusetts Convention as an invited observer and helped lead the opposition, *id*. at 465. Presumably, therefore, he supported Samuel Adams's proposed amendments, even though he also desired additional ones. *See id*. at 486–89.

[300] Remarks of Gerry (Aug. 17, 1789), *reprinted in Creating the Bill of Rights*, *supra* note 82, at 182.

[301] *See Creating the Bill of Rights*, *supra* note 82, at 183–85.

quasi-collective right view of the other clauses of the amendment, have some *right* to do so, and thus Congress could not, as Gerry charged, "*prevent* them" from serving.

After more debate over the conscientious objector clause on August 20, the House added back "in person" at the end and approved the draft.[302] It attached all of the amendments to the end of the Constitution rather than incorporating them, but no substantive change was intended.[303] The right of the people to keep and bear arms was the fifth of the seventeen proposed amendments that the House then sent to the Senate.[304]

An Anti-Federalist who during the ratification debates had written widely published essays as "Centinel" was enraged enough by the House's failure to restrict federal, and protect state, power that he took up his pen again, as Centinel Revived.[305] He denounced "the partial amendments making [sic] by Congress" and lamented that, although "many of these amendments are very proper and necessary, yet . . . the constitution is suffered to retain powers that may not only defeat their salutary operation, but may, and incontrovertibly will be so decisively injurious as to sweep away every vestige of liberty." He highlighted the Second Amendment for criticism:

> It is remarkable that this article only makes the observation, "that a well regulated militia, composed of the *body* of the people, is the best security of a free state"; it does not ordain, or constitutionally provide for, the establishment of such a one. The absolute command vested by other sections in Congress over the militia, are not in the least abridged by this amendment.[306]

---

[302] *See id*. at 198–99. The addition may have been an effort to partially satisfy Representative Scott, by ensuring that Congress could at least require conscientious objectors to provide an equivalent. Unlike Gerry, he objected to the exemption because he worried that citizens, rather than Congress, would abuse it, with the result that "you can never depend upon your militia." He added, "This will lead to the violation of another article in the constitution, which secures to the people the right of keeping arms, as in this case you must have recourse to a standing army." *Id*. at 198. While this cryptic and elliptical comment conceivably might be construed to suggest a quasi-collective right, its meaning is far from clear, and we find little probative value in it. The Fifth Circuit in *Emerson* reasonably concluded that Scott's comment "does not plainly lend support to any of the Second Amendment models," 270 F.3d at 248, and the Ninth Circuit in *Silveira* did not cite it, *see* 312 F.3d at 1085–86.

[303] *See Creating the Bill of Rights*, *supra* note 82, at 117–28 (debate of Aug. 13, 1789); *id*. at 197–98 (debate of Aug. 19, 1789).

[304] *Id*. at 37–41.

[305] "The most prolific and one of the best known of the Anti-Federalist essayists was the Centinel, whose essays appeared in the Philadelphia *Independent Gazetteer* and the Philadelphia *Freeman's Journal* and were widely reprinted." 2 *Complete Anti-Federalist*, *supra* note 101, at 130. He published twelve essays as Centinel Revived. *Id*.

[306] *Centinel (Revived), No. 29* (1789), Phila. Indep. Gazetteer, Sept. 9, 1789, *quoted in Emerson*, 270 F.3d at 255.

Centinel understood the Second Amendment not to constrain Congress's Article I, Section 8 "absolute command" over the militia or otherwise secure any power of the states to maintain one (whether by creating a "right" of states or of the members of their organized militia units), and understood the Amendment's prefatory praise of the militia—a mere "observation"—not to have any operative effect. The reasonable inference is that he viewed the "right of the people to keep and bear arms" as one belonging to individuals.

The Senate reduced the House's proposed amendments to twelve in early September.[307] In so doing, it made three changes in what would become the Second Amendment: (1) deleting "composed of the body of the people," (2) replacing "the best" with "necessary to the," and (3) deleting the conscientious objector clause. It also voted down a motion to insert "for the common defense" immediately after "to keep and bear Arms."[308] The Senate deliberated in secret, and its minutes are conclusory, so it is difficult to discern the reasons for these changes. One could argue that some of them (deletion of the conscientious objector clause and rejection of the "common defense" clause) tend to support the individual right view of the Amendment, although contrary arguments are no doubt possible.[309] One also could argue that deletion of the definition of the militia cuts against the individual right view's reading of the prefatory language, although there, too, a counter-argument is possible.[310] Because of the lack of historical records and the multiple possible explanations, we are reluctant to attribute any material significance to these actions.

We do, however, find it significant that the Senate rejected a motion to add a separate amendment securing state power to organize, arm, and discipline the militias if Congress should "omit or neglect" to do so.[311] Notwithstanding the lack of historical records of the deliberations on this motion, the broader historical

---

[307] The Senate combined provisions (such as in creating what became the First and Fifth Amendments) and rejected House provisions regulating appeals to the Supreme Court; applying religion, speech, press, and criminal jury protections to the states; and prohibiting violations of the separation of powers. *See* 2 Schwartz, *Bill of Rights*, *supra* note 67, at 1145–47 (summarizing changes); *compare Creating the Bill of Rights*, *supra* note 82, at 37–41 (House proposals), *with id*. at 47–49 (Senate).

[308] *See Creating the Bill of Rights*, *supra* note 82, at 39 n.13; 2 Schwartz, *Bill of Rights*, *supra* note 67, at 1153–54 (Sen. Journal).

[309] *See* Uviller & Merkel, *supra* note 45, 76 Chi.-Kent L. Rev. at 507 (theorizing that vote on common defense clause was prompted by desire to avoid either redundancy or the objection that the amendment failed to protect militia service in defense of a state, as opposed to the "common" national defense). The deletion of the troublesome conscientious objector clause could have been simply because of a desire, as voiced in the House, to leave the matter to Congress's discretion, *see, e.g.*, Remarks of Rep. Benson (Aug. 17, 1789), *reprinted in Creating the Bill of Rights*, *supra* note 82, at 184, without affecting the right one way or the other.

[310] One could argue that the definition was considered superfluous. *See* 2 Schwartz, *Bill of Rights*, *supra* note 67, at 1145 (observing that Senate in its revisions of the House proposals generally "tighten[ed] up the language of the House version, striking out surplus wording and provisions."); Part II.C.2–4 (discussing meaning of "Militia" at the time).

[311] 2 Schwartz, *Bill of Rights*, *supra* note 67, at 1152 (Sen. Journal).

context suggests that, had Congress sought to secure the states' ability to maintain organized militia units, adopting this provision is how it would have done so. It is hard to ascribe this vote to a view that the proposed amendment was redundant with the right of the people to keep and bear arms: Not only are the texts of the two provisions markedly different, but also, as explained in the previous subpart, the Virginia and North Carolina Ratifying Conventions (from which the rejected language was directly taken) had made distinct proposals, one covering the right to arms and the other covering state power over the militia (the Pennsylvania Minority also had done this). In addition, the Senate was even more Federalist than the House (Lee and Grayson of Virginia being the only Anti-Federalists among the 22 senators).[312] As already noted, the Federalists were determined to avoid amendments affecting the federal-state balance of power and instead to focus on individual rights. If senators had thought that what became the Second Amendment had the effect of this rejected provision, one would have expected them to have refused to approve it as well. Finally, the two Anti-Federalist senators acknowledged that their efforts to obtain amendments affecting the federal-state balance had failed. Senator Lee, like Centinel, complained, in a letter to Patrick Henry, that the amendments were inadequate for "securing the due Authority of the States."[313] Senators Lee and Grayson jointly informed the Virginia legislature of their failure to secure the "Radical Amendments proposed by the Convention."[314] Thus, the Senate continued the House's approach—rejecting attempts to restrict congressional powers or augment state powers, while securing individual rights in the hope of creating a national consensus in favor of the new government.

On September 24, 1789, a conference committee agreed to some changes in the Senate's proposed amendments, but there was no change in (or effort to change) the Senate's version of what became the Second Amendment. Congress, through the President, then sent the twelve proposed amendments to the then-eleven states for ratification and to North Carolina and Rhode Island (which still had not ratified the Constitution).[315] The records of the state ratifying conventions are sparse and do not appear to provide any significant material concerning the meaning of the

---

[312] *See Creating the Bill of Rights*, *supra* note 82, at xii; Letter from Madison to Jefferson (Mar. 29, 1789), *reprinted in id.* at 225.

[313] Letter from Lee to Henry (Sept. 14, 1789), *reprinted in id.* at 295. The Senate also, like the House, had rejected a proposal to append to what became the Second Amendment a supermajority requirement for peacetime standing armies, a provision to help ensure that Congress would depend on and therefore provide for the militia. 2 Schwartz, *Bill of Rights*, *supra* note 67, at 1149 (Sen. Journal); *see Creating the Bill of Rights*, *supra* note 82, at 38–39 n.13.

[314] Letter from Lee and Grayson to the Speaker of the Virginia House of Delegates (Sept. 28, 1789), *reprinted in Creating the Bill of Rights*, *supra* note 82, at 299.

[315] *See id.* at 49–50 (Conference Committee Report and House Resolution); *id.* at 296–98 (various letters of Sept. 1789, including by Madison, detailing concerns with certain Senate revisions but not mentioning Second Amendment); 2 Schwartz, *Bill of Rights*, *supra* note 67, at 1171–73 (regarding presidential transmittal).

Second Amendment right.[316] The states approved ten of the twelve proposed amendments, and in March 1792, Secretary of State Jefferson officially declared the Bill of Rights ratified.[317]

The history in this subpart of the immediate development of the Second Amendment reveals a right consistent with, and developed from, the individual right to arms that had been inherited from England, recognized and invoked in revolutionary America, and codified to various extents in early state declarations of rights. In addition, the early states prized a well-regulated citizen militia, as some of their declarations recognized, and understood the individual right to arms to facilitate such a militia. The Second Amendment, following the lead of several of the ratifying conventions, reflects the contemporaneous understanding of this relationship; in so doing, it grants the right to "the people," not to the "Militia" (much less to members of select militia units), or to the "State." Nor does the history support limiting the right secured by the Amendment to any of these entities. Indeed, those who wanted to ensure that the states could have fully functioning militias proposed a separate amendment, expressly protecting state power. Their proposals failed.[318] Thus, the history of the Amendment, like its text, indicates that the Second Amendment's "right of the people to keep and bear Arms" is not collective or quasi-collective but rather is a personal right that belongs to individuals.

## IV. The Early Interpretations

Our analysis of the Second Amendment's text and history in the two preceding parts of this memorandum is supported by the views of those who first interpreted the Amendment. In the generations immediately following its ratification, the three leading commentators to consider the Second Amendment each recognized that its right of the people to keep and bear arms belonged to individuals, not to states and not just to members of militias (whether of organized, select militia units or even of the citizen militia). Nearly all of the discussions of the antebellum courts, including in the leading cases, understood the right in the same way, whether they were considering the Second Amendment or similar provisions in

---

[316] *See* 2 Schwartz, *Bill of Rights*, *supra* note 67, at 1171–72 ("[W]e know practically nothing about what went on in the state legislatures during the ratification process" and "[e]ven the contemporary newspapers are virtually silent."); *Emerson*, 270 F.3d at 255 (without comment, omitting discussion of ratification); *Silveira*, 312 F.3d at 1086 (same).

[317] 2 Schwartz, *Bill of Rights*, *supra* note 67, at 1171, 1203. One of the two not then ratified was ratified in 1992 as the Twenty-Seventh Amendment, which relates to congressional pay. The other addressed the size of the House.

[318] And even if one believes, contrary to the historical record, that Anti-Federalists' concerns about the militia were resolved in their favor, the Anti-Federalists' insistence on the superiority of a citizen militia to a select militia, noted at the beginning of Part III.C, would lead to the understanding of the Amendment's prefatory clause that we set out in Part II.C, an understanding that is, as we explained, fully consistent with the individual right view of the Second Amendment.

state constitutions. This early understanding of a personal right continued at least through Reconstruction. The modern alternative views of the Second Amendment did not take hold until 1905, well over a century after the Amendment had been ratified.

## A. The First Commentators

In the first few decades after the Second Amendment was drafted and ratified, each of the three leading commentators on the Constitution addressed it: St. George Tucker, William Rawle, and Joseph Story. Each agreed that it protects an individual right. Less prominent early commentators also concurred with this interpretation.

Tucker, a judge and law professor from Virginia, published in 1803 an edition of Blackstone's *Commentaries* to which he had added annotations and essays explaining the relation of American law, including the new Constitution, to England's. Tucker's Blackstone quickly became the leading American authority on both Blackstone and American law.[319]

Tucker addressed the Second Amendment at several points. He first did so, repeatedly, in his introductory *View of the Constitution of the United States*. He tied the federal right, as Blackstone had the English one, to the individual, natural right of self-defense and to the freedom of the state. After quoting the Amendment, he wrote:

> This may be considered as the true palladium of liberty . . . . The right of self defence is the first law of nature: in most governments it has been the study of rulers to confine this right within the narrowest limits possible. Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction.[320]

He condemned the use of the game laws in England as a pretext to disarm ordinary people—the "farmer, or inferior tradesman, or other person not qualified to kill game."[321] And he grouped the Second Amendment right with those of the First, confirming that all belonged to individuals:

---

[319] *See* Clyde N. Wilson, Forward, *in* St. George Tucker, *View of the Constitution of the United States, with Selected Writings* at viii–ix (1999); Paul Finkelman & David Cobin, An Introduction to St. George Tucker's *Blackstone's Commentaries*, *in* 1 Tucker's Blackstone, *supra* note 60, at v–xii; 1 *id.*, Editor's Preface at v.

[320] 1 Tucker's Blackstone, *supra* note 60, Note D, at 300 (ellipsis in original).

[321] *Id*.

> If, for example, a law be passed by congress, prohibiting the free ex-
> ercise of religion, according to the dictates, or persuasions of a man's
> own conscience; or abridging the freedom of speech, or of the press;
> or the right of the people to assemble peaceably, or to keep and bear
> arms; it would, in any of these cases, be the province of the judiciary
> to pronounce whether any such act were constitutional, or not; and if
> not, to acquit the accused . . . .[322]

Second, in annotating Blackstone's description, in Book I, Chapter 1, of the individual English subject's right to have and use arms for self-defense (discussed above in Part III.A), Tucker praised the Second Amendment "right of the people" for being "without any qualification as to their condition or degree, as is the case in the British government" (under England's Bill of Rights) and again denounced the game laws, by which "the right of keeping arms is effectually taken away from the people of England."[323] Finally, in a note to one of Blackstone's (critical) discussions of the game laws, Tucker once more attacked them, because "it seems to be held" that no one but the very rich has "any right to keep a gun in his house" or "keep a gun for their defence," the result being that "the whole nation are completely disarmed, and left at the mercy of the government," and "the mass of the people" are kept "in a state of the most abject subjection." By contrast, "in America we may reasonably hope that the people will never cease to regard the right of keeping and bearing arms as the surest pledge of their liberty."[324]

In all of these discussions, the right belonged to individuals—to persons avail-ing themselves of the natural, individual "right of self defence," to the "accused" seeking judicial review of a violation of the Second Amendment, and to "the mass" of ordinary people able to defend themselves because protected by the Second Amendment from class-based pretexts for disarmament. Tucker under-stood both the English and American rights to arms to belong to individuals, and he thought the latter more secure and broad-based.

Nowhere did Tucker suggest that the right of the people to keep and bear arms depended on a person's enrollment and exercise in the citizen militia (much less his membership in an organized, select militia unit) or that it was a "right" that belonged to state governments. He did elsewhere, in discussing the Militia Clauses, point out that the Second Amendment eliminated "all room for doubt, or

---

[322] *Id*. at 357; *see id*. at 315–16 (explaining that, whereas in England, "the game-laws, as was before observed, have been converted into the means of disarming the body of the people," and statutes have restricted assemblies, the Constitution will not "permit any prohibition of arms to the people; or of peaceable assemblies by them"); *id*. at 289 (describing hypothetical law "prohibiting any person from bearing arms" as violating the Second Amendment).

[323] 2 *id*. at *143–44 & nn. 40–41. *See also id*. at *145 n.42 (again criticizing game laws).

[324] 3 *id*. at *414 n.3; *see also* Parts III.A (discussing right to arms in England) & III.B.2 (discussing doubts whether the relaxation of English game laws in 1700s succeeded as a practical matter in enabling commoners to keep arms).

uneasiness" on whether the federal government could prohibit states from simply providing arms for their militias (doubt he rightly found questionable given that the original Constitution left a concurrent arming power in the states).[325] Tucker did not suggest here that he thought the Amendment had only this effect, and his other discussions confirm that he did not so understand it.

William Rawle of Pennsylvania published his *View of the Constitution of the United States of America* in 1825, with a second edition appearing in 1829. After having turned down President Washington's offer to be the first attorney general, he had served in the Pennsylvania Assembly when it ratified the Bill of Rights. His commentary, like Tucker's, gained wide prominence.[326]

Rawle analyzed the Second Amendment in a chapter entitled "Of the Restrictions on the Powers of Congress . . . [,] Restrictions on the Powers of States and Security to *the Rights of Individuals*," by which he meant, respectively, Article I, Section 9; Article I, Section 10; and the first eight amendments of the Bill of Rights.[327] He started with the Second Amendment's preface, giving to it, including the word "Militia," precisely the sense and significance that emerges from our analysis above, and making clear that the substantive right belonged to the ordinary citizen:

> In the second article, it is declared, that *a well regulated militia is necessary to the security of a free state*; a proposition from which few will dissent. Although in actual war, the services of regular troops are confessedly more valuable; yet, while peace prevails, and in the commencement of a war before a regular force can be raised, the militia form the palladium of the country. . . . That they should be well regulated, is judiciously added. . . . The duty of the state government is, to adopt such regulations as will tend to make good soldiers with the least interruptions of the ordinary and useful occupations of civil life. . . .
>
> The corollary, from the first position, is, that *the right of the people to keep and bear arms shall not be infringed.*

---

[325] 1 *id.* at 273. Tucker thought the federal powers in Article I, Section 8, Clause 16, to provide for "organizing" and "disciplining" the militia were exclusive, *id.* at 180–81, but that states retained "concurrent, though perhaps subordinate" powers to provide for "arming" their militias and "to call them forth when necessary for their internal defence," *id.* at 182, 183. His only other reference to the Second Amendment in connection with the militia was in a note to Blackstone's discussion of the militia, in which Tucker collected all references in the Constitution to the militia, along with the Third Amendment, Virginia laws, and the federal Militia Act. 2 *id.* at \*409 n.1.

[326] *See* Hardy, *supra* note 33, 9 Harv. J.L. & Pub. Pol'y at 613. Rawle did agree to be United States Attorney for the District of Pennsylvania. *See, e.g.*, *United States v. Fries*, 3 U.S. (3 Dall.) 515, 517 (C.C.D. Pa. 1799).

[327] William Rawle, *A View of the Constitution of the United States of America* 115 (2d ed. 1829; reprint 1970) (font altered; emphasis added).

> The prohibition is general. No clause in the Constitution could by any rule of construction be conceived to give to congress a power to disarm the people. Such a flagitious attempt could only be made under some general pretence by a state legislature. But if in any blind pursuit of inordinate power, either should attempt it, this amendment may be appealed to as a restraint on both.[328]

Both Rawle's language—the Amendment's prohibition "is general" and protects the arms of "the people"—and his view of the Second Amendment as applying to the states and *restricting* their power indicate that he saw the right as individual, not as collective or quasi-collective.

Two additional points further show that Rawle viewed the right as belonging to individuals. Like Tucker, he favorably contrasted the right of the people that the Second Amendment secured with the more selective individual right in England under the aristocratic game laws, including a summary of Blackstone's critique of those laws. In addition, he expressly recognized, as had Blackstone, Tucker, and, in varying degrees, the Pennsylvania Minority, Samuel Adams, and the New Hampshire Ratifying Convention, that the right provided no warrant to breach the peace, including by inciting reasonable fear of a breach.[329] This recognition indicates an individual right view because there is no need for ordinary criminal law to oversee either the actions of states in regulating their militias or the bearing of arms by members of a state's militia in connection with their service and under state regulation.

Rawle further explained the individual right view's understanding of the Second Amendment preface when discussing the President's limited power to command the militia. Although not mentioning the Amendment expressly, he noted: "In a people permitted and accustomed to bear arms, we have the rudiments of a militia, which properly consists of armed citizens, divided into military bands, and instructed at least in part in the use of arms for the purposes of war."[330] Thus, the "people" of the country, as individuals, keep and bear arms for private purposes; they also form the militia; and the former facilitates the latter, but only as a rudiment. That is why the individual right is a "corollary" from the need for a militia.

The same view appears in the influential 1833 *Commentaries on the Constitution of the United States* of Supreme Court Justice and law professor Joseph Story,

---

[328] *Id*. at 125–26.

[329] *Id*. at 126. Regarding Blackstone, see Part III.A above. For Tucker's annotations of some of Blackstone's discussions of improper uses of arms, *see* 5 Tucker's Blackstone, *supra* note 60, at *126, *142–49, *175. Regarding the Pennsylvania Minority, Adams, and New Hampshire, see Part III.C.1 above.

[330] Rawle, *View of the Constitution*, *supra* note 327, at 153. Significantly, in separately discussing the Militia Clauses of Article I, Section 8, Rawle made no mention of the Second Amendment. *Id*. at 111–12.

as well as in his later *Familiar Exposition* of the Constitution. The *Commentaries* appeared first in a three-volume set and then, a few months later, in a one-volume abridgement by Story (the "*Abridgement*").[331]

Story devoted a chapter of his *Abridgement* to the Bill of Rights. Before turning to its provisions, he recounted the debate over whether to add one and identified several purposes, all related to individual rights: (1) to prevent powers granted to the government from being exercised in a way "dangerous to the people"; (2) as part of "the muniments of freemen, showing their title to protection," to ensure against an "extravagant or undue extention of" powers granted; and (3) to protect minorities.[332] He then singled out those amendments that did not relate to judicial procedure (the First, Second, Third, Fourth, Eighth, Ninth, and Tenth) as those addressing "subjects properly belonging to a bill of rights."[333]

With regard to the Second Amendment, he first explained the importance of the militia for "a free country," including as a check on "domestic usurpations of power," and the hazards "for a free people" of keeping up "large military establishments and standing armies in time of peace." He linked these policies to the right: "The right of the citizens to keep, and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them."[334] In the unabridged version, he cited Tucker, Rawle, and the House of Representatives' first day of debate on the Amendment in support of this sentence.[335]

By paraphrasing the "right of the people" as the "right of the citizens"—not of states or members of their militias—as well as by citing Tucker and Rawle's discussions (including borrowing from Tucker's "palladium" language), Story left no doubt that he considered the right to belong to individuals. He reinforced this point in an additional paragraph in the unabridged version, citing both Blackstone's discussion of the "similar provision" in England—clearly an individual right, as explained above—and Tucker's discussion of what Story called the "defensive privilege" there.[336] In his *Familiar Exposition*, Story began his discus-

---

[331] Ronald D. Rotunda & John E. Nowak, Introduction, *in* Story, *Abridgement*, *supra* note 66, at xi–xiv.

[332] *Id.* §§ 980–982, at 696–97.

[333] *Id.* § 984, at 698; *see id*. §§ 985–1011, at 698–714.

[334] *Id.* § 1001, at 708.

[335] 3 Story, *Commentaries*, *supra* note 75, § 1890, at 746 n.1. In *United States v. Miller*, 307 U.S. 174, 182 n.3 (1939), the Supreme Court included this passage (from a later edition) in a string citation.

[336] 3 Story, *Commentaries*, *supra* note 75, § 1891, at 747. In a separate chapter, the full *Commentaries* also included an extended discussion of the Anti-Federalist charges leveled against the Militia Clauses, including the charge that the federal militia powers would be exclusive (which Story found unpersuasive). Story alluded to the failure of proposals explicitly to protect state militia powers. *Id.* §§ 1198–1202, at 83–87.

sion of the Amendment with an even more explicit statement: "One of the ordinary modes, by which tyrants accomplish their purposes without resistance, is, by disarming the people, and making it an offence to keep arms, and by substituting a regular army in the stead of a resort to the militia."[337]

Thus Story, like Tucker, Rawle, and others, recognized that the right that the Second Amendment secured was an individual one. He also saw, as they had, that this personal right was necessary for ensuring a well-regulated militia of the people. But he likewise recognized, consistent with the individual right view, that such a right was not sufficient for ensuring such an entity, wondering how it would be "practicable to keep the people duly armed without some organization," and lamenting the decline of militia discipline.[338]

Less prominent commentators shared Tucker, Rawle, and Story's view of the Second Amendment as securing an individual right. Most significant of these was probably Henry Tucker (son of St. George). In an 1831 commentary, he explained:

> The right of bearing arms—which with us is not limited and restrained by an arbitrary system of game laws as in England; but is practically enjoyed by every citizen, and is among his most valuable privileges, since it furnishes the means of resisting as a freeman ought, the inroads of usurpation.[339]

He also noted that the right inherited from England and expounded by Blackstone "is secured with us by" the Second Amendment.[340] And Jonathan Elliot, in his record of the ratification debates first published in the 1830s, provided an index of the Constitution that, under the heading "*Rights of the citizen* declared to be," listed each of the rights of the first nine amendments of the Bill of Rights, including "To keep and bear arms."[341] He grouped the right secured by the Second Amendment with the unquestionably individual rights secured by its neighbors. There was no entry in the index for the militia or its members, aside from reference to the congressional powers in Article I, Section 8, and none of his entries regarding the states included reference to the militia or the Second Amendment.[342] Thus, these early commentators were all consistent in recognizing that the Second

---

[337] Joseph Story, *A Familiar Exposition of the Constitution of the United States* § 450, at 319 (1840; reprint 1986).

[338] Story, *Abridgement, supra* note 66, § 1001, at 708–09.

[339] Henry St. George Tucker, *Commentaries on the Laws of Virginia* 43 (1831).

[340] *Id*.

[341] *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* xv (Jonathan Elliot ed., 2d ed. 1836; reprint 1987).

[342] For additional antebellum commentators, see David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU L. Rev. 1359, 1399–1403, 1435–41; *see also id*. at 1397–98 (discussing Henry Tucker).

Amendment secures an individual right. They did not even mention possible alternative views, whether involving a collective or a quasi-collective "right."

## B. The First Cases

Like the commentators, the early case law also treated the Second Amendment as securing a right of individuals, not a right of governments or those in its service. Without taking any position on the correctness of the courts' holdings or the constitutionality, under the Second Amendment, of any particular limitations on owning, carrying, or using firearms, we find it significant that these decisions consistently understood the right to be an individual one. The earliest cases, although not numerous, consistently recognized that the right to "bear" arms belonged to individuals, just as the right to "keep" them did. Judicial treatment became more common beginning in the 1840s, mostly because of new prohibitions on carrying weapons concealed. The courts upheld these prohibitions (some courts applying the Second Amendment and some applying similar state provisions), but in so doing they all recognized an individual right to arms: All of the decisions recognized an individual right to keep private arms; nearly all, including the leading cases, recognized a right of individuals to "bear" those arms for private purposes; and all recognized some manner of individual right to bear them. Most notably, the Supreme Court of Georgia twice unanimously ruled in favor of individuals on the basis of the Second Amendment.

### 1. Cases Before 1840

The first of the early cases is *Houston v. Moore*, in 1820. The Supreme Court, in upholding Pennsylvania's power to try a militiaman for failing to report for federal service in the War of 1812, recognized that states had concurrent power to regulate their militias at least when the militias were in the service of their state or in the absence of congressional regulation. Yet it did not mention the Second Amendment. Justice Story, in dissent, also recognized the concurrent power, and he noted that the Second Amendment was probably irrelevant to the question.[343] As we explained above in Part III.C.1, the Anti-Federalists who claimed to fear that the federal militia powers would not allow a concurrent state jurisdiction did not rely on the proposals for a right to arms to resolve their concern, but rather proposed separate amendments (which failed to pass). It appears that the Court in *Houston* similarly recognized that the Second Amendment did not guard state power to maintain militias, whether by creating a collective right of states or a quasi-collective right of militiamen to vindicate state power. Otherwise, one would

---

[343] *Houston v. Moore*, 18 U.S. (5 Wheat.) 1, 16–17, 21–22 (1820) (plurality opinion of Washington, J.); *see id.* at 34–36 (Johnson, J., concurring); *id.* at 50–53 (Story, J., dissenting). Story dissented on the ground that the militia law granted enforcement authority exclusively to federal courts. *Id.* at 71–72.

expect the Court to have discussed it. Thus, *Houston,* although far from conclusive, lends some support to an individual right view.

Second, in *Bliss v. Commonwealth* (1822), in what appears to be the first judicial interpretation of the right to bear arms in America, a divided highest court of Kentucky applied that state's constitutional protection of "the right of the citizens to bear arms in defense of themselves and the state," first adopted in 1792, to void a ban on wearing certain weapons concealed.[344] The state had argued that the ban merely restricted the manner of exercising the right. The court, although not citing authority, gave two primary reasons for rejecting this argument: (1) the right in 1792 included carrying weapons concealed, and (2) to recognize this one exception would leave no principled basis to reject others, eviscerating the right.[345] The court's specific holding was rejected thereafter—by courts[346] and by the people of Kentucky, who in their 1850 constitution added a clause allowing laws to prevent carrying concealed arms.[347] But the holding was rejected, not on the ground that it improperly recognized a right of individuals to "bear arms" (Kentucky's provision remained otherwise unchanged), but rather on the ground that *Bliss* erred in determining the right's scope. Thus *Bliss* confirms the individual nature of the right.

Third, several early references to the right or to "bearing arms" indicate that courts viewed the right as an individual one, or at least that an individual carrying weapons and not in militia service could be said to "bear arms." A Virginia appellate court in 1824, discussing that state's restrictions on the rights of free blacks—"many of which are inconsistent with the letter and spirit of the Constitution, both of this State and of the United States"—cited the restriction "upon their right to bear arms."[348] That the restriction involved their rights as individuals is evident from Tucker's summary of the Virginia laws.[349] In an 1829 libel case, the Supreme Court of Michigan (then a territory) drew a parallel between the freedoms of speech and press and the right of the people to bear arms to explain that

---

[344] 12 Ky. (2 Litt.) 90, 1822 WL 1085. The dissenting judge did not issue an opinion. *See id.* at *4.

[345] *Id.* at *2.

[346] The first court to depart from *Bliss*'s holding, the Indiana Supreme Court eleven years later in *State v. Mitchell*, 3 Blackf. 229, 1833 WL 2617, at *1, did not cite its neighboring court or otherwise explain itself, the entire opinion being as follows: "It was *held* in this case, that the statute of 1831, prohibiting all persons, except travelers, from wearing or carrying concealed weapons, is not unconstitutional." We discuss the later antebellum cases in the next subpart.

[347] *See* Ky. Const. art. XIII, § 25 (1850), *reprinted in* 3 *Federal and State Constitutions*, *supra* note 78, at 1314.

[348] *Aldridge v. Commonwealth*, 4 Va. (2 Va. Cas.) 447, 1824 WL 1072, at *3 (Va. Gen. Ct.).

[349] 5 Tucker's Blackstone, *supra* note 60, at *175 n.17, ¶ 7 (listing as among the "offences against the public police, or [e]conomy," the restriction against "any" black or mulatto "keeping or carrying any gun-powder, shot, club, or other weapon," including a "gun"). *See also Waters v. State*, 1 Gill. 302, 1843 WL 3024 (Md.) (explaining, with regard to free blacks, that "laws have been passed to prevent their migration to this State; to make it unlawful for them to bear arms; to guard even their religious assemblages with peculiar watchfulness.").

individual rights are not unlimited: "The constitution of the United States also grants to the citizen the right to keep and bear arms. But the grant of this privilege cannot be construed into the right in him who keeps a gun to destroy his neighbor."[350] And in a jury instruction while riding circuit in 1833, in a case unrelated to the militia, U.S. Supreme Court Justice Baldwin included the Amendment in a list of potentially relevant individual rights.[351]

Last of the earliest cases is the 1833 decision of the Supreme Court of Tennessee in *Simpson v. State*.[352] The question was the validity of a boilerplate indictment alleging that the defendant had appeared in a "public street and highway . . . arrayed in a warlike manner" and then "to the great terror and disturbance of divers good citizens . . . an affray did make . . . against the peace and dignity of the state."[353] The court held the indictment invalid because it alleged neither fighting (an element of "affray") nor any other act likely to have caused public terror and indictable at common law. The court reached this conclusion first by considering the common law, particularly as set out by Blackstone. But because there was some uncertainty regarding the common law, the court also relied on the 1796 Tennessee Constitution, which provided "that the freemen of this state have a right to keep and to bear arms for their common defence."[354] This right eliminated any doubt whether merely appearing in public armed could create "terror" and thus be criminal: "By this clause of the constitution, an express power is given and secured to all the free citizens of the state to keep and bear arms for their defence, without any qualification whatever as to their kind or nature."[355] The court recognized that individuals could "bear arms" for private purposes, just as they could "keep" them, and included self-defense within "their common defence." Thus, in the first four decades after the Founding, the courts were consistent in recognizing that the right to keep and bear arms was a right of individuals,

---

[350] *United States v. Sheldon*, 5 Blume Sup. Ct. Trans. 337, 1829 WL 3021, at *12 (Mich. Terr.). *See also Commonwealth v. Blanding*, 20 Mass. (3 Pick.) 304, 338 (1825) (invoking right to keep arms to draw same analogy).

[351] *Johnson v. Tompkins*, 13 F. Cas. 840, 850 (C.C.E.D. Pa. 1833) (No. 7,416).

[352] 13 Tenn. (5 Yer.) 356, 1833 WL 1227.

[353] 1833 WL 1227, at *1.

[354] *Id*. For more regarding the relevant common law, see the discussion in *State v. Huntly*, 25 N.C. (3 Ired.) 418, 1843 WL 891, at *2–3 (surveying common law and noting "that the carrying of a gun *per se* constitutes no offence"). *See also State v. Langford*, 10 N.C. (3 Hawks) 381, 1824 WL 380; 4 William Blackstone, *Commentaries* *149; 1 Hawkins, *Pleas of the Crown*, *supra* note 177, ch. 63, § 9, at 136. An English case that the court cited in *Huntly*, predating the English Declaration of Rights, had construed a seemingly restrictive medieval statute as only punishing "people who go armed to terrify the king's subjects," not all who go armed. *Sir John Knight's Case*, 87 Eng. Rep. 75, 76, 3 Mod. Rep. 117 (K.B. 1686). The court recognized that "now there be a general connivance to gentlemen to ride armed for their security," such that violating the statute required riding "malo animo." *Id*., 90 Eng. Rep. 330, 330, Comberbach Rep. 38.

[355] 1833 WL 1227, at *1.

allowing both the keeping of private arms and the bearing of them for private purposes.

## 2. Cases From 1840 to the Civil War

The leading case from the antebellum period on the right to bear arms, and the first major decision, was *State v. Reid* in 1840. The Supreme Court of Alabama unanimously upheld the state's new ban on carrying guns or knives secretly, finding no violation of the provision in the state's 1819 constitution that "[e]very citizen has a right to bear arms, in defence of himself and the State."[356] In so doing, the court recognized that the provision's right to "bear arms" was a right of an individual, who could bear them to facilitate his self-defense. The court first looked to the origins of the right in the "provisions in favor of the liberty of the subject" in the English Declaration of Rights. Quoting the right of subjects to have arms for their defense, the court explained: "The evil which was intended to be remedied by the provision quoted, was a denial of the right of Protestants to have arms for their defence, and not an inhibition to wear them secretly."[357]

The court then adopted the state's factual argument that carrying weapons concealed did not facilitate self-defense but rather served the purpose of aggression and breaching the peace. The court elaborated in explaining the limits of the state's power to enact laws regulating "the manner in which arms shall be borne":

> A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional. But a law which is intended merely to promote personal security, and to put down lawless aggression and violence, and to that end inhibits the wearing of certain weapons, in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the constitution.[358]

The court thus rejected *Bliss*'s holding: "[The constitution] authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence."[359] If the need for defense were immediate, "there can be no necessity for concealing the weapon," and if it were not immediate, there were legal processes for securing protection. If

---

[356] 1 Ala. 612, 1840 WL 229, at *2.

[357] 1840 WL 229, at *2.

[358] *Id.* at *3.

[359] *Id.* at *5–6.

a defendant could prove that it was "indispensable to the right of defence" for him to conceal his weapon, the court might construe the statute not to apply, but Mr. Reid had not done so.[360]

Eighteen years later, the same court in *Owen v. State* reaffirmed *Reid* in recognizing the constitutionality of a similar statute (the legislature, perhaps prompted by *Reid*, had added an exception for those threatened with or reasonably fearing attack). In so doing, the court made explicit what had been implicit in *Reid*—that "carries" in the statute "was used as the synonym of 'bears.'"[361]

Soon after *Reid*, the Supreme Court of Georgia, in *Nunn v. State*, relied on *Reid*, as well as *Bliss*, in unanimously reversing a conviction for *openly* carrying a pistol. The court applied the Second Amendment, holding "that so far as the act . . . seeks to suppress the practice of carrying certain weapons *secretly*, . . . it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*."[362] As had *Reid*, *Nunn* looked for guidance to the right to have and use arms in England. The court viewed that right, the right of the Second Amendment, and the rights protected by the states' constitutions as all securing a personal right of individuals: "When, I would ask, did any legislative body in the Union have the right to deny to its citizens the privilege of keeping and bearing arms in defence of themselves and their country?" Likewise, "the Constitution of the United States, in declaring that the right of the people to keep and bear arms, should not be infringed, only reiterated a truth announced a century before, in the act of 1689."[363] This "right of the people" was just as "comprehensive" and "valuable" as those in the First, Fourth, Fifth, and Sixth Amendments.[364]

Like Rawle and Story, the *Nunn* court recognized the harmony between the Second Amendment's individual right and its preface: "[O]ur Constitution assigns as a reason why this right shall not be interfered with or in any manner abridged, that the free enjoyment of it will prepare and qualify *a well-regulated militia*, which are necessary to the security of a free State." More broadly:

> The right of the whole people, old and young, men, women and
> boys, and not militia only, to keep and bear arms of every descrip-

---

[360] *Id*. at *6–7; *see id*. at *1.

[361] 31 Ala. 387, 1858 WL 340, at *1, *2.

[362] 1 Ga. (1 Kelly) 243, 1846 WL 1167, at *11. Georgia's constitution did not expressly protect the right to arms. The court alluded to *Barron v. Mayor & City Council of Baltimore*, 32 U.S. (7 Pet.) 243 (1833), which held that the Takings Clause of the Fifth Amendment did not apply to the states and reasoned that none of the Bill of Rights did, but rejected it because of the court's own precedent, the Second Amendment's broad, non-restrictive language, and the fundamental importance of the right. 1846 WL 1167, at *9–10.

[363] *Id*. at *8.

[364] *Id*. at *10.

tion, and not such merely as are used by the militia, shall not be in-fringed, curtailed, or broken in upon, in the smallest degree; and all this for the important end to be attained: the rearing up and qualify-ing a well-regulated militia, so vitally necessary to the security of a free State.[365]

The preface's reference to the militia as "necessary to the security of a free State" reinforced this understanding and helped convince the court that the Amendment also restricted the states: "If a well-regulated militia is *necessary* to the *security* of the State of Georgia and of the United States, is it competent for the General Assembly to take away this security, by disarming the people?" The right lay "at the bottom of every free government," state or federal.[366] As had Rawle, the court in *Nunn*, by concluding that the Amendment *restricted* the powers of the states, confirmed its view that the Amendment did not protect the powers of the states but rather protected the rights of their individual citizens.

Fifteen years later, the same court reported that *Nunn* had "been constantly adhered to," and unanimously applied it to reverse a jury instruction that, for a weapon to be carried openly, it had to be *entirely* uncovered. Because such carrying was "impossible," such an interpretation "would . . . prohibit the bearing of those arms altogether."[367]

The Louisiana Supreme Court took the same view of the Second Amendment as an individual right in a series of cases in the 1850s. In *State v. Chandler*, a murder defendant had sought an instruction that carrying weapons "either concealed or openly" could not be a crime consistent with the Constitution. The court affirmed the denial of the instruction. Like *Reid* and *Nunn*, the court saw no factual link between carrying weapons concealed and self-defense. But, also like them, it viewed open carrying of arms differently: "This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country."[368] Six years later, the court upheld a conviction for carrying a concealed weapon, finding no Second Amendment violation because "[t]he arms there spoken of are such as are borne by a people in war, or at least carried openly."[369] And two years after

---

[365] *Id.*

[366] *Id.* at *10, *9.

[367] *Stockdale v. State*, 32 Ga. 225, 1861 WL 1336, at *3. The Texas Supreme Court before the Civil War appears also to have viewed the Second Amendment as applying to the states and including an individual right to own arms and use them for self-defense and perhaps hunting. *See Choate v. Redding*, 18 Tex. 579, 1857 WL 5009, at *2; *Cockrum v. State*, 24 Tex. 394, 1859 WL 6446, at *6–8. In the latter case, in which the court rejected a constitutional challenge to a sentencing enhancement for homicide with a bowie knife, the court did not cite any authority, but the defendant had cited *Nunn, Reid, Bliss,* and *Mitchell*. 1859 WL 6446, at *3.

[368] 5 La. Ann. 489, 1850 WL 3838, at *1; *see id.* at *2 (discussing self-defense).

[369] *State v. Smith*, 11 La. Ann. 633, 1856 WL 4793, at *1.

that, the same court cited these decisions in upholding another such conviction, again treating the right as belonging to individuals and understanding "carry" to be synonymous with "bear": "The statute in question . . . . is a measure of police prohibiting only *a particular mode* of bearing arms which is found dangerous to the peace of society."[370]

Two other state court cases of this later antebellum period merit special mention. The first and more significant is *Aymette v. State*,[371] the second, *State v. Buzzard*.[372] In both, the court's holding was unremarkable—that bans on carrying weapons concealed were constitutional. But the courts' rationales were novel. While still recognizing a right to keep and to bear arms that belonged to individuals, these decisions sharply restricted the purposes for which arms could be borne. Unlike *Reid* and *Nunn*, neither case was cited until several years after the Civil War (and then usually just for their holdings), but *Aymette* acquired some prominence thereafter, and *Buzzard* is notable for one judge's separate opinion somewhat foreshadowing the collective and quasi-collective right views.

In *Aymette*, the Tennessee Supreme Court applied that state's 1834 Constitution, which provided "that the free white men of this State have a right to keep and bear arms for their common defence." (The only difference from the provision discussed in *Simpson* was the change of "freemen" to "free white men."[373]) In upholding the defendant's conviction for carrying a concealed bowie knife, the court limited the state right to "bear arms" to actions done "by the people in a body for their common defense."[374] Some have relied on *Aymette*'s reasoning in arguing against the individual right view of the Second Amendment. The Ninth Circuit in *Silveira*, for example, overlooking all of the antebellum cases discussed above, described *Aymette* as "the most significant judicial decision to construe the term 'bear arms'" and as concluding that the phrase "referred to the performance of a military function."[375] *Silveira* particularly relied on *Aymette*'s statement that "'[a] man in pursuit of deer, elk and buffaloes might carry his rifle every day for forty years, and yet it would never be said of him that he had borne arms.'"[376] Fairly read, however, *Aymette* does not contravene an individual right view of the Second Amendment.

First, even assuming for the sake of argument that *Aymette* read the Tennessee Constitution not to secure any individual right to bear arms, the decision has two

---

[370] *State v. Jumel*, 13 La. Ann. 399, 1858 WL 5151, at *1.

[371] 21 Tenn. (2 Hum.) 154, 1840 WL 1554.

[372] 4 Ark. (4 Pike) 18, 1842 WL 331.

[373] That change may have been prompted by Nat Turner's 1831 slave rebellion, which created fears of free blacks arming and inciting slaves. *See* Cottrol & Diamond, *supra* note 33, 80 Geo. L.J. at 337–38.

[374] 1840 WL 1554, at *3.

[375] 312 F.3d at 1073.

[376] *Id*. (quoting *Aymette*, 1840 WL 1554, at *5).

distinctive features that undermine its relevance to the Second Amendment. *Aymette*'s analysis rested heavily on the phrase "for their common defence" in the Tennessee provision, which is absent from the Second Amendment. The phrase pervades the court's brief analysis. The court defined "common" and even described the right to arms in the English Bill of Rights as if it included the word.[377] The court also relied on a conscientious objector clause that appeared elsewhere in the state constitution, citing it at the end of its opinion, in criticizing *Bliss*, to make "the case still more clear."[378] Yet no conscientious objector clause appears in the Second Amendment or even the Constitution.[379]

Second, and more importantly, *Aymette* does not reject an individual right either to keep or to bear arms, even though it may exclude individual self-defense from the meaning of "bear." The court was unequivocal on "keep": "The citizens have the unqualified right to keep the weapon," so long as it is a protected "arm."[380] It did describe "bear" as limited to "military use,"[381] but by that appears still to have contemplated a right that belonged to individuals rather than to the state or those engaged in its service.[382] The court did not mention the militia. Rather, the "military" bearing that it appears to have had in mind was the people, in an extreme case of governmental tyranny, independently bearing arms as a body to check the government. The court confined "bear" to the most radical of emergencies. Thus, it provided the following account of the English Revolution of 1688–1689:

---

[377] 1840 WL 1554, at *3; *see id*. at *2. As noted above in Part III.B.2, in discussing the Massachusetts Declaration of Rights, the phrase "common defense" is not necessarily inconsistent with a right to bear arms for private purposes.

[378] *Id.* at *5. Thus the Ninth Circuit was incorrect in contending that *Aymette* "reached its conclusion primarily because of" the conscientious objector provision, rather than the "common defense" language. *Silveira*, 312 F.3d at 1073. Furthermore, *Aymette*'s reliance on the conscientious objector provision was not persuasive, as our discussions of the Pennsylvania and Vermont declarations of rights (Part III.B.2) and proposals emerging from the Pennsylvania, Virginia, and North Carolina ratifying conventions (Part III.C.1) showed. *See also* Part II.B.2 (discussing meaning of "bear arms"). It was common in a single document to refer separately both to the right of individuals to "bear arms" and to exemption of individuals from the duty to "bear" them in the service of the government. In addition, the court's assertion that a hunter could never be said to "bear" arms, quoted above, is open to doubt, given the proposed Virginia law discussed in Part II.B.2 and the Pennsylvania Minority Report (*see* Parts II.B.2 and III.C.1), and, in any event, says nothing about persons "bearing" arms in self-defense. The court did not cite the decision of its southern neighbor in *Reid*, which appears to have been decided about six months before; it treated its previous discussion of the right in *Simpson* as dicta, 1840 WL 1554, at *5–6.

[379] See Part III.C.2 above (discussing conscientious objector clause in draft of Second Amendment).

[380] 1840 WL 1554, at *4. As we noted in the introduction of Part II.B, the Ninth Circuit, in reaffirming its collective right view, did not attempt to reconcile the right to "keep" arms with its view.

[381] *Id*. at *3, *5.

[382] *See id*. at *4 ("the citizens may bear [arms] for the common defence," but "the Legislature may prohibit such manner of wearing as would never be resorted to by persons engaged in the common defence") (emphasis added).

> [I]f the people had retained their arms, they would have been able, by a just and proper resistance to those oppressive measures, either to have caused the king to respect their rights, or surrender (as he was eventually compelled to do) the government into other hands. No private defence was contemplated, or would have availed anything. . . . [The right in the English Declaration means] that they may as a body rise up to defend their just rights, and compel their rulers to respect the laws. . . . The complaint was against the government. The grievances to which they were thus forced to submit were for the most part of a public character, and could have been redressed only by the people rising up for their common defence, to vindicate their rights.[383]

The court also wrote that the people "may keep arms to protect the public liberty, to keep in awe those in power, and to maintain the supremacy of the laws and the constitution." Citizens need to be prepared "to repel any encroachments upon their rights by those in authority," and the right "is a great political right. It respects the citizens, on the one hand, and the rulers on the other."[384]

Subsequent treatment by the same court confirms that *Aymette*, despite its narrow reading of "bear," still recognized an individual right. In *Andrews v. State*, a prominent case after the Civil War, the Tennessee Supreme Court interpreted the right of the "citizens of this State . . . to keep and bear arms for their common defense" under the state's 1870 constitution. It was not until after *Andrews* that *Aymette*, previously uncited, acquired any prominence.[385] The new constitution had added an exception granting to "the Legislature . . . power by law, to regulate the wearing of arms, with a view to prevent crime," which had been prompted by an

---

[383] *Id*. at *2.

[384] *Id*. at *3–4. Furthermore, even if one might read the court's rejection of an individual right to bear arms in "private defence" as foreclosing *any* individual right to bear arms, two aspects of the court's reasoning (in addition to its analysis of "bear") leave it open to question. First, the court's account of the English right, *see id*. at *2, was contrary to the text of the English Bill of Rights and Blackstone's exposition of an individual right to arms for self-defense, and failed to recognize that the individual English right was transplanted to America free of England's aristocratic restrictions, as Tucker, Rawle, Story, and others had recognized and praised. Second, faced with the defendant's provocatively absolute claim regarding the scope of the right, *see id*. at *1, the court responded with dichotomies between bearing arms by the body of the people for the common defense and "bearing" arms for hypothetical criminal purposes, such as terrifying people. In thus defining the question, the court defined away the well-established third possibility—bearing arms in legitimate self-defense—and overlooked background law prohibiting bearing weapons for the hypothesized purposes. *Compare id*. at *3–4, *with Simpson*, 1833 WL 1227, at *1; *State v. Huntly*, 25 N.C. (3 Ired.) 418, 1843 WL 891; 4 William Blackstone, *Commentaries* *145–47; *Reid*, 1840 WL 229, at *3, *5–6.

[385] *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 1871 WL 3579, at *6. *Andrews* was the first case in any jurisdiction to cite *Aymette* regarding the right to bear arms.

enduring dispute between partisans of *Aymette* and *Simpson*.[386] The statute at issue prohibited *any* public or private carrying of "a dirk, swordcane, Spanish stiletto, belt or pocket pistol or revolver."[387] Notwithstanding the added constitutional clause and the arguable implications of *Aymette*, the court held it unconstitutional as applied to certain revolvers.[388]

In reaching this holding, the court went far to assimilate *Aymette* to the reasoning of *Reid* and *Nunn*, even while technically retaining *Aymette*'s view of "bear."[389] It did so in three ways. First, it expressly reaffirmed that at least the right to "keep" belonged to individuals: The "right to bear arms for the common defense . . . may well be held to be a political right, or for protection and maintenance of such rights, intended to be guaranteed; but the right to keep them, with all that is implied fairly as an incident to this right, is a *private individual right, guaranteed to the citizen, not the soldier*."[390] The court added, relying on Story, that it is "to be exercised and enjoyed by the citizen as such, and not by him as a soldier, or in defense solely of his political rights."[391]

Second, *Andrews* read "keep" expansively to include broad "incidental use," emphasizing that the goal of the right was to ensure that "the citizens making up the yeomanry of the land, the body of the militia," would be prepared when needed. Thus:

> The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair. And clearly for this purpose, a man would have the right to carry them to and from his home, and no one could claim that the Legislature had the right to punish him for it, without violating this clause of the Constitution.

> But farther than this, it must be held, that the right to keep arms involves, necessarily, the right to use such arms for all the ordinary

---

[386] *See id.* at *8 ("The Convention of 1870, knowing that there had been differences of opinion on this question, have conferred on the Legislature in this added clause, the right to regulate the wearing of arms, with a view to prevent crime"); *id.* at *13 ("Ever since the opinions were promulgated, it has been my deliberate conviction that the exposition of the Constitution . . . in *Simpson* . . . was much more correct than that . . . in *Aymette* . . . .") (Nelson, J., joined by Turley, J., dissenting in part).

[387] *Id.* at *3.

[388] *Id.* at *11.

[389] *Id.* at *10 (finding "much of interesting and able discussion of these questions" in *Bliss*, *Reid*, and *Nunn*; explaining that in *Reid* and *Nunn* "the general line of argument found in this opinion is maintained" and that the court had been "aided . . . greatly by the reasoning of these enlightened courts"); *id.* (describing *Aymette* as "hold[ing] the same *general* views" as the *Andrews* court) (emphasis added).

[390] *Id.* at *8 (emphasis added).

[391] *Id.* at *9.

> purposes, and in all the ordinary modes usual in the country, and to which arms are adapted, limited by the duties of a good citizen in times of peace . . . .

Because citizens needed to be able to "become familiar with" the use of arms "in times of peace, that they may the more efficiently use them in times of war, . . . the right to keep arms for this purpose involves the right to practice their use."[392] Use for "ordinary purposes" included a man taking his gun "from his room into the street to shoot a rabid dog that threatened his child"[393] and using them on one's property in lawful self-defense.[394] Such reasoning is in large measure the same as that taken by the traditional individual right view in explaining the relation between the Second Amendment's preface and operative text.

Third, consistently with its reading of "keep," the court also broadened "arms." *Aymette* had defined the word to include only such arms "as are usually employed in civilized warfare, and that constitute the ordinary military equipment."[395] *Andrews* explained it as follows: "[T]he idea of the Constitution is, the keeping and use of such arms as are useful either in warfare, or in preparing the citizen for their use in warfare, by training him as a citizen, to their use in times of peace."[396] The court took judicial notice "that the rifle of all descriptions, the shot gun, the musket, and repeater, are such arms."[397]

Thus, setting aside any distinctions based on the specific language of Tennessee's Constitution, the consequence of *Aymette*, taken together with *Andrews*, is that "bear arms" was defined more narrowly in those cases, and "keep arms" more broadly, than was usual. The net result seems to be not far from the traditional individual right view held at the Founding and reflected in the great weight of early authority.

The divided 1842 decision of the Arkansas Supreme Court in *Buzzard* did not, even after the Civil War, ever acquire the prominence of *Aymette*, and when cited

---

[392] *Id*. at *6–7.

[393] *Id*. at *11.

[394] *Id*. at *13.

[395] 1840 WL 1554, at *3.

[396] 1871 WL 3579, at *9. The court elsewhere defined "arms" as those furthering the end of "the efficiency of the citizen as a soldier," *id*. at *7, and as including not only weapons "adapted to the usual equipment of the soldier" but also those "the use of which may render him more efficient as such," *id*. at *11. The term had to be "taken in connection with the fact that the citizen is to keep them as a citizen" and therefore included such "as are found to make up the usual arms of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State." *Id*. at *7.

[397] *Id*. at *7; *id*. at *11. Two judges dissented in part, criticizing *Aymette* and taking a broader view than the majority based on *Simpson*, *Bliss*, Blackstone, and Tucker. *Id*. at *13–15 (Nelson, J., joined by Turney, J., dissenting in part). They argued that "for their common defense" was equivalent to "in defense of themselves and the State." *Id*. at *13–14. Similarly, "[t]he word 'bear' was not used alone in the military sense of carrying arms, but in the popular sense of wearing them in war or in peace." *Id*.

it was simply for its limited, uncontroversial holding, upholding a ban on carrying weapons concealed.[398] Nevertheless, coming four years before *Nunn*, it appears to have been the first judicial holding involving the Second Amendment, and one judge's concurring opinion was the first appearance of something suggesting a collective right or quasi-collective right view.

The reasoning of the leading opinion for the 2-1 court was similar to that of *Aymette*. The court addressed both the Second Amendment and the 1836 Arkansas Constitution, which, like Tennessee's, provided that "the free white men of this State shall have a right to keep and bear arms for their common defense."[399] Despite the textual differences between these two provisions (in particular the Arkansas provision's "for their common defense" language), the court treated them as the same.[400] Much like *Aymette*, albeit without distinguishing between "keep" and "bear," the court apparently recognized a right of individuals but gave it a limited scope.[401] The Arkansas court's post-war decisions confirmed that the right secured by the Arkansas Constitution belonged to individuals and included the right to bear arms for at least some private purposes.[402]

---

[398] *E.g.*, *Fife v. State*, 31 Ark. 455, 1876 WL 1562, at *3 (summarizing holding and then relying on *Aymette* and *Andrews*); *State v. Wilforth*, 74 Mo. 528, 1881 WL 10279, at *1 (including *Buzzard* in string citation with *Nunn*, *Jumel*, *Mitchell*, *Owen*, and *Reid*, and relying on *Reid*). *Buzzard* was first cited in 1872. *See State v. English*, 35 Tex. 473, 1872 WL 7422; *Carroll v. State*, 28 Ark. 99, 1872 WL 1104.

[399] *Buzzard*, 4 Ark. 18, 1842 WL 331, at *6.

[400] *See id.* (equating the two, and adopting a single rule for evaluating restrictions).

[401] *See id.* at *4 (explaining that "the militia, without arms . . . might be unable to resist, successfully, the effort of those who should conspire to overthrow the established institutions of the country, or subjugate their common liberties" and that "the people designed and expected to accomplish this object by the adoption of the article under consideration, which would forever invest them with a legal right to keep and bear arms for that purpose"); *id.* at *6 ("The act in question does not . . . detract anything from the power of the people to defend their free state and the established institutions of the country."); *see also id.* at *2 (expressly equating Second Amendment right with rights in First); *id.* at *7 (noting that *Reid* and *Mitchell* had upheld similar laws notwithstanding constitutional provisions expressly protecting bearing arms in self-defense). As in *Aymette*, the court was faced with an absolute claim that the right was subject to no restrictions, and responded similarly. *See id.* at *3, *5.

[402] *See Carroll*, 1872 WL 1104, at *2 (upholding conviction for carrying deadly weapon concealed and explaining *Buzzard* as holding that "a constitutional *right to bear arms in defense of person and property* does not prohibit the legislature from making such police regulations as may be necessary for the good of society, as to the manner in which such arms shall be borne"; adding that a "citizen" may not "use his own property or *bear his own arms* in such way as to injure the property or endanger the life of his fellow citizen") (emphases added); *Fife*, 1876 WL 1562, at *3, *4 (restating *Buzzard*'s holding, and upholding conviction for carrying pistol by construing statute only to apply to pistol that "is usually carried in the pocket, or of a size to be concealed about the person, and used in private quarrels, and brawls, and not such as is in ordinary use, and effective as a weapon of war, and useful and necessary for 'the common defence'"); *Wilson v. State*, 33 Ark. 557, 1878 WL 1301, at *2 (reversing conviction for carrying side arms, where trial court had refused jury instruction to acquit if pistol was "army size . . . such as are commonly used in warfare"; citing *Fife* and *Andrews* and explaining that "*to prohibit the citizen from wearing or carrying a war arm*, except upon his own premises or when on a journey . . . , or when acting as or in aid of an officer, *is an unwarranted restriction upon his constitutional right to keep and bear arms*") (emphases added).

The concurring opinion cited no history or authority and, as far as we are aware, no court or even judge has ever cited it in interpreting a right to bear arms, whether secured by the Second Amendment or by any of the analogous provisions in state constitutions.[403] It did not present what would now be considered a standard collective right or quasi-collective right view. Whereas those views address the limits of federal power to interfere with state law, Judge Dickinson addressed the case from the opposite vantage point, stating the question as whether the state's ban on carrying weapons concealed "interfere[s] with any regulations made by Congress, as to the organizing, arming, or disciplining the militia, or in the manner in which that militia are either to keep or bear their arms."[404] In modern terminology, the judge seemed to recast the case as turning on possible federal preemption of the state law. The Second Amendment, in setting out what he described as "the power given the militia to keep and bear arms," merely rephrased the express federal powers in Article I, Section 8, Clause 16 of the Constitution, the Amendment being "but an assertion of that general right of sovereignty belonging to independent nations to regulate their military force."[405] The Amendment thus did not add any protection of *state* powers. That protection was implicit in Clause 16: "[T]he States *retain the power* to legislate in relation to arms and the mode of carrying and keeping them, provided its exercise is not repugnant to the previous grant to the Federal Government. . . . Could Congress authorize any and every person by express law, to carry deadly weapons concealed about his person, when not composing one of the militia, and not a part of the regulations ordained for their government?"[406]

The dissenting opinion employed the general rule for interpreting prefaces (discussed above in Part II.C.1), and the same reasoning as Rawle, Story, and *Nunn*, to explain the relation of the Amendment's preface to the right:

> Now, I take the expressions 'a well regulated militia being necessary for the security of a free State,' and the terms 'common defense,' to be the reasons assigned for the granting of the right, and not a restriction or limitation upon the right itself . . . . [W]hen was it contended before that the reason given for the establishment of a right or

---

[403] 1842 WL 331, at *7 (Dickinson, J., concurring). *See also* Kopel, *supra* note 342, 1998 BYU L. Rev. at 1425 ("The *Buzzard* concurrence's assertion that the right to arms was not individual vanished from American case law for the rest of the nineteenth century.").

[404] 1842 WL 331, at *7 (Dickinson, J.); *see id*. at *10 ("The act . . . does not, in my opinion, conflict with any of the powers of the General Government.").

[405] *Id*. at *7, *9. It is unclear what significance he gave to the state constitution's provision. *See id*. at *9.

[406] *Id*. at *8.

its uninterrupted enjoyment not only limited the right itself, but restrained it to a single specific object?[407]

Judge Lacy also pointed to the Second Amendment's reference to a "free State": "To suppose that liberty cannot be in danger, except from a foreign foe or internal disorder, is virtually to deny the importance and necessity of written constitutions. . . . I cannot separate the political freedom of the State from the personal rights of its citizens."[408] He singled out the concurring opinion for granting the right to "the militia alone," and only at "the discretion of the Legislature"—a right "valueless and not worth preserving; for the State unquestionably possesses the power, without the grant, to arm the militia and direct how they shall be employed in cases of invasion or domestic insurrection. . . . [W]hy give that which is no right in itself and guarantees a privilege that is useless?"[409] Finally, the dissent explained the right much as Blackstone had, tying it to self-defense and pointing out that it was no more unlimited than the freedoms of speech and press.[410]

In sum, the activity of courts closest to the Founding tends to reinforce what the text and history establish—that the right secured by the Second Amendment belongs to individuals. No court questioned the private right to keep arms, and most recognized the traditional individual right to bear them. Two of the three state supreme courts to apply the Second Amendment (Georgia and Louisiana) repeatedly recognized a private right to bear arms for self-defense. The two cases taking the narrowest view of the right (both in states whose constitutions had "common defense" clauses in their right) were ignored, and even they recognized some manner of individual right. Only in an opinion of a single judge, which was and has continued to be ignored, did something like a quasi-collective or collective right understanding appear, but even that opinion did not view the Second Amendment as securing any right of states or of state (as opposed to federal) militias. On balance, then, the cases before the Civil War, like the first commentators, confirm that the text and history of the Second Amendment support the individual right view, not the collective right or quasi-collective right views.

## C. Reconstruction

As the Civil War ended in 1865, southern governments enacted "black codes," which, among other things, either directly prohibited the newly freed slaves from keeping and bearing arms or imposed stringent permit systems. In addition, armed white mobs, sometimes including the militias, frequently disarmed the freed

---

[407] *Id*. at *10 (Lacy, J., dissenting).

[408] *Id*. at *14. *See also id*. (arguing that the right has at times "been the only means by which public liberty or the security of free States has been vindicated and maintained").

[409] *Id*. at *10.

[410] *Id*. at *12–14.

blacks.[411] Such practices, coupled with blacks' lack of citizenship, prompted the Thirty-Ninth Congress to take several actions securing the rights of the newly freed slaves and reaffirming the understanding that the right to keep and bear arms was a personal right.

The first action was enactment of the Civil Rights Act of 1866. One goal of many who sought its passage, noted by them and lamented by their opponents, appears to have been to secure to freedmen the Second Amendment's right to keep and bear arms. Both representatives and senators highlighted disarmament of blacks and argued that the Act, by making blacks citizens, would secure to them that right. Senator Trumbull, Chairman of the Judiciary Committee and a sponsor of the Act, explained that it would counteract those portions of the black codes that "prohibit any negro or mulatto from having fire-arms."[412] In the House, Representative Clarke quoted the Second Amendment and declared, "I shall insist that the reconstructed rebels of Mississippi respect the Constitution in their local laws"; he also decried that newly formed southern governments had been "allowed to rob and disarm our [black] veteran soldiers." Representative Raymond argued, in favor of the Act, that making blacks citizens would give to them "every right which you or I have," including "a right to bear arms."[413]

The second congressional action was passage of the Fourteenth Amendment in June 1866. Senator Pomeroy, in addressing an early draft, listed as among the "safeguards of liberty . . . under our Constitution" the right of "the freedman" to "bear arms for the defense of himself and family and his homestead," even suggesting that Congress's power to enforce the Thirteenth Amendment's ban on slavery might justify it in protecting this right in the South.[414] One of the Fourteenth Amendment's sponsors, in listing the rights of citizenship that its Privileges or Immunities Clause would extend to blacks, pointed to "the personal rights guaranteed and secured by the first eight amendments of the Constitution; such as the freedom of speech and of the press; . . . [and] the right to keep and to bear

---

[411] *See, e.g.*, Laws of Miss. ch. 23, § 1, at 165 (enacted Nov. 29, 1865), *reprinted in* Stephen P. Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866–1876*, at 2 (1998). *See generally* Halbrook, *Freedmen* at 2–3, 5, 8–12, 15–16, 18–20, 22–23, 26–32, 34–37 (collecting reports of army and Freedmen's Bureau officers to President and Congress, petitions to Congress, and other public materials documenting attempts in former Confederacy in 1865 and 1866 to disarm blacks, including through legislation and by militias).

[412] Cong. Globe, 39th Cong., 1st Sess. 474 (1866). *See also id*. at 478 (Sen. Saulsbury, lamenting this effect of the Act). Regarding Trumbull, see Raoul Berger, *Government by Judiciary: The Transformation of the Fourteenth Amendment* 32 (2d ed. 1997).

[413] Cong. Globe at 1838–39 (Rep. Clarke); *id*. at 1266 (Rep. Raymond). *See also id*. at 1629 (Rep. Hart, explaining that Act would guarantee to free blacks "[a] government . . . where 'no law shall be made prohibiting the free exercise of religion'; where 'the right of the people to keep and bear arms shall not be infringed'").

[414] *Id*. at 1182.

arms."[415] The *New York Times* and other leading newspapers reprinted these comments, including the reference to the Second Amendment, and praised them.[416]

This history indicates that it was widely recognized that the right to keep and bear arms was to be protected by the Civil Rights Act and the Fourteenth Amendment, and that that right was understood to belong to individuals. For example, Raoul Berger, even while arguing against the view that the Fourteenth Amendment "incorporated" the Bill of Rights to apply to the states, explains that "all are agreed" that the Fourteenth Amendment aimed at least "to embody and protect" the Civil Rights Act of 1866; he contends that the Act, in turn, "intended to confer on the freedmen the auxiliary rights that would protect their 'life, liberty, and property'—no more." He quotes Blackstone's listing of these three principal rights and demonstrates Blackstone's prominence in the debates and in the denunciations of the black codes.[417] As explained above in Part III.A, Blackstone described five "auxiliary rights," and the right of individuals to have and use arms for their defense was one of them. Given the language of Section 1 of the Civil Rights Act, it may be that states simply could not discriminate against blacks in the right to keep and bear arms, not that the Second Amendment applied per se, but the point remains that there was a consensus that the right in question belonged to individuals and was a right *against* the state.[418]

Were there any remaining doubt on this question, Congress eliminated it a month after approving the Fourteenth Amendment, when it renewed the Freedmen's Bureau over President Andrew Johnson's veto. The act provided that wherever the courts were not open, or in any state that had not been restored to the Union, various rights, largely paralleling those in the Civil Rights Act, should "be secured to and enjoyed by all the citizens . . . without respect to race or color, or previous condition of slavery." Among these were "the right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and the acquisition, enjoyment, and disposition of estate, real and personal, *including the constitutional right to bear arms*."[419] Congress thus not

---

[415] *Id*. at 2765 (Sen. Howard).

[416] *See* Halbrook, *Freedmen*, *supra* note 411, at 36 (collecting excerpts).

[417] Berger, *Government by Judiciary*, *supra* note 412, at 30, 30–39, 53–54. Berger does not specifically mention the right to keep and bear arms. *See, e.g.*, *id*. at 166–69 (addressing Sen. Howard's statement but omitting his listing of rights).

[418] Section 1 of the Civil Rights Act declares all those born in the United States to be citizens, grants "the same right, in every State and Territory in the United States . . . as is enjoyed by white citizens" with regard to certain enumerated aspects of property, contracting, and lawsuits, and guarantees "full and equal benefit of all laws and proceedings for the security of person and property." 14 Stat. 27, 27 (1866). In light of Blackstone's understanding and the context of the black codes, any laws regarding the ability to keep or bear arms would presumably be "laws . . . for the security of person and property" and therefore would need to be equal for all citizens regardless of color.

[419] Act of July 16, 1866, § 14, 14 Stat. 173, 176 (emphasis added). The President's reasons for his veto did not involve any disagreement with Congress regarding this right. *See* Veto Message (July 16, 1866), *reprinted in* 8 *Messages and Papers*, *supra* note 276, at 3620.

only enacted the understanding that the Second Amendment protected an individual right, including the right to "bear" arms, but also did so in a way that rested on Blackstone's exposition of the individual right to arms as a critical auxiliary to the three primary individual rights of life, liberty, and property.

Congress took the same view early in the following year, demonstrating not only its understanding that the right belonged to individuals but also the limited, indirect way in which it protected the states' militias. Responding to the southern militias' depredations against the freed blacks, Congress included in a bill, which the President signed, a provision "[t]hat all militia forces now organized or in service" in the states of the former Confederacy "be forthwith disbanded, and that the further organization, arming, or calling into service of the said militia forces, or any part thereof, is hereby prohibited."[420] Significantly, the bill's sponsor had agreed to strike "disarmed" after "disbanded," in the face of opposition from several (northern) senators that to disarm the citizens from whom the militia was drawn, rather than merely disbanding the militias, would violate the Second Amendment.[421] Congress's actions both in disbanding the southern states' militias and in not disarming their citizens show that it understood the Second Amendment right to protect individuals, not states or their militias.[422] Thus, from the Founding through the Civil War, the overwhelming understanding of the right of the people to keep and bear arms was that it was a right that belonged to individuals.

### D. Beyond Reconstruction

As already suggested by our discussions above of *Andrews* and cases citing *Buzzard*, the understanding of the right to keep and bear arms as an individual right continued beyond the Civil War and Reconstruction. Although we do not provide an exhaustive survey of the post-war period, we find it significant that the modern alternative views of the right did not take hold until the twentieth century, well over a century after the Second Amendment was ratified. Before that, the

---

[420] Act of Mar. 2, 1867, § 6, 14 Stat. 485, 487. The President did inform the House that he was signing under "protest" because this provision, and another to which he objected, were included in an essential appropriation bill. *See* Letter to the House of Representatives (Mar. 2, 1867), *reprinted in* 8 *Messages and Papers*, *supra* note 276, at 3670. Regarding the militia provision, he objected that it "denies to ten States of this Union their constitutional right to protect themselves in any emergency by means of their own militia." It may be that in his constitutional objection he had in mind Article I, Section 10's implicit recognition of the prerogative of states to defend themselves with their militias in cases of invasion or imminent danger. See Part II.D.2 above (discussing ways in which original Constitution recognizes that states will have and be able to use militias).

[421] The Senate debate is summarized from the Congressional Globe in Halbrook, *Freedmen*, *supra* note 411, at 68–69.

[422] *See id.* at 69 ("Astonishingly, while still waving the bloody shirt and depriving Southerners of suffrage, Republicans were unwilling to deny the right to have arms to ex-Confederates."); Nelson Lund, Book Review, *Outsider Voices on Guns and the Constitution*, 17 Const. Comm. 701, 713 (2000) (reviewing Halbrook) ("This incident perfectly illustrates why the Second Amendment had been adopted in the first place.").

views of the leading constitutional law scholar of the period, Thomas Cooley, were in accord with his predecessors Tucker, Rawle, and Story, in recognizing an individual right. And the Supreme Court, although making no holding regarding the substance of the Amendment, suggested in dicta that it protected an individual right.

Cooley's *General Principles of Constitutional Law*, first published in 1880, gained a prominence on the level of the works of his predecessors.[423] As had the antebellum commentators, he espoused the individual right view of the Second Amendment. After quoting the Amendment, noting that it was a "modification and enlargement from the English Bill of Rights," and citing Tucker, Cooley added the following:

> *The Right is General.*—It might be supposed from the phraseology of this provision that the right to keep and bear arms was only guaranteed to the militia; but this would be an interpretation not warranted by the intent. . . . [I]f the right were limited to those enrolled [in the militia, a number that the government could constrict], the purpose of this guaranty might be defeated altogether by the action or neglect to act of the government it was meant to hold in check. The meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms, and they need no permission or regulation of law for the purpose. But this enables the government to have a well-regulated militia; for to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use; in other words, it implies the right to meet for voluntary discipline in arms, observing in doing so the laws of public order.[424]

Cooley's rejection of any collective right and quasi-collective right view is consistent with the understanding of the Amendment's prefatory clause that is evident from the Founding and had been reiterated before the Civil War by Rawle, Story, and *Nunn*. Even Cooley's heading echoed Rawle's statement over fifty years earlier: "The prohibition is general."[425] Cooley likewise treated *both* keeping and bearing as private rights of citizens, and recognized that the right has limita-

---

[423] *See supra* note 41; Kates, *supra* note 33, 82 Mich. L. Rev. at 243. Among Cooley's many works was to prepare the fourth edition of Story's unabridged *Commentaries*, published in 1873.

[424] Cooley, *General Principles*, *supra* note 41, at 271. Cooley cited 1 Tucker's Blackstone, *supra* note 60, at 300, which praises the right in the Second Amendment as "the true palladium of liberty" and, paralleling Blackstone, ties it to the natural "right of self defence." See Part IV.A above.

[425] Rawle, *View of the Constitution*, *supra* note 327, at 125, discussed above in Part IV.A.

tions ("the laws of public order"), just as any other individual right does.[426] Conversely, in discussing the Militia Clauses of Article I, Section 8, in a separate part of his treatise, he made no mention of the Second Amendment.[427]

Cooley reiterated this individual right interpretation in his even more celebrated *Treatise on the Constitutional Limitations*, first published in 1868.[428] Among the clauses common in state constitutions, he explained, were "[t]hose declaratory of the fundamental rights of the citizen," among which were freedom of speech and of the press and "that every man may bear arms for the defence of himself and the State."[429] In a later chapter he included the right among the "the constitutional protections to personal liberty": "Among the other defences to personal liberty should be mentioned the right of the people to keep and bear arms." He explained the right's English origins, noted the importance for a "well-regulated militia" of "the people" being "trained to bearing arms," praised the lack of legislation "regulat[ing] this right," and cited *Bliss*, *Nunn*, and a case concerning the right of self-defense.[430] Finally, in elsewhere explaining the scope of a state's concurrent power to organize and discipline the militia, Cooley simply cited *Houston v. Moore*, not mentioning the Second Amendment.[431] Like the Court, he apparently did not see the Amendment as relevant to the scope of the state's power to maintain a militia.

The Supreme Court did not address the substance of the Second Amendment during this period, because of its view that the Bill of Rights, including the Second Amendment, did not apply to the states.[432] In *Robertson v. Baldwin*, however, the Court invoked the history of, and limitations on, the various rights in the Bill of Rights, including the Second Amendment, to illustrate and defend a holding regarding the limitations on the Thirteenth Amendment's ban on slavery:

> The law is perfectly well settled that the first ten amendments to the Constitution, commonly known as the Bill of Rights, were not intend-

---

[426] He added, citing *Andrews* (which had not interpreted the Second Amendment), that the Amendment protected the keeping of arms "suitable for the general defence of the community against invasion or oppression," whereas "the secret carrying of those suited merely to deadly individual encounters may be prohibited." Cooley, *General Principles*, *supra* note 41, at 271–72.

[427] *Id.* at 88–89.

[428] *See* Kopel, *supra* note 342, 1998 BYU L. Rev. at 1462.

[429] Thomas Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 35–36 (1868).

[430] *Id.* at 350; *see id.* at 295 (chapter title). *Miller* cited this section. *See* 307 U.S. at 182 n.3 (citing "Cooley's Constitutional Limitations, Vol. 1, p. 729," likely the 8th edition, published well after Cooley's death).

[431] Cooley, *Constitutional Limitations*, *supra* note 429, at 18.

[432] *See Presser v. Illinois*, 116 U.S. 252, 264–65 (1886); *see also United States v. Cruikshank*, 92 U.S. 542, 553 (1876); *Logan v. United States*, 144 U.S. 263, 286–87 (1892); *Maxwell v. Dow*, 176 U.S. 581, 597 (1900). As noted above in Part I, the federal government did not regulate private firearms until 1934.

ed to lay down any novel principles of government, but simply to em-
body certain guaranties and immunities which we had inherited from
our English ancestors, and which had from time immemorial been sub-
ject to certain well-recognized exceptions arising from the necessities
of the case. In incorporating these principles into the fundamental law
there was no intention of disregarding the exceptions, which continued
to be recognized as if they had been formally expressed. Thus, the
freedom of speech and of the press (art. 1) does not permit the publica-
tion of libels, blasphemous or indecent articles, or other publications
injurious to public morals or private reputation; [and] the right of the
people to keep and bear arms (art. 2) is not infringed by laws prohibit-
ing the carrying of concealed weapons . . . .[433]

The Court added similar illustrations from the Fifth and Sixth Amendments. The
Court thus suggested that the Second Amendment protected an individual right,
both by treating it in parallel with the individual rights in the rest of the Bill of
Rights and by pointing to the right's English origins.

Not until 1905 was a view rejecting the individual right view truly born, and then
in a decision interpreting not the Second Amendment but rather a provision in a state
constitution. In *City of Salina v. Blaksley*, the Kansas Supreme Court held that a
clause in the Kansas Bill of Rights, providing that "'[t]he people have the right to
bear arms for their defence and security,'" referred only "to the people as a collec-
tive body" and dealt "exclusively with the military. Individual rights are not
considered in this section." Rather, the "people shall exercise this right" through the
*power of their legislature*, set out in the body of the state constitution, to organize,
equip, and discipline the militia. The right extended "only to the right to bear arms as
a member of the state militia, or some other military organization provided for by
law."[434] The court seems to have been influenced by a provision in the state constitu-
tion admonishing against standing armies in time of peace, and praising civilian
control of the military, that immediately followed the text of the right.[435] The court
also, without citing historical authority and with little explanation, pointed to the
Second Amendment as analogous and reinforcing its reading.[436] *Salina*'s novelty was

---

[433] 165 U.S. 275, 281–82 (1897).

[434] 83 P. 619, 620 (Kan. 1905).

[435] *See id*. As shown in Parts III.B.2 and III.C.1, however, there was nothing unusual in combining
such declarations with an individual right to arms.

[436] *See Blaksley*, 83 P. at 620. The Fifth Circuit in *Emerson* criticized *Salina*, to the extent that it
was endorsing a quasi-collective right view, as "constru[ing] the constitutional provision as saying no
more than that the citizen has a right to do that which the state orders him to do and thus neither grants
the citizen any right nor in any way restricts the power of the state." It found such a criticism
"especially applicable to the theory that such *state* constitutional provisions grant rights only to the
state," noting that *Salina* did "not appear even to recognize, much less attempt to justify, the anomaly
of construing a constitutional declaration of rights as conferring rights only on the state which had them
anyway." 270 F.3d at 231 n.30 (emphasis added). In the context of the right to keep and bear arms in

not missed. One state supreme court soon after, in a survey reaching back to *Bliss*, *Reid*, *Nunn*, and *Aymette*, described *Salina* as having gone "further than any other case" by holding that the right to bear arms in the Kansas Constitution imposed no limit on the legislature's power to prohibit private individuals from carrying arms.[437]

## V. Conclusion

For the foregoing reasons, we conclude that the Second Amendment secures an individual right to keep and to bear arms. Current case law leaves open and unsettled the question of whose right is secured by the Amendment. Although we do not address the scope of the right, our examination of the original meaning of the Amendment provides extensive reasons to conclude that the Second Amendment secures an individual right, and no persuasive basis for either the collective right or quasi-collective right views. The text of the Amendment's operative clause, setting out a "right of the people to keep and bear Arms," is clear and is reinforced by the Constitution's structure. The Amendment's prefatory clause, properly understood, is fully consistent with this interpretation. The broader history of the Anglo-American right of individuals to have and use arms, from England's Revolution of 1688–1689 to the ratification of the Second Amendment a hundred years later, leads to the same conclusion. Finally, the first hundred years of interpretations of the Amendment, and especially the commentaries and case law in the pre-Civil War period closest to the Amendment's ratification, confirm what the text and history of the Second Amendment require.

STEVEN G. BRADBURY
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

HOWARD C. NIELSON, JR.
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

C. KEVIN MARSHALL
*Acting Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

the federal Constitution, the quasi-collective right view appears to amount to the right of a militiaman, through a private cause of action (or defense), to act as an agent for the interests of the state to vindicate its power to establish and maintain an armed and organized militia such as the National Guard. *See, e.g.*, *United States v. Haney*, 264 F.3d 1161, 1165 (10th Cir. 2001).

[437] *Strickland v. State*, 72 S.E. 260, 262 (Ga. 1911). For additional discussion of *Salina*, see Kopel, *supra* note 342, 1998 BYU L. Rev. at 1510–12.